STATE OF NORTH CAROLINA v. KEVIN SALVADOR GOLPHIN

STATE OF NORTH CAROLINA v. TILMON CHARLES GOLPHIN, JR.

No. 441A98

(Filed 25 August 2000)

### 1. Constitutional Law— right to be present at all stages— out-of-court discussions—special venire

The trial court did not violate defendants' right to be present at all stages of their capital trial when it ruled the jury would be drawn from a special venire from another county, even though defendants were not present during out-of-court meetings relating to change of venue or a special venire, because: (1) the meetings took place prior to commencement of defendants' trial; (2) defendants were present at the hearing on change of venue at which defendants stipulated to a special venire; and (3) both defendants agreed through counsel to the special venire.

### 2. Jury— special venire—another county

Although one defendant argues there was no filed court order changing venue for purposes of jury selection, the trial court did not abuse its discretion in a capital trial by ordering a special venire from another county for the limited purpose of jury selection because: (1) both defendants agreed through their counsel to the proposed change; (2) N.C.G.S. § 15A-957 does not apply since defendants never moved for a change of venue; and (3) N.C.G.S. § 15A-133 was not violated since the trial court had the inherent authority to order the change based on the nature and circumstances of the alleged crimes against two law enforcement officers, and defendants' acquiescence to the stipulation and proposal at the hearing.

### 3. Constitutional Law— right to fair cross-section—jury venire

The trial court did not violate defendants' right to have a jury selected from a representative cross-section of the community in which the crimes occurred, based on defendants' failure to establish a prima facie case of disproportionate representation, because: (1) defendants are not entitled to a special venire from the population of a county which exactly mirrors the population of the county in which the crimes were committed as long as the

venire was selected in a manner in which various interests were represented; (2) there is only a 14.3% absolute disparity in the representation of African-Americans between the county of the crimes and the special venire county, and this percentage standing alone is not unfair and unreasonable; and (3) the fact that the racial composition of the county of the crimes differs from that of the special venire county is not sufficient to show "systematic exclusion."

**4. Homicide— first-degree murder—short-form indictment—sufficiency**

The trial court did not err by denying one defendant's motion to dismiss the murder indictments and by holding the short-form indictments were sufficient to charge both defendants with first-degree murder.

**5. Homicide— first-degree murder—indictment—aggravating circumstances**

The trial court did not err in a capital trial by failing to require the State to disclose in its indictment the aggravating circumstances it intended to rely upon at sentencing, and by denying defendants' pretrial motions for disclosure of aggravating and mitigating circumstances, because: (1) an indictment does not need to set forth facts relevant only to the sentencing of an offender found guilty of the charged crime, since it is not an element of the offense; and (2) a trial court may not require the State to disclose which aggravating circumstances it intends to rely upon at the sentencing phase since N.C.G.S. § 15A-2000(e) provides sufficient notice of the aggravating circumstances.

**6. Criminal Law— joinder—common scheme—same transaction**

The trial court did not abuse its discretion in a capital trial by denying one defendant's pretrial motion to sever the cases and by overruling his objections to improper joinder, because: (1) the presence of antagonistic defenses standing alone does not warrant severance; (2) there was overwhelming evidence from several eyewitnesses concerning defendant's involvement in the crimes; (3) defendant signed a waiver regarding any objections to the redaction and/or admission of the statement of his non-testifying co-defendant, and defendant's attorney stated in open court that there was no objection to the introduction of the codefendant's statement as it relates to defendant; (4) defendant was not precluded from offering exculpatory evidence since he could

have subpoenaed witnesses to testify for him; and (5) the evidence supports consolidation of defendants' trials since the offenses arose out of a common scheme and were part of the same transaction. N.C.G.S. §§ 15A-926(b) and 15A-927(c).

**7. Discovery— victims' personnel files—not discoverable**

The trial court did not err in a capital trial by denying one defendant's pretrial motion for discovery of the two law enforcement victims' personnel files because: (1) defendant did not preserve his constitutional issue since it was not raised and determined by the trial court, N.C. R. App. P. 10(b)(1); and (2) the list of discoverable items in N.C.G.S. § 15A-903(d) does not include victims' personnel files, and the personnel files were not in the possession, custody, or control of the prosecutor in this case.

**8. Constitutional Law— right to counsel—incriminating statements—booking exception**

The trial court did not violate one defendant's rights in a capital trial by denying his pretrial motion to suppress the incriminating statements he made to law enforcement officers after his arrest, based on the police continuing the custodial interrogation of defendant after he invoked his right to counsel, because: (1) a motion in limine was not sufficient to preserve this issue since defendant did not object when it was offered at trial; (2) defendant did not argue plain error in his brief, N.C. R. App. P. 10(c)(4); (3) the questions asked by the police were included in the booking exception for eliciting biographical information; (4) it is unreasonable to conclude the S.B.I. agent should have known his questions concerning biographical information were reasonably likely to elicit an incriminating response; and (5) defendant initiated the further discussion when he asked the agent and detective why they wanted to talk about the incident when it had been videotaped.

**9. Constitutional Law— right to counsel—incriminating statements—no standing**

The trial court did not violate defendant's rights in a capital trial by denying his codefendant's pretrial motion to suppress the incriminating statements the codefendant made to law enforcement officers after his arrest because: (1) defendant has no standing to assert his codefendant's constitutional right to counsel; (2) defendant did not make a motion in limine to suppress his co-

defendant's statement, nor did he object at the time the statement was offered into evidence at trial, N.C. R. App. P. 10(b)(1); and (3) defendant did not argue plain error, N.C. R. App. P. 10(c)(4).

**10. Jury— capital trial—selection—use of panels**

The trial court did not violate its duty to ensure jury selection was conducted in a random manner when it used panels because: (1) defendants failed to object on constitutional grounds, thus waiving review of any constitutional issues; (2) defendants failed to comply with N.C.G.S. § 15A-1211(c) to challenge the panels; (3) even if the trial court violated N.C.G.S. § 15A-1214(a), defendants cannot show prejudicial error in light of the fact that neither defendant objected when the trial court informed both defendants of how the prospective jurors were to be placed into panels; and (4) neither defendants nor the State exhausted their peremptory challenges, evidencing satisfaction with the jury which was empaneled.

**11. Constitutional Law— right to be present at every stage— administrative matters**

The trial court did not violate defendants' right to be present at every stage of their capital trial by directing the clerk of court to meet privately with jurors about transportation and logistical matters because: (1) the right to be present is not violated when a clerk communicates with a jury about administrative matters, and defendants failed to show their presence would have had a reasonably substantial relation to their opportunity to defend; (2) the trial court's failure to give an additional instruction shows there was no concern that the jurors were asking the clerk inappropriate questions; (3) nothing in the record suggests that anything other than logistics were discussed; and (4) the fact that defendants failed to object allows the assumption that the clerk engaged only in the administrative duties assigned.

**12. Jury— challenge for cause—unable to render fair and impartial verdict**

The trial court did not abuse its discretion in a capital trial by excusing for cause a prospective juror based on the theory that she was unable to render a fair and impartial verdict as required by N.C.G.S. § 15A-1212(9) because: (1) the prospective juror became emotional and stated she had substantial doubt about her impartiality after being questioned by one defendant's counsel; (2) one defendant did not request an opportunity to ask addi-

tional questions of the prospective juror as required by N.C. R. App. P. 10(b)(1) in order to preserve this question for appeal; and (3) there was no showing that further questioning by the code-fendant's counsel would have produced different answers.

### 13. Jury— excusal—service on federal jury within two years

The trial court did not violate one defendant's rights by excusing a prospective juror under N.C.G.S. § 9-3 on the basis that she had previously served on a federal jury within two years and was not immediately qualified to serve in the instant case, because: (1) defendant suggested that the trial court excuse her from service and cannot now complain that his constitutional rights have been violated; (2) defendant did not raise any constitutional issue below, and therefore, has failed to preserve this question for appellate review; and (3) the trial court could not have moved the prospective juror to a later panel and then have her sworn in at the time she was called, which would have been two years after her prior jury service, since N.C.G.S. § 9-14 mandates that prospective jurors be sworn in at the beginning of court.

### 14. Jury— peremptory challenges—not racially discriminatory manner

The trial court did not err in a capital trial by allowing the State to exercise peremptory challenges for two African-American prospective jurors because: (1) the articulated reasons that one juror was relatively young and close to the age range of the defendants, and that she had a sibling approximately the age range of defendants, constitutes an articulable race neutral reason; (2) the articulated reasons that the other juror had a criminal record specifically involving an interaction with an officer and the potential empathy that might be engendered, and the fact that the juror's father was incarcerated for six years, are race neutral reasons; (3) the State did accept an African-American juror; and (4) the State made no comments which would support an inference of discrimination.

### 15. Evidence— demonstration—pepper spray

The trial court did not unfairly prejudice one defendant's defense in a capital trial by allowing the State during its presentation of rebuttal evidence to demonstrate the effects of pepper spray because: (1) the demonstration was relevant under N.C.G.S. § 8C-1, Rule 401 since defendant made the effects of

pepper spray an issue in the case, and the probative value was not substantially outweighed by the danger of unfair prejudice under N.C.G.S. § 8C-1, Rule 403; (2) the use of law enforcement officers during the presentation did not prejudice defendant since he was also given an opportunity to present witnesses to be sprayed and then to testify, but decided not to do so; and (3) the trial court allowed both sides to cross-examine each person as to their potential bias.

**16. Appeal and Error— preservation of issues—constitutional issue—failure to raise in a motion or in trial court**

The trial court did not violate one defendant's Confrontation Clause rights in a capital trial by admitting evidence of a police report regarding seizure of that defendant's luggage by the police a week prior to the murders because: (1) defendant did not raise any constitutional issue in his motion in limine requesting a hearing on the admissibility of evidence; and (2) defendant did not preserve his argument since he did not raise this constitutional issue at the trial court.

**17. Evidence— hearsay—police report—not truth of matter asserted—subsequent actions**

The trial court did not err in a capital trial by admitting evidence of a police robbery report regarding seizure of one defendant's luggage by the police a week prior to the murders because: (1) the report was relevant since the statements made to the officer were vital to the identification of defendants as the suspects in the armed robbery; (2) the report does not indicate the Fayetteville police actually discovered drugs in the luggage; and (3) the report was admissible for nonhearsay purposes to help explain the subsequent actions taken by the officer in traveling to the home of defendants' grandparents, which in turn furthered the investigation of the case.

**18. Evidence— prior crimes or acts—motive**

The trial court did not violate one defendant's rights by admitting his grandfather's testimony, offered by his codefendant, concerning the seizure of defendant's luggage by the police at a bus station a week prior to the murders because: (1) defendant did not preserve any constitutional argument since he did not raise it at the trial court; (2) the testimony was admissible under N.C.G.S. § 8C-1, Rule 404(b) to prove defendant's motive for not wanting to return by bus, and for his future actions; and (3) the

jury could infer that defendant did not wish to take the bus because it would stop in the city where his luggage had been seized by police.

### 19. Confessions and Incriminating Statements— redacted statement of codefendant

The trial court did not violate one defendant's constitutional rights by admitting his nontestifying codefendant's redacted statement that there was a plan to rob a Food Lion and that the codefendant shot the two officers when he saw them attempting to spray defendant with mace, because: (1) the codefendant's statement to another inmate was not "powerfully incriminating" toward defendant; (2) the trial court repeatedly cautioned the jury to consider the evidence against each defendant separately; and (3) the codefendant's statement to another inmate did not clearly make reference to defendant in relation to the plan, nor did it create a substantial risk that the jury would ignore the trial court's instructions in its determination of defendant's guilt.

### 20. Confessions and Incriminating Statements— right to silence—equivocal

The trial court did not commit plain error in a capital trial by admitting into evidence a portion of one defendant's statement to police after defendant's alleged invocation of his right to silence because defendant's statement, that he did not want to say anything about the jeep and that he did not know who it was or he would have told the officers, did not constitute an unequivocal request to remain silent.

### 21. Criminal Law— prosecutor's argument—displaying rifle in direction of juror

The trial court did not err in a capital trial by failing to intervene ex mero motu during the State's closing argument when the prosecutor displayed a rifle in the direction of a juror because: (1) the prosecutor did not use the rifle to attempt to draw inferences from the weapon which were not supported by the evidence; (2) the juror was not frightened or intimidated by the prosecutor's actions; (3) the prosecutor was merely explaining one defendant's actions according to what witnesses observed; and (4) defendants were not prejudiced and were not prevented from receiving a fair trial in light of the overwhelming evidence.

**22. Criminal Law— prosecutor's argument—defendant's statements as lies**

The trial court did not err in a capital trial by overruling one defendant's objection to the portion of the State's closing argument where the prosecutor referred to parts of the nontestifying defendant's statement as lies because: (1) the prosecutor was showing the jury instances where defendant had not been truthful while giving his statement to law enforcement officers; and (2) the prosecutor was pointing out exculpatory statements or omissions to show how the facts differed from defendant's statement.

**23. Criminal Law— acting in concert—propriety of instruction**

The trial court did not err in a capital trial by giving acting in concert instructions based on the possession of a stolen vehicle for the first-degree murder and robbery with a dangerous weapon charges because the trial court's instructions were given consistent with the pattern jury instructions and comported in all respects with previous case law.

**24. Homicide; Robbery— first-degree murder—armed robbery—sufficiency of evidence**

The trial court did not err in a capital case by denying one defendant's motion to dismiss charges of first-degree murder and robbery with a dangerous weapon of a deputy sheriff because: (1) defendants acted with a common purpose in possessing a stolen vehicle and removing the license plate from the stolen vehicle to avoid detection; (2) sufficient evidence revealed that defendant committed first-degree murder based on his admission that he took a State trooper's gun and was the only one to shoot it, a gunshot residue test revealed defendant had shot a weapon recently, and a bullet from the trooper's gun was recovered from the deputy's body; and (3) sufficient evidence revealed that defendants committed robbery with a dangerous weapon based on the facts that the codefendant shot the deputy with an assault rifle and thereafter took the deputy's weapon, defendant inflicted a fatal wound to the deputy, and both defendants fled the scene with the deputy's weapon.

**25. Sentencing— capital—joinder**

The trial court did not abuse its discretion in a capital sentencing proceeding by joining defendants' cases for sentencing and by denying a motion to sever because: (1) one defendant did

STATE v. GOLPHIN

[352 N.C. 364 (2000)]

not preserve this issue since he did not object to joinder for sentencing or renew a previous motion to sever, and plain error review does not apply; (2) the codefendant made an unsubstantiated assumption without an offer of proof that his mother would have testified favorably on his behalf if the trials were severed, and the significance of the testimony is not apparent from the record; (3) the codefendant could have subpoenaed his mother to testify; and (4) the codefendant cannot show he was denied individualized consideration.

### 26. Appeal and Error— preservation of issues—failure to object

Although one defendant contends the trial court erred in a capital sentencing proceeding by denying his motion to suppress two letters seized by prison officials, defendant did not preserve this issue for appeal since he did not object when the letters were introduced, and he cannot rely on his pretrial motion to suppress.

### 27. Sentencing— capital—note confiscated from courtroom—racial motivation—aggravating circumstances—especially heinous, atrocious, or cruel

The trial court did not err during a capital sentencing proceeding by admitting evidence of a note that one defendant drafted while sitting in the courtroom during the jury selection phase of the trial, which was confiscated by an officer when defendant was leaving the courtroom, because: (1) defendant did not preserve any constitutional argument since he did not raise it at the trial court; (2) the trial court is not required to perform the N.C.G.S. § 8C-1, Rule 403 balancing test during a sentencing proceeding; and (3) the references in defendant's note are evidence that the murders were racially motivated, and therefore, could be considered by the jury when determining if the murder was especially heinous, atrocious, or cruel under N.C.G.S. § 15A-2000(e)(9).

### 28. Appeal and Error— preservation of issues—failure to object—failure to argue plain error

Although one defendant claims the trial court erred during a capital sentencing proceeding by allowing the State to cross-examine an expert regarding his potential bias, defendant did not preserve this issue because: (1) he failed to object or to raise any constitutional argument at the trial court; and (2) defendant did not "specifically and distinctly" argue plain error as required by N.C. R. App. P. 10(c)(4).

STATE v. GOLPHIN

[352 N.C. 364 (2000)]

**29. Sentencing— capital—hearsay—Rules of Evidence inapplicable**

The trial court did not violate one defendant's rights during a capital sentencing proceeding by allowing one expert's report into evidence for purposes of cross-examining another expert because: (1) even if the report itself was hearsay, the Rules of Evidence do not apply in sentencing hearings; and (2) the trial court can admit any evidence it deems relevant to sentence.

**30. Constitutional Law— right of confrontation—expert report—basis of opinion**

The trial court did not violate one defendant's right of confrontation during a capital sentencing proceeding based on the theory that defendant was not given an opportunity to cross-examine an expert regarding the substance of the expert's report because: (1) defendant was aware of the report's existence prior to the conclusion of the expert's testimony; (2) the trial court gave defendant a second opportunity to question the expert after the State revealed the report's existence, and defendant stated he had no questions for the expert; (3) defendant could have requested a continuance if he felt he had a lack of time for adequate preparation; and (4) the report did not contain inadmissible hearsay since the comments in the report were introduced to help show the basis of the expert's opinion, and not for the truth of the matter asserted. N.C.G.S. § 8C-1, Rule 703.

**31. Evidence— expert witnesses—cross-examination—another expert's report**

The trial court did not violate one defendant's rights during a capital sentencing proceeding by allowing the State to cross-examine his codefendant's expert witness with a report prepared by another expert witness because: (1) N.C.G.S. § 8C-1, Rule 705 provides that an expert witness may be cross-examined with regard to the underlying facts and data used by the expert in reaching his expert opinion, including other experts' reports; and (2) any error that may have resulted was harmless beyond a reasonable doubt in light of the overwhelming evidence of his guilt.

**32. Sentencing— capital—aggravating and mitigating circumstances—requested instruction**

The trial court did not err during a capital sentencing proceeding by failing to instruct the jury that a life sentence should be imposed unless the aggravating circumstances outweighed the

mitigating circumstances, because: (1) the trial court's instruction was consistent with N.C.G.S. § 15A-2000(c)(3); and (2) the Supreme Court has previously denied this same argument.

### 33. Criminal Law— prosecutor's argument—capital sentencing—general deterrent effect of death penalty

The trial court did not err in a capital sentencing proceeding by failing to intervene ex mero motu during the State's arguments that these two defendants deserve the death penalty for what they did, that someone has got to tell people like these two defendants that we absolutely will not tolerate this any longer, and that we cannot rely on the next jury to send that message, because: (1) the State's argument viewed in context did not constitute a general deterrence argument; and (2) even if the State's arguments were improper, they were not so grossly improper as to warrant intervention by the trial court.

### 34. Criminal Law— prosecutor's argument—capital sentencing—community sentiment

The trial court did not err in a capital sentencing proceeding by failing to intervene ex mero motu during the State's arguments, that someone has got to stand up and tell defendants like this that we are not going to tolerate this conduct and that asked what type of message a life sentence for these two defendants would send to the citizens of this state, because a review of the prosecutor's statements reveals that the prosecutor never told the jury what was expected of them by the community, but instead reiterated what the jury's message should be to the community.

### 35. Criminal Law— prosecutor's argument—capital sentencing—hatred based on Rastafarian beliefs

The trial court did not violate one defendant's rights in a capital sentencing proceeding by failing to intervene ex mero motu during the State's argument stating that both defendants had hatred based on Rastafarian beliefs because there was evidence that defendant was involved with Rastafarianism, including a note and the testimony of defendant's own expert witness.

### 36. Sentencing— capital—*Enmund/Tison* instruction inapplicable

The trial court did not commit plain error during a capital sentencing proceeding by failing to instruct the jury according to

the *Enmund/Tison* instruction that there was evidence one defendant did not participate in the murder of the deputy, because this instruction does not apply to a defendant who has been found guilty of first-degree murder based on premeditation and deliberation.

**37. Sentencing— capital—peremptory instructions—statutory mitigating circumstances—age—controverted evidence**

The trial court did not violate one defendant's rights during a capital sentencing proceeding by failing to give a peremptory instruction for the N.C.G.S. § 15A-2000(f)(7) mitigating circumstance concerning the age of defendant at the time of the crime, because: (1) the trial court gave a partial peremptory instruction that all the evidence showed defendant was seventeen years old at the time of the crimes; (2) defendant waived review of the trial court's instruction since he failed to object, N.C. R. App. P. 10(b)(2); (3) defendant cannot show prejudice because one or more jurors found the (f)(7) circumstance to exist; and (4) defendant did not specifically and distinctly argue plain error, N.C. R. App. 10(c)(4).

**38. Appeal and Error— preservation of issues—failure to object**

The trial court did not violate one defendant's rights during a capital sentencing proceeding by refusing to give a peremptory instruction for the N.C.G.S. § 15A-2000(f)(7) mitigating circumstance concerning the age of defendant at the time of the crime, because defendant failed to preserve this issue since he did not request this peremptory instruction, nor did he object to the trial court's failure to give this instruction. N.C. R. App. P. 10(b)(2).

**39. Sentencing— capital—peremptory instructions—statutory mitigating circumstances—ability to appreciate criminality—controverted evidence**

The trial court did not violate one defendant's rights during a capital sentencing proceeding by refusing to give a peremptory instruction for the N.C.G.S. § 15A-2000(f)(6) mitigating circumstance concerning his ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, because: (1) defendant attempted to eliminate a witness, and he initially denied shooting either victim; and (2) defendant's family members stated that defendant cared for his grandmother, and evidence by friends and family that a defendant volunteered to

help and take care of others conflicts with evidence that a defendant's capacity to appreciate the criminality of his conduct was impaired.

**40. Sentencing— capital—peremptory instructions—nonstatutory mitigating circumstances—controverted evidence**

The trial court did not violate one defendant's rights during a capital sentencing proceeding by refusing to give peremptory instructions for the nonstatutory mitigating circumstances that he was subjected to parental neglect, his mother forced him to lie about being abused, he did not receive appropriate counseling, and he was abandoned by his father, because: (1) the jury was given a peremptory instruction on the mitigating circumstance that defendant was abandoned by his father; (2) the State presented contradictory evidence from defendants' neighbors that they never witnessed neglect by defendants' parents; (3) the evidence is unclear as to whether defendant was forced to lie about his abuse; and (4) an expert's testimony that there was nothing in the record that says defendant got any counseling is not definitive evidence that he did not have any counseling.

**41. Sentencing— capital—aggravating circumstances—murder during course of felony—disjunctive instructions**

The trial court did not err during a capital sentencing proceeding by giving disjunctive instructions on the N.C.G.S. § 15A-2000(e)(5) aggravating circumstance that the murder was committed in the course of a felony based on either an armed robbery in which a car was taken or a robbery in which a trooper's weapon was taken, because: (1) there was evidence to support both theories of the (e)(5) circumstance and both theories involved felonies, showing that it is immaterial which crime the jurors use to support the circumstance; and (2) unanimity is required for elements of an offense, rather than for aggravating circumstances.

**42. Sentencing— capital—aggravating circumstances—especially heinous, atrocious, or cruel**

The trial court did not err during a capital sentencing proceeding by submitting as to one defendant the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance that the murder of a State trooper was especially heinous, atrocious, or cruel, because: (1) although defendant now contends the (e)(9) circumstance is unconstitutionally vague, no constitutional claims were

made at trial, defendant never objected, and this argument has previously been rejected; (2) the trooper-victim was aware of his fate and unable to prevent impending death; and (3) the State met its burden to show that one defendant's part in the crime was unnecessarily torturous to the victim.

**43. Sentencing— capital—aggravating circumstances—avoiding lawful arrest—committed against law enforcement officer**

The trial court did not err during a capital sentencing proceeding by submitting both the N.C.G.S. § 15A-2000(e)(4) aggravating circumstance that the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody, and the N.C.G.S. § 15A-2000(e)(8) circumstance that the capital felony was committed against a law enforcement officer while engaged in the performance of his official duties, because even though the same underlying sequence of events was the subject of both circumstances, the (e)(8) circumstance looks to the underlying factual basis of defendant's crime whereas the (e)(4) circumstance looks to defendant's subjective motivation for his act.

**44. Sentencing— capital—aggravating circumstances—flight—course of conduct—no plain error**

The trial court did not commit plain error during a capital sentencing proceeding by submitting the N.C.G.S. § 15A-2000(e)(5) aggravating circumstance that the capital felony was committed while defendant was engaged in or in flight after committing a robbery, and the N.C.G.S. § 15A-2000 (e)(11) circumstance that the murder was committed as part of a course of conduct involving other violent crimes, because: (1) neither defendant objected to submission of these two circumstances on the basis that there was a likelihood the jury might have utilized the same evidence, nor did they request a limiting instruction to that effect; (2) there is sufficient evidence to provide independent bases for the two aggravating circumstances; and (3) defendants cannot show that a different result was probable had a limiting instruction been given.

**45. Sentencing— capital—mitigating circumstances**

The trial court did not err during a capital sentencing proceeding by its instruction that allows the jury to reject a nonstatutory mitigating circumstance if it finds the circumstance to

be without mitigating value because although one defendant attempts to frame this argument anew by stating that his non-statutory mitigating circumstances contain "inherent mitigating content" requiring the jury to give them mitigating value, the Supreme Court has previously rejected this claim and finds no reason to revisit their prior decisions.

## 46. Sentencing— capital—mitigating circumstances—peremptory instruction—jury free to reject

The sentences of death were not imposed in an arbitrary and capricious manner based on the jury's rejection of the N.C.G.S. § 15A-2000 (f)(2) mental or emotional disturbance mitigating circumstance, even though a peremptory instruction was given, because: (1) a jury remains free to reject the circumstance; (2) the evidence presented by one defendant's mental health expert was not so manifestly credible to require the jury to find it convincing; and (3) a juror's acceptance of an expert's testimony that defendant lacked parental involvement or support in treatment for psychological problems is not determinative of the sufficiency of the evidence in support of the (f)(2) circumstance since the nonstatutory mitigating circumstance relates to parental support whereas the statutory circumstance involves defendant's mental or emotional state at the time of the crimes.

## 47. Sentencing— capital—death penalty not disproportionate

The trial court did not err by imposing two sentences of death for each defendant because: (1) defendants murdered two law enforcement officers for the purpose of evading lawful arrest; (2) defendants were each convicted of two counts of first-degree murder; (3) defendants' convictions for the murders were based on the theory of premeditation and deliberation; and (4) as to each murder conviction, the jury found the two aggravating circumstances of N.C.G.S. § 15A-2000(e)(5) and N.C.G.S. § 15A-2000(e)(11), either of which standing alone has been held sufficient to support a death sentence.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing two sentences of death for each defendant entered by Brewer, J., on 13 May 1998 in Superior Court, Cumberland County, upon jury verdicts finding each defendant guilty of two counts of first-degree murder. The Supreme Court allowed defendants' motions to bypass the Court of Appeals as to their appeal of

additional judgments on 19 July 1999. Heard in the Supreme Court 14 February 2000.

> *Michael F. Easley, Attorney General, by William B. Crumpler and Robert C. Montgomery, Assistant Attorneys General, for the State.*

> *Malcolm Ray Hunter, Jr., Appellate Defender, by Janine C. Fodor and Anne M. Gomez, Assistant Appellate Defenders, for defendant-appellant Kevin Golphin.*

> *M. Gordon Widenhouse, Jr., for defendant-appellant Tilmon Golphin.*

WAINWRIGHT, Justice.

On 1 December 1997, indictments were handed down charging defendants Kevin Salvador Golphin (Kevin) and Tilmon Charles Golphin, Jr. (Tilmon), each with two counts of first-degree murder, two counts of robbery with a dangerous weapon, one count of assault with a deadly weapon with intent to kill, one count of discharging a firearm into occupied property, and one count of possession of a stolen vehicle. Defendants, who are brothers, were tried jointly in a capital proceeding at the 23 February 1998 Criminal Session of Superior Court, Cumberland County. Defendants were tried before a jury drawn from a special venire selected in Johnston County. The jury found defendants guilty on all charges. After a capital sentencing proceeding, the jury recommended a sentence of death in each murder for both defendants. On 13 May 1998, the trial court entered judgments against defendants in accordance with the jury's recommendations. In addition, the trial court sentenced each defendant to the following consecutive terms of imprisonment: (1) for possession of a stolen vehicle, a minimum of six months and a maximum of eight months; (2) for assault with a deadly weapon with intent to kill, a minimum of thirty-one months and a maximum of forty-seven months; (3) for discharging a firearm into occupied property, a minimum of thirty-one months and a maximum of forty-seven months; and (4) for each count of robbery with a dangerous weapon, a minimum of eighty months and a maximum of one hundred five months. Defendants appeal to this Court as of right from the judgments imposing sentences of death. On 19 July 1999, this Court allowed defendants' motions to bypass the Court of Appeals on the other convictions.

The State presented evidence which tended to show that on 23 September 1997, Kevin, who was seventeen, and Tilmon, who was nineteen, were living with their grandparents in Greeleyville, South Carolina. That morning, defendants' cousin, Demetric Mack, drove them to Kingstree, South Carolina, leaving them in a parking lot in the downtown area. During the ride into town, Mack noticed that Kevin was carrying a rifle that he had covered with a white towel and that Tilmon was carrying a book bag.

At about 10:00 a.m., defendants entered Financial Lenders, a finance company in downtown Kingstree. Two employees, Ava Rogers and Sandra Gaymon, were working that morning, and a customer, Earletha Mouzon, was also in the building. Gaymon and Mouzon were discussing business in a small office near the front of the building and saw defendants enter and walk toward the office where Rogers was working. Mouzon saw that one defendant was carrying a rifle. She immediately left the building and called the police. The taller defendant, later identified as Kevin, pointed the rifle at Rogers and demanded the keys to her car. She gave the keys to him. Defendants then ordered Rogers and Gaymon to go to the back of the building. Defendants then told the two women to go into the bathroom. The taller defendant told the women to stand with their backs toward defendants. While their backs were turned, both women heard clicking sounds made by the rifle. Defendants then left the bathroom, and the two women heard them moving things around and placing objects in front of the door. The women stayed in the bathroom for approximately five minutes. While they were in the bathroom, they heard a vehicle start and leave the parking lot behind the building. The women then left the bathroom and called 911. Rogers found that her purse had been opened and that her wallet had been stolen. She also found that her car, a dark green 1996 Toyota Camry with South Carolina license plate number CEL-269, had been stolen.

Lieutenant Michael Kirby of the Kingstree Police Department investigated the robbery at Financial Lenders. He arrived at the business shortly after the robbery and obtained a description of the suspects and the stolen vehicle. He then issued a "BOLO" advisory ("Be On the Look Out" for certain suspects or vehicles) to all law enforcement agencies in the area which contained the description of the suspects and the stolen vehicle. Lt. Kirby also entered the description of the stolen vehicle into the National Crime Information Center (NCIC) computer network. Later that morning, Lt. Kirby learned that the

suspects were Kevin and Tilmon Golphin. He then went to their grandparents' home but was unable to locate the suspects.

On that same day, Bobby Owens was on duty as a shift supervisor at the State Highway Patrol Communications Center in Elizabethtown, North Carolina. The Elizabethtown center provided communications support to state troopers in a region comprised of Cumberland, Harnett, Robeson, Onslow, Duplin, Pender, New Hanover, Brunswick, Bladen, and Columbus Counties. At approximately 12:25 p.m., Owens was communicating with troopers in Cumberland County. Trooper Lloyd E. Lowry of the North Carolina State Highway Patrol was on duty in Cumberland County. He was patrolling the northbound lanes on Interstate 95 (I-95). At 12:25 p.m., Owens received a radio call from Trooper Lowry asking for a check on South Carolina registration CEL-269. Owens performed the check on the NCIC computer, and the check indicated that the vehicle with that registration had been stolen in South Carolina. At 12:26 p.m., Owens asked Trooper Lowry whether he had the vehicle stopped, and Trooper Lowry responded that he did. Owens then advised Trooper Lowry, using code "signal three," to turn off the speaker inside his vehicle so that anyone in the vehicle could not hear the communications and told Trooper Lowry that the vehicle was stolen. Trooper Lowry asked Owens to send him a backup unit. Owens requested Trooper Lowry's location, and Trooper Lowry answered that he was near the intersection of I-95 and N.C. Highway 24. At 12:27 p.m., Owens informed Trooper Lowry that there were no highway patrol units available to respond and that he would contact the Cumberland County Sheriff's Department to request assistance. Owens called the sheriff's department, and the dispatcher acknowledged the request and told Owens that a car would be dispatched to the scene. At 12:29:12 p.m., Owens called Trooper Lowry and informed him that a sheriff's department unit was en route to assist. Trooper Lowry informed Owens that a subject was in his vehicle and that he was awaiting the backup unit. After this transmission, Owens called the highway patrol office in Fayetteville and informed Sergeant Bill Martin of Trooper Lowry's situation. Sgt. Martin advised Owens that he would be en route to assist Trooper Lowry and asked Owens to attempt to contact Trooper Lowry again. At 12:32 p.m., Owens called Trooper Lowry to inform him that Sgt. Martin was en route to his location and to ask him to verify the description of the vehicle given by the NCIC computer as a dark green Toyota. At 12:32:22 p.m., Trooper Lowry confirmed the description of the vehicle. Owens did not receive any further communication from Trooper Lowry.

On that same day, Susan Gillis was working as a dispatcher with the Cumberland County Sheriff's Department. At 12:28 p.m., she received a telephone call from Owens requesting assistance for Trooper Lowry. Gillis passed the request for assistance to Linda Zema, another dispatcher, who asked for available sheriff's department units in the area of I-95 and N.C. Highway 24. Deputy David Hathcock responded to the call, and the dispatchers determined that he was the closest unit to the area where Trooper Lowry had requested assistance. Deputy Hathcock was sent to the scene at 12:30 p.m. At 12:33 p.m., Deputy Hathcock reported that he would be reaching the scene in approximately one minute. No further transmissions were received from Deputy Hathcock despite repeated attempts by the dispatchers to contact him.

At 12:38 p.m., Deputy Kelly Curtis of the Cumberland County Sheriff's Department advised the dispatchers that he had arrived at the scene. Seconds later, Deputy Curtis informed dispatchers, "Officers down. Officers down." He requested immediate assistance. At 12:39 p.m., Deputy Curtis called and advised the dispatchers that two black male suspects were last seen headed northbound on I-95 driving a dark green Toyota. Shortly thereafter, Deputy Curtis informed the dispatchers that both officers appeared to be dead.

The State presented a number of witnesses who testified regarding the events that occurred along the side of I-95 near its intersection with N.C. Highway 24 at mile marker 52 in Cumberland County. James Patrick Rogers was driving along the exit ramp which led from westbound Highway 24 onto the service road which led to the northbound lanes of I-95. As Rogers came down the ramp, he saw that a highway patrol vehicle and a sheriff's department vehicle were stopped in the grassy area between the service road and the northbound lanes of I-95. The two police vehicles were parked parallel to one another on opposite sides of the grassy area facing northbound. A dark—colored car was pulled over in front of the highway patrol vehicle. Rogers testified that a black male was standing at the rear of the highway patrol vehicle with his hands on the trunk. A state trooper was standing behind him. A second black male was sitting in the front passenger seat of the dark-colored car. A sheriff's deputy was standing near the open door of that vehicle and appeared to be talking to the male seated in the car.

Walter Pearce was traveling on I-95 north and saw the flashing blue lights of the highway patrol vehicle. As he got close to the vehi-

cles, he saw a state trooper and a black male with braided hair scuffling on the ground at the back of the patrol car. Pearce saw a sheriff's deputy standing between the police vehicles and a second black male sitting in the front seat of a Toyota Camry that was pulled over in front of the highway patrol vehicle. Pearce continued northbound, and a few minutes later, he saw the same two black males pass him in the Camry. A highway patrol vehicle passed him shortly afterwards, and Pearce saw both the Camry and the highway patrol vehicle leave I-95 at exit 71.

Marla McDowell was traveling on I-95 north and saw the police vehicles on the side of the road with a Toyota Camry pulled over in front of them. She saw an officer and a black male struggling on the ground behind the highway patrol vehicle, and another officer and a second black male struggling in the area between the police vehicles and the Camry. She also saw the second black male pull away from the officer and run back toward the Camry.

Janice Hocutt and her niece were traveling south on I-95 as they approached the scene where two police vehicles and a bluish-green car were pulled over. Hocutt saw a black male, who was wearing an "orange-brownish" hooded sweatshirt, facing south between the green car and the police vehicles. An officer was standing in front of him facing north. Hocutt saw the black male moving toward the officer, and then she saw something brown being sprayed by the officer. The officer began backing away from the black male and then fell. She then saw the black male kick and punch the officer on the ground. She never saw the officer get up. Hocutt identified Tilmon as the black male she saw kicking and punching the officer on the ground.

Wilbur Brannan was traveling northbound on I-95 and passed the scene. He saw the highway patrol vehicle with its blue lights flashing, and as he passed it, he saw a state trooper lying facedown on the ground near the back of his vehicle. A black male was bending over the trooper. Brannan saw the black male get up and turn around toward a dark green Toyota Camry parked in front of the highway patrol vehicle. Brannan continued driving northbound and saw the same Toyota Camry with two black occupants pass him a few miles further on I-95.

Dana Blecke, a pharmacist and former emergency medical technician, was traveling south on I-95 and saw the blue lights flashing from the highway patrol vehicle. As she passed by, she

saw someone lying in the grass on the side of the road in front of the highway patrol vehicle. She also saw a black person running toward the driver's side of a car that was parked in front of the highway patrol vehicle. Blecke slowed down and turned around through the median of the interstate and drove back toward the police vehicles. The car parked in front of the police vehicles was now gone. She parked her vehicle and went to the police officer lying in the grass. She could feel no pulse or respirations. She then walked to the state trooper who was lying facedown near the back of his vehicle. By this time, another state trooper who had arrived at the scene helped her roll the trooper's body. They found no pulse or other signs of life.

Ronald Waters was driving north on I-95 as he came over a hill and saw the flashing blue lights of the highway patrol vehicle. As he approached the scene, he saw two black males, one taller than the other, moving around in the area between the two police vehicles and the car parked in front of the highway patrol vehicle. He saw an officer wearing a gray shirt and dark pants lying facedown in the grass near the back of the highway patrol vehicle. As he drove almost parallel with the highway patrol vehicle in the right lane of I-95, he saw that one of the black males had what appeared to be an "automatic" handgun in his hand. At that time, Waters, who had slowed down, accelerated quickly past the scene. He pulled off approximately two hundred yards further up the road, got out of his vehicle, and called 911 on his cellular phone. He looked back toward the scene and saw the taller black male shoot one of the officers four or five times. The two black males then got into the Toyota Camry and drove north on I-95. Waters saw that other motorists had stopped, and he decided to follow the Camry. Waters remained on his cellular phone talking to the 911 operator while following the Camry. He followed the Camry until it left I-95 at exit 55, Murphy Road. Waters saw the vehicle turn off onto a dirt road near the exit. Waters stopped his car and watched the subjects. A few minutes later, the subjects got back in the Camry and drove over the bridge to the other side of the interstate. Waters noted that the license plate had been removed from the Camry. Waters waited along the side of the ramp that led back to I-95 north. He soon noticed the Camry come back over the top of the bridge and turn onto the ramp beside him. As the Camry pulled alongside Waters' vehicle, Waters saw the barrel of a rifle being pointed out the window toward him. He leaned over in his seat and accelerated quickly. He heard three shots hit his vehicle, and subsequently, discovered the vehicle was disabled. Waters heard the other vehicle's engine revving

higher and thought it had left, so he raised his head to look out the window. He saw the Camry drawing almost parallel with his window just four to six feet away. Waters testified that the black male holding the rifle smiled at him and then pulled the trigger. The rifle clicked as if it were jammed or out of ammunition. The black male pulled the rifle back into the Camry, which sped north on I-95. Waters identified the individual who pointed the rifle at him as Tilmon, and he identified the rifle pointed at him as the same Russian-made SKS 7.62-millimeter rifle seen by Demetric Mack, defendants' cousin, in his car that morning.

Trooper Kenneth Morgan heard a radio transmission that a trooper was down and proceeded south on I-95 from exit 72 in Harnett County. As he drove south, he obtained a description of the Toyota Camry and its occupants. At exit 65, just inside the Cumberland County line, Trooper Morgan waited on an exit ramp facing south. Just after 12:52 p.m., Trooper Morgan observed a green Toyota Camry driving north on I-95. Trooper Morgan drove down the northbound exit ramp to attempt to overtake the Camry. He noted that there was no license plate on the vehicle and that it swerved quickly from the left lane over to the emergency lane on the far right and began accelerating rapidly. Trooper Morgan pursued the vehicle at speeds up to 120 miles per hour as the Camry veered from lane to lane heading north. At exit 71, the Camry drove up the ramp but failed to make the turn. It rolled at least once down an embankment and came to rest on its wheels. Trooper Morgan saw the two suspects run from the vehicle toward a group of tractor-trailers that were parked near a tire repair shop.

Police officers from the Harnett County Sheriff's Department, the Cumberland County Sheriff's Department, the Dunn Police Department, and the State Highway Patrol searched the area and apprehended Tilmon and Kevin. A Glock 9-millimeter handgun, later identified as Deputy Hathcock's weapon, was found beside Tilmon as he was arrested, and a Beretta .40-caliber handgun, identified as Trooper Lowry's weapon, was found under the steps of a home near where Kevin was captured. Deputy Hathcock's Glock handgun was fully loaded and did not exhibit any signs of being fired. Trooper Lowry's Beretta handgun was found in a cocked position, ready to fire. Only five cartridges remained in the weapon, indicating that if the weapon had been fully loaded when taken, six cartridges were missing. The SKS rifle was recovered from the wrecked Camry. The top cartridge in the magazine had misfed, causing the

rifle to jam. Tilmon and Kevin were transported by the State Highway Patrol to the Cumberland County Sheriff's Department where they were questioned.

At the sheriff's department, Kevin waived his juvenile rights and gave a statement to Special Agent Jay Tilley of the State Bureau of Investigation (SBI). Agent Tilley and Detective Ray Wood of the Cumberland County Sheriff's Department interviewed Kevin. Kevin admitted that he and Tilmon stole the Camry in Kingstree that morning and headed north on I-95, intending to drive to Richmond, Virginia. A state trooper pulled them over in North Carolina. The trooper asked Kevin for his license, and Kevin gave him Tilmon's South Carolina license. The trooper told Kevin he was stopped for not wearing a seat belt and asked him to get out of the Camry and sit in the patrol vehicle. Kevin saw the trooper typing on his computer and talking into his telephone. Kevin heard the trooper ask for another car to come and assist him.

Kevin stated that he saw a different kind of police car drive up beside the trooper's car and that a police officer wearing a different uniform got out and came over to the trooper's car. The trooper got out of the car and told Kevin to "sit tight." The trooper then came around to the passenger side where Kevin was sitting, pulled out his pistol, opened the door, and ordered Kevin out of the car. Kevin said that he got out and put his hands on the hood of the car. The trooper told the other police officer to "get the guy" in the Camry. Kevin asked why he was being arrested and was told to "shut up." The trooper pushed Kevin's head down and put him in an arm lock. Kevin stated that he resisted and tried to get free. The trooper pushed Kevin to the ground. The other officer brought Tilmon back toward the trooper's car. The trooper told the other officer to spray Kevin with pepper spray. The other officer sprayed Kevin, and Kevin began screaming and kicking at the other officer. At that point, Kevin heard gunshots. His eyes began to clear, and he saw the two police officers on the ground. The trooper tried to grab Kevin, but he shook the trooper away. Kevin then took the trooper's pistol.

At first, Kevin did not admit shooting the trooper's pistol and claimed not to have shot any gun that day. After being told that .40-caliber shell casings had been found at the scene and that gunshot residue tests had been performed on his hands, Kevin admitted firing the trooper's handgun. He said he did not know how many times he shot the gun, but it was pointed at the trooper when he did so.

**STATE v. GOLPHIN**

[352 N.C. 364 (2000)]

After he fired the gun, Kevin got into the passenger seat of the Camry, and he and Tilmon drove north on I-95. He and Tilmon left the interstate at the next exit and stopped on top of a bridge where they switched places. Kevin continued driving north on I-95, and they were chased by several police cars. Kevin said that he tried to get away, but wrecked the car when he attempted to exit the interstate. He and Tilmon ran from the car, but both were caught.

Later in the interview, Kevin admitted that Tilmon had shot at a Jeep that was following them on I-95 and that had stopped at the same exit where they switched drivers. Kevin said that Tilmon told him he was trying to shoot at the tires of the vehicle. Kevin also admitted that Tilmon never shot the trooper's handgun and that Tilmon never had the trooper's handgun in his possession.

Tilmon was interviewed at the sheriff's department by Special Agent Neil Godfrey of the SBI and Detective Mike Casey of the Cumberland County Sheriff's Department. Agent Godfrey advised Tilmon of his rights, and Tilmon asked to speak with an attorney. Tilmon was informed that investigators could no longer talk with him because he had requested an attorney, but they asked him several biographical questions. After he answered the questions, Tilmon stated he wanted to tell the investigators what had happened.

Tilmon's description of the events was very similar to Kevin's. When the Camry was pulled over by the state trooper, the trooper told them he had pulled them over because Kevin was not wearing his seat belt. Kevin and the trooper went back to the trooper's car while Tilmon waited in the Camry. Eventually, he saw another police car pull up beside them. He saw the other officer get out and walk toward the trooper's car. He then saw Kevin and the trooper at the back of the trooper's vehicle, and Kevin was pushed up against the vehicle. Tilmon got out of the Camry and walked back toward them. The other officer came toward him, pushed him up against the Camry, and patted him down. The officer then walked with him back toward the trooper's car where Kevin and the trooper were on the ground struggling. Tilmon said he heard Kevin say that he could not breathe. The trooper then told the other officer to spray Kevin with pepper spray. The officer sprayed Kevin and then turned to spray Tilmon. Tilmon knocked the canister from the officer's hand and ran back toward the Camry. He got the rifle from the backseat of the car. Tilmon said he pointed the rifle directly at the other officer who was about nine to twelve feet away; looked him right in the eyes; and shot him. Tilmon

said the other officer appeared to be dead. He then walked over to where the trooper was on top of Kevin, aimed at the trooper's side, and shot him. Tilmon said he aimed at the trooper's side because he did not want to kill him. Tilmon then ran over to the other officer, took the handgun from his holster, and went to the driver's side of the Camry. He and Kevin drove north on I-95 for a few miles, then exited and switched places. Tilmon stated he shot at the tires of a vehicle that had been following them. He and Kevin then continued driving north on I-95 and were captured a short while later after they were chased by other police cars.

Tilmon originally stated that he had not fired a gun that day but later admitted that he "probably had" shot a gun but could not remember doing so. Subsequently, Tilmon was able to recount how the rifle "jumped" as he shot the trooper. Tilmon also made no mention of the use of pepper spray by either officer but later remembered that the trooper told the other officer to spray Kevin. Additionally, Tilmon said nothing about his encounter with Waters during the first portion of his interview, but later described shooting at the tires of the Jeep in detail.

Autopsies were performed on the bodies of Trooper Lowry and Deputy Hathcock. Three .40-caliber bullets that were fired from Trooper Lowry's handgun were recovered from his body along with a 7.62-millimeter bullet fired from the SKS rifle. An additional 7.62-millimeter bullet was found inside the body bag used to transport Trooper Lowry's body. Trooper Lowry was shot at least seven and possibly eight times, with several gunshots coming from close range. Trooper Lowry suffered potentially fatal wounds from both weapons. One .40-caliber bullet fired from Trooper Lowry's handgun and two 7.62-millimeter bullets fired from the SKS rifle were recovered from Deputy Hathcock's body. Deputy Hathcock suffered four gunshot wounds to his chest and abdomen and one gunshot wound to his wrist. Any of the four wounds to his chest and abdomen would have been fatal. Those wounds were made by both .40-caliber and 7.62-millimeter bullets.

## PRETRIAL ISSUES

[1] By assignments of error, both Kevin and Tilmon argue the trial court violated their federal and state constitutional rights to be present at every stage of their capital trial when it ruled the jury would be drawn from a special venire from Johnston County. Specifically, defendants claim they should have been present during out-of-court

meetings relating to change of venue or a special venire. Defendants argue the right to be present includes the right to be present during the meetings concerning venue because the discussions were substantially related to the fullness of their rights to defend against the charges. *See United States v. Gagnon*, 470 U.S. 522, 526, 84 L. Ed. 2d 486, 490 (1985). Defendants further argue that because the meetings involved venue for jury selection and trial, they were particularly critical to defendants, and not merely administrative as in *State v. Chapman*, 342 N.C. 330, 338-39, 464 S.E.2d 661, 665-66 (1995), *cert. denied*, 518 U.S. 1023, 135 L. Ed. 2d 1077 (1996). We disagree.

Initially, we note the Confrontation Clause of the Sixth Amendment to the United States Constitution guarantees all defendants the right to be present at every stage of their trial. *See Illinois v. Allen*, 397 U.S. 337, 338, 25 L. Ed. 2d 353, 356 (1970). Through the Due Process Clause of the Fourteenth Amendment, this right also applies to the states. *See Pointer v. Texas*, 380 U.S. 400, 403, 13 L. Ed. 2d 923, 926 (1965); *State v. Buchanan*, 330 N.C. 202, 209, 410 S.E.2d 832, 836 (1991).

Similarly, in North Carolina, pursuant to the Confrontation Clause in Article I, Section 23 of the North Carolina Constitution, a defendant has a right to be present at every stage of his trial. *See State v. Call*, 349 N.C. 382, 397, 508 S.E.2d 496, 506 (1998); *Chapman*, 342 N.C. at 337, 464 S.E.2d at 665; *State v. Daniels*, 337 N.C. 243, 256, 446 S.E.2d 298, 307 (1994), *cert. denied*, 513 U.S. 1135, 130 L. Ed. 2d 895 (1995); *State v. Payne*, 320 N.C. 138, 139, 357 S.E.2d 612, 612 (1987). If the defendant is being tried capitally, this right cannot be waived. *See State v. Buckner*, 342 N.C. 198, 227, 464 S.E.2d 414, 430 (1995), *cert. denied*, 519 U.S. 828, 136 L. Ed. 2d 47 (1996). Generally, however, "this right does not arise prior to the commencement of trial." *Call*, 349 N.C. at 397, 508 S.E.2d at 506; *see also Chapman*, 342 N.C. at 338, 464 S.E.2d at 665; *State v. Rannels*, 333 N.C. 644, 653, 430 S.E.2d 254, 259 (1993).

In November 1997, defense counsel for both defendants informed the prosecution that they intended to file change of venue motions from Cumberland County. In meetings between the defense attorneys and the prosecutors to discuss change of venue, defendants were not present, and the meetings were not recorded. The prosecutors and defense attorneys then met with the presiding judge to discuss possible change of venue sites or special venire locations; defendants were not present at this meeting, and the meeting was not recorded.

Subsequently, on 5 January 1998, in the presence of Kevin, Tilmon, and their attorneys, the parties stipulated to a change of venue for purposes of jury selection. Thereafter, the trial court stated:

> As to each Defendant, it would be my understanding that each Defendant is agreeing to a special venire for [sic] Johnston County for that Defendant's trial if the cases are joined or if that Defendant is chosen for the first trial, but that neither Defendant is waiving their right to make a Motion for a Change of Venue if there are separate trials and that particular Defendant's trial is not the first trial.

When the trial court asked both defendants if this was correct, they responded, through their attorneys, in the affirmative. Pretrial motions were later heard on 16 and 23 February 1998, and jury selection commenced in Johnston County on 26 February 1998.

The meetings at issue in this case took place prior to commencement of defendants' trial. Moreover, defendants were present at the hearing on change of venue at which defendants stipulated to a special venire from a county other than Cumberland; the trial court proposed a special venire from Johnston County; and both defendants agreed, through counsel, to the special venire from Johnston County. Thus, no error, constitutional or otherwise, was committed. *See Buckner*, 342 N.C. at 228, 464 S.E.2d at 431 (holding there was no constitutional violation because the pretrial conference took place prior to commencement of the defendant's trial); *Rannels*, 333 N.C. at 652, 430 S.E.2d at 258 (holding it was not error to conduct private, unrecorded sidebar conferences with prospective jurors where conferences took place prior to calling the calendar for the session and the administration of the oath to the jurors). These assignments of error are overruled.

[2] In another assignment of error, Kevin argues there was no filed court order changing venue for purposes of jury selection, and this violated his federal and state constitutional rights. However, the question presented in Kevin's brief relating to this assignment of error concerns whether the trial court erred by not following the statutory mandates in ordering the special venire from Johnston County. In his argument, Kevin does not address the trial court's failure to file a court order changing venue for that limited purpose. Rule 28(a) of the North Carolina Rules of Appellate Procedure provides: "Questions raised by assignments of error in appeals from trial tri-

bunals but not then presented and discussed in a party's brief, are deemed abandoned." N.C. R. App. P. 28(a). Thus, Kevin abandoned this assignment of error. Nevertheless, in our discretion pursuant to Rule 2 of the North Carolina Rules of Appellate Procedure, we will address the merits of the question presented in Kevin's brief. *See* N.C. R. App. P. 2.

Kevin argues the trial court did not follow the statutory mandates in ordering the special venire from Johnston County, thereby entitling him to a new trial. Specifically, Kevin argues there are only two statutory mechanisms for changing venue—by order of the court pursuant to N.C.G.S. §§ 15A-957 and -958, or by an agreement of the parties pursuant to N.C.G.S. § 15A-133. The trial court followed neither. We disagree.

Generally, venue for "trial proceedings in cases within the original jurisdiction of the superior court lies in the county where the charged offense occurred." N.C.G.S. § 15A-131(c) (1999). Parties may waive venue or defendants may move for a change of venue pursuant to N.C.G.S. § 15A-957. *See* N.C.G.S. § 15A-133 (1999). A waiver of venue must be in writing, must be signed by both parties, and must specify the stages of the proceedings affected by the waiver. *See id.* A defendant may move for a change of venue if the prejudice is so great that he/she cannot obtain a fair and impartial trial; the trial court can then move the proceeding or order a special venire. *See* N.C.G.S. § 15A-957 (1999). In addition, the trial court may, upon motion by the defendant or the State, or upon its own motion, "issue an order for a special venire of jurors from another county if in its discretion it determines the action to be necessary to insure a fair trial." N.C.G.S. § 15A-958 (1999).

"These statutory limitations on the power of a court to order a change of venue are preempted by the inherent authority of the superior court to order a change of venue in the interest of justice." *State v. Chandler*, 324 N.C. 172, 183, 376 S.E.2d 728, 735 (1989) (holding the trial court did not abuse its discretion in granting the State's motion for change of venue, despite the statute's granting only the defendant a right to move for a change of venue, because the findings supported the trial court's conclusion and resulting order); *see also State v. Barfield*, 298 N.C. 306, 320, 259 S.E.2d 510, 524-25 (1979) (holding the superior court had the inherent power to move the proceedings to a county other than an adjoining county in the judicial district or a county in an adjoining judicial district as provided by the statute),

*cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). Moreover, the trial court's ruling on a motion to change venue will not be disturbed absent a showing of abuse of discretion. *Chandler*, 324 N.C. at 183, 376 S.E.2d at 735.

In the instant case, on 5 January 1998, there was a hearing at which both defendants, through counsel, stipulated to a transfer of venue to allow jury selection in a county other than Cumberland County with the trial to be held in Cumberland County. The trial court proposed changing venue for the limited purpose of jury selection from a special venire of Johnston County residents. The trial court asked both defendants if they agreed to the proposal, and both defendants, through counsel, answered in the affirmative. Thereafter, on 13 January 1998, the trial court entered an "ORDER FOR SPECIAL VENIRE" which provided that "venue . . . has been ordered changed to Johnston County as of February 26th, 1998 for the selection of a jury." Additionally, the trial court stated "that . . . due to the number of defendant[]s and the fact that the charges involve the first degree murders of two law enforcement officers, the jury selection process in these matters will require that a Special Venire of jurors be summoned."

As Kevin never moved for a change of venue, N.C.G.S. § 15A-957 does not apply in the instant case. In addition, there is no violation of N.C.G.S. § 15A-133 as Kevin argues because there was a ruling by the trial court on the issue of venue for jury selection. Given the nature and circumstances of the alleged crimes against two law enforcement officers and defendants' acquiescence to the stipulation and proposal at the hearing, the trial court had the inherent authority to order the change of venue for the limited purpose of jury selection from a special venire of Johnston County residents. Moreover, Kevin has not shown the trial court abused its discretion in ordering the limited change of venue. Kevin's assignment of error has no merit.

[3] By assignments of error, both defendants argue the trial court violated their federal and state constitutional rights to have a jury selected from a representative cross-section of the community in which the crime occurred. We disagree.

Initially, we address the State's argument that defendants did not preserve this issue for appellate review. Generally, "[t]his Court will not consider arguments based upon matters not presented to or adjudicated by the trial tribunal." *State v. Eason*, 328 N.C. 409, 420, 402 S.E.2d 809, 814 (1991); *see also* N.C. R. App. P. 10(b)(1). In this case,

there is no indication from the record that defendants objected to the special venire from Johnston County. In fact, defendants, through counsel, agreed with the trial court's proposal of a special venire from Johnston County. Thus, defendants waived appellate review of this assignment of error. Nevertheless, we elect, in our discretion pursuant to Rule 2 of the North Carolina Rules of Appellate Procedure, to review these assignments of error. See N.C. R. App. P. 2.

The state and federal constitutional guarantees of a trial by a jury of the accused's peers "assures that members of a defendant's 'own race have not been systematically and arbitrarily excluded from the jury pool which is to decide [his] guilt or innocence.' " State v. Bowman, 349 N.C. 459, 467, 509 S.E.2d 428, 434 (1998) (quoting State v. McNeill, 326 N.C. 712, 718, 392 S.E.2d 78, 81 (1990)) (alteration in original), cert. denied, —— U.S. ——, 144 L. Ed. 2d 802 (1999). In Duren v. Missouri, 439 U.S. 357, 364, 58 L. Ed. 2d 579, 587 (1979), the United States Supreme Court established a three-prong test to determine whether the right to a fair cross-section in the jury venire had been violated. To establish a prima facie case of disproportionate representation in the jury venire, a defendant must show:

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Id., quoted in Bowman, 349 N.C. at 468, 509 S.E.2d at 434.

In the instant case, defendants claim, according to the 1990 Census data, 60% of the residents of Cumberland County are Caucasian, and 31.8% are African-American; and 80% of the residents of Johnston County are Caucasian, and 17.5% are African-American. Thus, defendants contend, African-Americans were underrepresented in the jury pool by 45%.

There is no question in the instant case that defendants satisfied the first prong of the Duren test because African-Americans are unquestionably a "distinct" group for purposes of the Duren analysis. See Peters v. Kiff, 407 U.S. 493, 498-99, 33 L. Ed. 2d 83, 91 (1972).

In determining whether there is disproportionate representation under the second prong of Duren, this Court considers absolute disparity figures on a case-by-case basis. See State v. Hough, 299 N.C.

245, 252, 262 S.E.2d 268, 273 (1980). "Absolute disparity" in the instant case is the percentage of African-Americans in Cumberland County minus the percentage of African-Americans in Johnston County. *See id.* at 251, 262 S.E.2d at 272. Defendants, however, calculated the comparative disparity, or the percentage of absolute disparity between the counties divided by the percentage of African-Americans in Cumberland County. *See id.* at 251-52, 262 S.E.2d at 272. To calculate the absolute disparity, we subtract 17.5% (the percentage of African-Americans in Johnston County) from 31.8% (the percentage of African-Americans in Cumberland County); thus, the absolute disparity is 14.3%, much lower than the 45% comparative disparity reported by defendants.

This Court has held various percentages of absolute disparity, standing alone, are not unfair and unreasonable. *See Bowman,* 349 N.C. at 468, 509 S.E.2d at 434 (absolute disparity of 16.17%); *State v. Price,* 301 N.C. 437, 447, 272 S.E.2d 103, 110 (1980) (absolute disparity of 14%). The reasoning is that a defendant is " 'not entitled to a jury of any particular composition, . . . [or to] a jury which mirrors the presence of various and distinctive groups within the community.' " *Bowman,* 349 N.C. at 468, 509 S.E.2d at 434 (quoting *Price,* 301 N.C. at 448, 272 S.E.2d at 110-11); *see also Apodaca v. Oregon,* 406 U.S. 404, 32 L. Ed. 2d 184 (1972). In addition, the trial by jury right " 'carries with it the right to be tried before a body which is selected in such a manner that competing and divergent interests and perspectives in the community are reflected rather than reproduced absolutely.' " *Bowman,* 349 N.C. at 468-69, 509 S.E.2d at 434 (quoting *Price,* 301 N.C. at 448, 272 S.E.2d at 111); *see also Taylor v. Louisiana,* 419 U.S. 522, 42 L. Ed. 2d 690 (1975).

As we stated in *Bowman* and *Price,* defendants are not entitled to a special venire from the population of a county which exactly mirrors the population of Cumberland County as long as the venire was selected in a manner in which various interests were represented. While the population of Johnston County is not the mirror image of the population of Cumberland County, African-Americans were represented in Johnston County, and there is only a 14.3% absolute disparity. Therefore, we cannot say the absolute disparity between Cumberland County and Johnston County, standing alone, is unfair or unreasonable.

As to the third prong of *Duren,* this Court has held "[t]he fact that a particular jury or series of juries does not statistically reflect the

racial composition of the community does not in itself make out an invidious discrimination forbidden by the [Equal Protection] Clause." *Washington v. Davis*, 426 U.S. 229, 239, 48 L. Ed. 2d 597, 607 (1976), *quoted in State v. Avery*, 299 N.C. 126, 130, 261 S.E.2d 803, 806 (1980); *see also Bowman*, 349 N.C. at 469, 509 S.E.2d at 434-35 (holding the defendant "failed to present any evidence showing that the jury-selection process was tainted by the systematic exclusion of African-Americans from the jury pool"). Moreover, "[s]tatistics concerning one jury pool, standing alone, are insufficient to meet the third prong of *Duren*." *Bowman*, 349 N.C. at 469, 509 S.E.2d at 435.

Likewise, in the instant case, the fact that the racial composition of Johnston County differs from that of Cumberland County is not sufficient to show "systematic exclusion." The statistics concerning this one jury pool cannot satisfy the "systematic exclusion" requirement of the third prong of *Duren*. *See id*. Therefore, defendants have failed to establish a *prima facie* case of disproportionate representation, and these assignments of error are overruled.

[4] By assignments of error, both defendants challenge the sufficiency of the short-form murder indictments. Kevin argues the trial court committed constitutional error by entering judgment on his first-degree murder convictions where the indictments were insufficient to charge this offense. Tilmon argues the trial court erred in denying his motion to dismiss the murder indictments. Both defendants contend the short-form indictments do not allege the specific elements of first-degree murder that defendants acted with premeditation and deliberation in violation of their federal constitutional rights.

We recently addressed this issue in *State v. Wallace*, 351 N.C. 481, 528 S.E.2d 326 (2000), and *State v. Braxton*, 352 N.C. 158, —— S.E.2d —— (2000), and we decline to revisit the issue in the instant case. Defendants' arguments that the short-form murder indictments were insufficient are overruled.

[5] By assignments of error, both defendants argue the trial court erred by failing to require the State to disclose the aggravating circumstances on which it intended to rely at sentencing. Defendants contend the indictment should have contained the aggravating circumstances, and the trial court erred in denying their pretrial motions for disclosure of aggravating and mitigating circumstances. Specifically, defendants rely on *Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311 (1999), and argue that because aggravating circum-

stances may increase the penalty for first-degree murder from life imprisonment to death, defendants are entitled to pretrial notice, within the indictment or other binding instrument, of the aggravating circumstances the State intends to use at sentencing. We disagree.

The United States Supreme Court has previously held an indictment "need not set forth facts relevant only to the sentencing of an offender found guilty of the charged crime." *Almendarez-Torres v. United States*, 523 U.S. 224, 228, 140 L. Ed. 2d 350, 358 (1998). In *Jones*, the Supreme Court recognized the difference between elements of an offense and sentencing factors when it stated, "Much turns on the determination that a fact is an element of an offense rather than a sentencing consideration, given that *elements* must be charged in the indictment." *Jones*, 526 U.S. at 232, 143 L. Ed. 2d at 319 (emphasis added).

On the same issue, this Court has held "the State need not set forth in an indictment the aggravating circumstances upon which it will rely in seeking a sentence of death." *State v. Young*, 312 N.C. 669, 675, 325 S.E.2d 181, 185 (1985). In *State v. Williams*, 304 N.C. 394, 422, 284 S.E.2d 437, 454 (1981), *cert. denied*, 456 U.S. 932, 72 L. Ed. 2d 450 (1982), we held N.C.G.S. § 15A-2000(e), which sets forth the aggravating circumstances the jury may consider, made the defendant fully aware of what the State had to prove before a death sentence could be imposed.

As to defendants' motions to disclose the aggravating circumstances, this Court has held a trial court may not require the State to disclose which aggravating circumstances it intends to rely on at the sentencing phase. *See State v. McKoy*, 323 N.C. 1, 44, 372 S.E.2d 12, 36 (1988), *sentence vacated on other grounds*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990); *State v. Holden*, 321 N.C. 125, 153, 362 S.E.2d 513, 531 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). In addition, we have stated that N.C.G.S. § 15A-2000(e) sets forth the only aggravating circumstances upon which the State may rely in seeking the death penalty, and the "notice provided by this statute is sufficient to satisfy the constitutional requirements of due process." *Holden*, 321 N.C. at 154, 362 S.E.2d at 531.

The United States Supreme Court's recent opinion in *Apprendi v. New Jersey*, —— U.S. ——, —— L. Ed. 2d ——, 68 U.S.L.W. 4576 (2000), does not affect our prior holdings regarding the inclusion of aggravating circumstances in an indictment. The Supreme Court cites its previous holding in *Almendarez-Torres* that differentiates aggravat-

ing circumstances from elements of a crime and notes that it "has previously considered and rejected the argument that the principles guiding our decision today render invalid state capital sentencing schemes." *Apprendi*, —— U.S. at ——, —— L. Ed. 2d at ——, 68 U.S.L.W. at 4584-85; *see also Almendarez-Torres*, 523 U.S. at 228, 140 L. Ed. 2d at 358.

Considering the Supreme Court's continued recognition of the ·difference between elements of a crime and the aggravating circumstances in a capital sentencing procedure, *see Walton v. Arizona*, 497 U.S. 639, 111 L. Ed. 2d 511 (1990), our prior holdings are consistent with the decisions in *Jones* and *Apprendi*. Therefore, as we stated previously, an indictment need not contain the aggravating circumstances the State will use to seek the death penalty, *see Young*, 312 N.C. at 675, 325 S.E.2d at 185, and the trial court may not order the State to disclose the aggravating circumstances upon which it intends to rely, *see Holden*, 321 N.C. at 153, 362 S.E.2d at 531. Thus, in the instant case, the lack of aggravating circumstances on the indictment did not create error, and the trial court did not err in denying defendants' motions to order disclosure of the aggravating circumstances. Accordingly, these assignments of error are overruled.

[6] By assignment of error, Tilmon argues the trial court committed error and denied him due process of law when it denied his pretrial motion to sever the cases and overruled his objections to improper joinder. We disagree.

The facts show that on 10 February 1998, Tilmon moved for severance of his case from that of Kevin to allow the pursuit of antagonistic defenses, to promote a fair determination of guilt or innocence, and to prevent a prejudicial outcome. Citing *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476 (1968), Tilmon contended each defendant made out-of-court statements regarding the other defendant; and citing *State v. Marlow*, 310 N.C. 507, 313 S.E.2d 532 (1984), Tilmon argued he and Kevin had irreconcilable differences. Subsequently, on 16 February 1998, the State made a motion to join the cases on the grounds the several offenses charged were part of a common scheme or plan; were part of the same act or transaction; and were so closely connected in time, place, and occasion that it would be difficult to separate one charge from proof of the others.

At a pretrial hearing, Tilmon requested an *ex parte, in camera* hearing regarding severance on the ground he needed to divulge his

defense to the trial court in order to fully and effectively argue this motion. Tilmon also argued there were antagonistic defenses with Kevin. Over the State's objection, the trial court allowed his request. Thereafter, all persons left the courtroom except Tilmon, his counsel, security personnel, the clerk, the judge, and the court reporter.

After the excluded parties were returned to the courtroom, Tilmon argued the cases should be separated because the conflict between his and Kevin's respective positions was such that he would be denied a fair trial. Additionally, Tilmon argued, pursuant to *State v. Nelson*, 298 N.C. 573, 260 S.E.2d 629 (1979), *cert. denied*, 446 U.S. 929, 64 L. Ed. 2d 282 (1980), that evidence concerning Kevin's seized luggage[1] should be held to conflict with Tilmon's defense and/or alleged motive. The trial court denied Tilmon's motion for severance and allowed the State's motion for joinder.

The North Carolina General Statutes provide for joinder of defendants subject to the following provisions:

(b) Separate Pleadings for Each Defendant and Joinder of Defendants for Trial.

(1) Each defendant must be charged in a separate pleading.

(2) Upon written motion of the prosecutor, charges against two or more defendants may be joined for trial:

a. When each of the defendants is charged with accountability for each offense; or

b. When, even if all of the defendants are not charged with accountability for each offense, the several offenses charged:

1. Were part of a common scheme or plan; or

2. Were part of the same act or transaction; or

---

1. On 17 September 1997, Kevin was traveling from Richmond, Virginia, to South Carolina on a bus which stopped in Fayetteville, North Carolina. While the bus was stopped, Fayetteville Police Department officers seized Kevin's luggage on the suspicion the luggage contained illegal drugs. A drug-sniffing dog had alerted the officers to the possible presence of drugs in the luggage. The officers detained the luggage after Kevin refused to give them permission to search it. Kevin continued his trip to South Carolina without his luggage and without being arrested or charged.

3. Were so closely connected in time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others.

N.C.G.S. § 15A-926(b) (1999). "The propriety of joinder depends upon the circumstances of each case and is within the sound discretion of the trial judge." *State v. Pickens*, 335 N.C. 717, 724, 440 S.E.2d 552, 556 (1994). The trial court's discretionary ruling will not be disturbed on appeal absent a showing that joinder deprived the defendant of a fair trial. *See id.*; *State v. Evans*, 346 N.C. 221, 232, 485 S.E.2d 271, 277 (1997), *cert. denied*, 522 U.S. 1057, 139 L. Ed. 2d 653 (1998); *Nelson*, 298 N.C. at 586, 260 S.E.2d at 640.

Motions for severance and objections to joinder are governed by N.C.G.S. § 15A-927(c), which provides:

(c) Objection to Joinder of Charges against Multiple Defendants for Trial; Severance.

(1) When a defendant objects to joinder of charges against two or more defendants for trial because an out-of-court statement of a codefendant makes reference to him but is not admissible against him, the court must require the prosecutor to select one of the following courses:

a. A joint trial at which the statement is not admitted into evidence; or

b. A joint trial at which the statement is admitted into evidence only after all references to the moving defendant have been effectively deleted so that the statement will not prejudice him; or

c. A separate trial of the objecting defendant.

(2) The court, on motion of the prosecutor, or on motion of the defendant other than under subdivision (1) above must deny a joinder for trial or grant a severance of defendants whenever:

a. If before trial, it is found necessary to protect a defendant's right to a speedy trial, or it is found necessary to promote a fair determination of the guilt or innocence of one or more defendants; or

    b. If during trial, upon motion of the defendant whose trial is to be severed, or motion of the prosecutor with the consent of the defendant whose trial is to be severed, it is found necessary to achieve a fair determination of the guilt or innocence of that defendant.

(3) The court may order the prosecutor to disclose, out of the presence of the jurors, any statements made by the defendants which he intends to introduce in evidence at the trial when that information would assist the court in ruling on an objection to joinder of defendants for trial or a motion for severance of defendants.

N.C.G.S. § 15A-927(c) (1999). Thus, "the trial court must deny joinder for trial or grant a severance of defendants whenever it is necessary to promote a fair determination of the guilt or innocence of one or more defendants." *Pickens*, 335 N.C. at 724, 440 S.E.2d at 556.

We have said the presence of antagonistic defenses does not, standing alone, warrant severance. *Id.* at 725, 440 S.E.2d at 556. Additionally, " '[t]he test is whether the conflict in defendants' respective positions at trial is of such a nature that, considering all of the other evidence in the case, defendants were denied a fair trial.' " *State v. Lowery*, 318 N.C. 54, 59, 347 S.E.2d 729, 734 (1986) (quoting *Nelson*, 298 N.C. at 587, 260 S.E.2d at 640); *see also Pickens*, 335 N.C. at 725, 440 S.E.2d at 556. To determine whether the positions of the defendants are so antagonistic, or conflicting, as to be prejudicial, this Court has stated the trial court should grant severance when necessary to avoid an evidentiary battle between the defendants "where the state simply stands by and witnesses 'a combat in which the defendants [attempt] to destroy each other.' " *Nelson*, 298 N.C. at 587, 260 S.E.2d at 640 (quoting *People v. Braune*, 363 Ill. 551, 557, 2 N.E.2d 839, 842 (1936)) (alteration in original).

The State in the instant case did not stand by and rely on Kevin's statement to prove its case. *See State v. Green*, 321 N.C. 594, 601, 365 S.E.2d 587, 591-92 (holding the State did not rely on the codefendant's testimony, but was able to show independent evidence of defendant's guilt), *cert. denied*, 488 U.S. 900, 102 L. Ed. 2d 235 (1988). In his statement, Kevin claimed he was debilitated by pepper spray, and while in this condition, he heard gunshots. To rebut Kevin's claim, the State offered contrary evidence on the effects of pepper spray. Contrary to

Tilmon's argument and to his benefit, the State's rebuttal evidence actually disproves Kevin's statement. Moreover, there was overwhelming evidence, including the testimony of several eyewitnesses, of Tilmon's involvement in the crimes. *See Evans*, 346 N.C. at 232, 485 S.E.2d at 277 (holding there was plenary evidence, irrespective of the codefendant's statement, that defendant was involved). This rebuttal evidence, along with the direct evidence of Tilmon's involvement in the crimes, shows the State was not a mere witness to an evidentiary battle between Kevin and Tilmon.

Tilmon also argues the trial court should have severed defendants' trials because Kevin's out-of-court statement to police could not be adequately "sanitized" so as to avoid violating *Bruton*.

In *Bruton*, the United States Supreme Court held admission of a statement by a nontestifying codefendant, which incriminates the other defendant, at a joint trial, violated that defendant's Sixth Amendment right to confront the witnesses against him. *See Evans*, 346 N.C. at 231, 485 S.E.2d at 277. *Bruton* applies to the states by way of the Fourteenth Amendment. *See Pointer*, 380 U.S. at 403, 13 L. Ed. 2d at 926; *State v. Parrish*, 275 N.C. 69, 73-74, 165 S.E.2d 230, 234 (1969).

> "The result is that in joint trials of defendants it is necessary to exclude extrajudicial confessions unless all portions which implicate defendants other than the declarant can be deleted without prejudice either to the State or the declarant. If such deletion is not possible, the State must choose between relinquishing the confession or trying the defendants separately. The foregoing pronouncement presupposes (1) that the confession is inadmissible as to the codefendant . . . , and (2) that the declarant will not take the stand. If the declarant can be cross-examined, a codefendant has been accorded his right to confrontation."

*State v. Tucker*, 331 N.C. 12, 23-24, 414 S.E.2d 548, 554 (1992) (quoting *State v. Fox*, 274 N.C. 277, 291, 163 S.E.2d 492, 502 (1968)) (alteration in original).

Tilmon, however, waived any *Bruton* objection by signing the "Notice of Waiver of Right" in which he explicitly "waive[d] any constitutional or statutory objection that [he] may have under [*Bruton*] and N.C.G.S. § 15A-927 regarding the redaction and/or admission of the statement of a nontestifying co-defendant." Additionally, Tilmon's attorney stated in open court there was "no objection to the intro-

duction of the statement of Kevin Golphin [taken by the agents on the date of his arrest] as it relates to Tilmon Golphin." *See United States v. Flaherty*, 76 F.3d 967, 971 (8th Cir. 1996) (holding the defendant waived a *Bruton* challenge when he did not mention *Bruton* when the codefendant's statements were admitted and the trial court gave the cautionary instruction requested by defendant); *State v. Hutchins*, 303 N.C. 321, 341-42, 279 S.E.2d 788, 801 (1981) (holding constitutional guarantees are not absolute as defendants "may waive the benefit of constitutional guarantees by express consent, failure to assert it in apt time, or by conduct inconsistent with a purpose to insist upon it"). Therefore, we conclude Tilmon waived appellate review of severance based on a *Bruton* violation.

Tilmon further contends, pursuant to *State v. Boykin*, 307 N.C. 87, 296 S.E.2d 258 (1982), and *State v. Alford*, 289 N.C. 372, 222 S.E.2d 222, *death sentence vacated sub nom. Carter v. North Carolina*, 429 U.S. 809, 50 L. Ed. 2d 69 (1976), that severance was appropriate because he was precluded from offering exculpatory evidence that would have been available if the cases had not been joined. However, contrary to Tilmon's argument, this case is distinguishable from *Boykin* and *Alford*. In *Boykin*, this Court held the defendant "was prejudiced by the court's consolidation of cases because he was prevented from testifying as to his motive in making his 'false confessions.' " *Boykin*, 307 N.C. at 91, 296 S.E.2d at 260. The trial court allowed the State to introduce the admission, but because of the joint trial, the trial court did not permit the defendant to explain that the "confessions" were intended to protect the codefendant, who had previously been convicted of murder. *Id.* This Court also held the defendant was prevented from eliciting testimony that the codefendant had also confessed to the crime. *Id.* The instant case is distinguishable in that Tilmon was not prevented from providing a motive for his own statements as was the case in *Boykin*. Tilmon contends other witnesses did not wish to testify because of the negative effect on Kevin. Tilmon's inability to elicit information about a possible motive Kevin may have had is also dissimilar from the situation in *Boykin* where the defendant was prevented from actually testifying about his own motive for giving false confessions.

In *Alford*, this Court held the defendant was entitled to a separate trial where the codefendant's statement could have corroborated the defendant's alibi, but neither the State nor the defendant offered the statement into evidence, and the defendant could not force the codefendant to testify because of the codefendant's Fifth Amendment

right against self-incrimination. *Alford*, 289 N.C. at 387-88, 222 S.E.2d at 232. In the instant case, unlike in *Alford*, Tilmon was not prevented from offering evidence which would support an alibi. Tilmon merely contends some witnesses would not testify because of the negative statements they would have to make about Kevin; however, contrary to *Alford* where the defendant could not force the codefendant to testify, *see id.*, Tilmon could have subpoenaed the witnesses to testify for him. Tilmon also states he was prevented from asking questions about Kevin's motive to kill both victims. Such questioning would not exculpate Tilmon, or clear him from guilt, as would the alibi evidence in *Alford*. *See id.* Therefore, the instant case is distinguishable from both *Boykin* and *Alford*.

Additionally, the evidence in the instant case clearly supports consolidation of defendants' trials and the trial court's grant of the State's motion for joinder. Kevin and Tilmon were both charged with two counts of first-degree murder; two counts of robbery with a dangerous weapon; and one count each of assault with a deadly weapon with intent to kill, discharging a firearm into occupied property, and possession of a stolen vehicle. The evidence tended to show the offenses arose out of a common scheme and were part of the same transaction. *See* N.C.G.S. § 15A-926(b)(2). Therefore, the trial court did not err in denying Tilmon's motion for severance and granting the State's motion for joinder.

[7] In another assignment of error, Tilmon argues the trial court erred in denying his pretrial motion for discovery of Trooper Lowry's and Deputy Hathcock's personnel files. Tilmon relies on his federal constitutional right to material evidence which is in the hands of the prosecution. Additionally, Tilmon relies on the rules of evidence pertaining to the admissibility of relevant evidence in arguing he was entitled to the personnel files. Tilmon further argues the files may have shown prior acts of lethal force which might have impacted the jury on the issue of whether Tilmon had a reasonable belief that Kevin was the victim of excessive force by the law enforcement officers on the day in question. We disagree.

Initially, we note Tilmon claims the denial of this requested discovery violated his state and federal constitutional rights. However, Tilmon's motion for discovery of the personnel files did not allege any constitutional violations. As such, the trial court did not rule upon any possible constitutional violations. " 'This Court is not required to pass upon a constitutional issue unless it affirmatively appears that

the issue was raised and determined in the trial court.' " *State v. Nobles*, 350 N.C. 483, 495, 515 S.E.2d 885, 893 (1999) (quoting *State v. Creason*, 313 N.C. 122, 127, 326 S.E.2d 24, 27 (1985)). Therefore, we need not address Tilmon's allegation that the denial of his motion was a violation of his state and federal constitutional rights. *See also* N.C. R. App. P. 10(b)(1).

Furthermore, discovery in the superior court is governed by chapter 15A, article 48 of the North Carolina General Statutes. N.C.G.S. § 15A-903 specifically governs disclosure of evidence by the State and provides in pertinent part:

> (d) Documents and Tangible Objects.—Upon motion of the defendant, the court must order the prosecutor to permit the defendant to inspect and copy or photograph books, papers, documents, photographs, motion pictures, mechanical or electronic recordings, buildings and places, or any other crime scene, tangible objects, or copies or portions thereof which are *within the possession, custody, or control of the State* and which are material to the preparation of his defense, are intended for use by the State as evidence at the trial, or were obtained from or belong to the defendant.

N.C.G.S. § 15A-903(d) (1999) (emphasis added). We have previously held " '[w]ithin the possession, custody, or control of the State' as used in th[is] provision[] means within the possession, custody or control of the prosecutor or those working in conjunction with him and his office." *State v. Crews*, 296 N.C. 607, 616, 252 S.E.2d 745, 751-52 (1979); *see also State v. Pigott*, 320 N.C. 96, 102, 357 S.E.2d 631, 635 (1987).

In the instant case, on 10 February 1998, Tilmon filed a motion for discovery of personnel files in which he requested that the trial court conduct an *in camera* review and then provide defendant any evidence deemed exculpatory as part of discovery. In the motion, Tilmon referred to newspaper articles published after the crimes which concerned an incident involving disciplinary action against Trooper Lowry two years prior to the crimes. At a pretrial hearing, the trial court denied the motion stating there was no justification for an *in camera* examination at that time, but the trial court reserved the right to order the files' production at a later time.

There was no violation of this discovery statute in the instant case. The list of discoverable items in the statute does not include

victims' personnel files, *see* N.C.G.S. § 15A-903(d), and the personnel files were not in the possession, custody, or control of the prosecutor in this case, *see id. See also State v. Cunningham,* 344 N.C. 341, 352-53, 474 S.E.2d 772, 776 (1996) (holding regardless of whether the defendant had a right to an *in camera* inspection of the personnel file, he was not prejudiced by the trial court's refusal to allow it because the victim's conduct as a police officer would have no relevance to the question at issue in that case). Therefore, the trial court did not err in denying Tilmon's motion to discovery of the victims' personnel files.

[8] By assignments of error, both Kevin and Tilmon argue the trial court erred in denying Tilmon's pretrial motion to suppress the incriminating statement Tilmon made to law enforcement officers after his arrest. Tilmon argues the police continued the custodial interrogation of him after he had invoked his right to counsel. Based upon this alleged violation, Tilmon contends the trial court should have granted his motion to suppress and the trial court's error in admitting the statement entitles him to a new trial. Kevin concedes he has no standing to assert Tilmon's constitutional rights but claims he was prejudiced by the erroneous admission of Tilmon's statement. Kevin argues Tilmon's confession directly incriminated Kevin because of the acting in concert theory submitted to the jury, and the jury could have drawn inferences regarding Kevin's participation in Deputy Hathcock's murder from omissions in Tilmon's statement. We disagree.

As to Tilmon's argument on this issue, we have previously stated that a motion *in limine* was not sufficient to preserve for appeal the question of admissibility of evidence if the defendant does not object to that evidence at the time it is offered at trial. *See State v. Hayes,* 350 N.C. 79, 80, 511 S.E.2d 302, 303 (1999) (per curiam). As a pretrial motion to suppress is a type of motion *in limine,* Tilmon's pretrial motion to suppress is not sufficient to preserve for appeal the question of the admissibility of his statement because he did not object at the time the statement was offered into evidence. *See id.* In addition, while Tilmon's assignment of error includes plain error as an alternative, his brief contains no specific argument that there is plain error in the instant case. Accordingly, Tilmon's argument is not properly before this Court. *See* N.C. R. App. P. 10(c)(4); *State v. McNeil,* 350 N.C. 657, 681, 518 S.E.2d 486, 501 (1999), *cert. denied,* —— U.S. ——, 146 L. Ed. 2d 321 (2000); *State v. Frye,* 341 N.C. 470, 496, 461 S.E.2d 664, 677 (1995), *cert. denied,* 517 U.S. 1123, 134 L. Ed. 2d 526 (1996).

However, given the constitutional nature of Tilmon's argument, pursuant to Rule 2 of the North Carolina Rules of Appellate Procedure, we will address the merits of Tilmon's argument.

Both the United States Supreme Court and this Court have held that during a custodial interrogation, if the accused invokes his right to counsel, the interrogation must cease and cannot be resumed without an attorney being present *"unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona,* 451 U.S. 477, 485, 68 L. Ed. 2d 378, 386 (1981) (emphasis added); *see also Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694 (1966); *State v. Warren,* 348 N.C. 80, 97, 499 S.E.2d 431, 440, *cert. denied,* 525 U.S. 915, 142 L. Ed. 2d 216 (1998); *State v. Jackson,* 348 N.C. 52, 55, 497 S.E.2d 409, 411, *cert. denied,* 525 U.S. 943, 142 L. Ed. 2d 301 (1998); *State v. Lang,* 309 N.C. 512, 521, 308 S.E.2d 317, 321 (1983).

The term "interrogation" is not limited to express questioning by law enforcement officers, but also includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 302, 64 L. Ed. 2d 297, 308 (1980); *see also State v. Coffey,* 345 N.C. 389, 400, 480 S.E.2d 664, 670 (1997); *State v. DeCastro,* 342 N.C. 667, 684, 467 S.E.2d 653, 661, *cert. denied,* 519 U.S. 896, 136 L. Ed. 2d 170 (1996). The focus of the definition is on the suspect's perceptions, rather than on the intent of the law enforcement officer, because *Miranda* protects suspects from police coercion regardless of the intent of police officers. *See Innis,* 446 U.S. at 301, 64 L. Ed. 2d at 308. However, because "the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Id.* at 301-02, 64 L. Ed. 2d at 308.

Based on the Supreme Court's definition of interrogation in *Innis,* there is a limited exception to *Miranda* for routine questions asked during the booking process. *See Pennsylvania v. Muniz,* 496 U.S. 582, 601, 110 L. Ed. 2d 528, 552 (1990) (plurality opinion) (where the accused made an incriminating statement prior to being read his *Miranda* rights, the Supreme Court held questions regarding a suspect's name, address, physical characteristics, date of birth, and current age constituted custodial interrogation, but were "nonetheless

admissible because the questions [fell] within a 'routine booking question' exception which exempts from Miranda's coverage questions to secure the 'biographical data necessary to complete booking or pretrial services' ") (quoting *United States v. Horton*, 873 F.2d 180, 181 n.2 (8th Cir. 1989)); *Clayton v. Gibson*, 199 F.3d 1162 (10th Cir. 1999) (where the suspect had been given his *Miranda* rights and had invoked his right to counsel, the Tenth Circuit Court of Appeals relied on *Muniz*, 496 U.S. at 601, 110 L. Ed. 2d at 552, in holding there was no constitutional violation because the questions asked fell within the booking exception); *State v. Ladd*, 308 N.C. 272, 286, 302 S.E.2d 164, 173 (1983) (where the suspect had been given his *Miranda* rights and had invoked his right to counsel, this Court relied on the language of *Innis*, 446 U.S. at 301, 64 L. Ed. 2d at 308, to find an exception to "interrogation" for questions related to the booking process). This exception is consistent with *Innis* because the Supreme Court stated that interrogation includes express questioning as well as " 'any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " *Ladd*, 308 N.C. at 286, 302 S.E.2d at 173 (quoting *Innis*, 446 U.S. at 301, 64 L. Ed. 2d at 308) (alteration in original). In an effort not to infringe upon an accused's constitutional rights, however, the exception is limited "to *routine informational* questions necessary to complete the booking process that are *not* 'reasonably likely to elicit an incriminating response' from the accused." *Id.* at 287, 302 S.E.2d at 173.

In addition, responses to generalized questions by law enforcement officers, which are not reasonably likely to elicit incriminating responses, are admissible. *See State v. Gray*, 347 N.C. 143, 171, 491 S.E.2d 538, 549 (1997) (asking whether the defendant needed anything was not designed to elicit an incriminating response), *cert. denied*, 523 U.S. 1031, 140 L. Ed. 2d 486 (1998); *State v. Vick*, 341 N.C. 569, 581, 461 S.E.2d 655, 662 (1995) (police captain's statements during the fingerprinting process that he would talk with the defendant later and answer any of the defendant's questions at that time were not intended or expected to elicit an incriminating response). Moreover, law enforcement officers can respond to questions posed by a defendant without violating *Innis* or *Edwards*. *See State v. McQueen*, 324 N.C. 118, 132, 377 S.E.2d 38, 46-47 (1989) (holding the law enforcement officer's willingness to respond to the defendant's questions and the actual answers given were not "words or actions . . . [the law enforcement officer] *should have known* were

reasonably likely to elicit an incriminating response" pursuant to *Innis*, 446 U.S. 291, 64 L. Ed. 2d 297, and the defendant's statements and questions were voluntary pursuant to *Edwards*, 451 U.S. 477, 68 L. Ed. 2d 378).

In the instant case, the transcript of the pretrial hearing concerning Tilmon's motion to suppress reveals that Agent Godfrey and Detective Casey questioned Tilmon on 23 September 1997. Agent Godfrey advised Tilmon of his constitutional rights. Tilmon stated he wanted to talk with a lawyer. Thereafter, Agent Godfrey informed Tilmon they could not ask Tilmon about his involvement in the shootings of Trooper Lowry and Deputy Hathcock because he had requested to speak with an attorney, but Agent Godfrey told Tilmon they did need to obtain biographical information and background data for the arrest report. Subsequently, Agent Godfrey asked Tilmon for his full name, address, height, weight, next of kin, place of employment, and grade of education he had completed. Then Tilmon asked Agent Godfrey where he would be kept until his trial. Agent Godfrey responded that he would be kept in the Cumberland County jail. Tilmon then informed Agent Godfrey that he was a vegetarian and that his religion allowed him to eat only fish and prohibited anyone from cutting his hair or taking anything from his body. Agent Godfrey asked the name of Tilmon's religion so he could inform jail management in order to justify Tilmon's request. In response, Tilmon stated he was a member of the Rastafarian religion. Next, based on the belief that a video camera in Trooper Lowry's car had recorded the incident, Tilmon asked Agent Godfrey and Detective Casey why they wanted to talk about what had happened because it should have been videotaped. Agent Godfrey responded that he still needed to know why it happened. Agent Godfrey testified that at the time he made this statement, he knew there was no videotape and that neither he nor Detective Casey ever indicated to Tilmon there was a videotape. Tilmon then stated he would tell Agent Godfrey and Detective Casey why it happened. Tilmon proceeded, over a lengthy interview process which included several breaks, to make a statement concerning the shooting incident.

After reviewing the motion, hearing the evidence offered by the State, and giving Tilmon an opportunity to present evidence, the trial court made findings of fact consistent with the above recitation of facts. Thereafter, the trial court concluded as a matter of law:

Tilmon Golphin made a statement to law enforcement officers freely, voluntarily and understandingly, after being fully

advised by law enforcement officers of all appropriate constitutional and state statutory rights and federal statutory rights related to the right to counsel and related to rights concerning self-incrimination.

Two, Tilmon Golphin's motion to suppress his statement of the—on the twenty-third day of September, 1997, should be denied.

Based on the findings of fact and conclusions of law, the trial court denied Tilmon's motion to suppress.

A trial court is to make an initial determination as to whether a defendant waived his/her right to counsel. Those findings of fact " 'are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting.' " *State v. Peterson*, 347 N.C. 253, 255, 491 S.E.2d 223, 224 (1997) (quoting *State v. Eason*, 336 N.C. 730, 745, 445 S.E.2d 917, 926 (1994), *cert. denied*, 513 U.S. 1096, 130 L. Ed. 2d 661 (1995)). Conclusions of law which are supported by findings of fact are binding on appeal. *Id.* "Further, the trial court's conclusions of law must be legally correct, reflecting a correct application of applicable legal principles to the facts found." *State v. Fernandez*, 346 N.C. 1, 11, 484 S.E.2d 350, 357 (1997).

We conclude the trial court's findings of fact are supported by competent evidence and are, therefore, binding on appeal. *See Coffey*, 345 N.C. 389, 480 S.E.2d 664 (holding the Court was bound by the trial court's findings because, assuming *arguendo* there was an interrogation, there was competent evidence in the record to support the trial court's finding that the defendant initiated the conversation with police after invoking his right to counsel). In addition, the findings of fact support the conclusions of law.

This Court must also determine if the trial court's conclusions are legally correct. We conclude they are. Although Tilmon asserted his right to counsel and the police continued to ask Tilmon questions, *see Innis*, 446 U.S. at 302, 64 L. Ed. 2d at 308, the questions were included in the exception for questions used to elicit biographical information, *see Ladd*, 308 N.C. at 286, 302 S.E.2d at 172-73. In addition, it is unreasonable to say Agent Godfrey should have known his questions concerning Tilmon's biographical information were reasonably likely to elicit an incriminating response, and there was no reason Agent Godfrey should have known his response to Tilmon's questions about where he would be housed until the time of trial would elicit an

incriminating response. *See Innis*, 446 U.S. at 301-02, 64 L. Ed. 2d at 308; *McQueen*, 324 N.C. at 132, 377 S.E.2d at 46. Moreover, Tilmon initiated the further discussion when he asked why Agent Godfrey and Detective Casey wanted to talk about the incident when it had been videotaped. *See Edwards*, 451 U.S. at 484-85, 68 L. Ed. 2d at 386. Agent Godfrey merely responded to Tilmon's question that they needed to know why it happened. Nothing should have led Agent Godfrey to believe his response to the question would elicit an incriminating response. *See Innis*, 446 U.S. at 301-02, 64 L. Ed. 2d at 308.

As we have concluded that the trial court's findings of fact are supported by competent evidence, that the findings of fact support the conclusions of law, and that the conclusions of law are legally correct, we hold Tilmon's constitutional rights were not violated by the trial court's denial of his motion to suppress his statement to police. Therefore, this assignment of error is overruled.

**[9]** Concerning Kevin's assignment of error, it is well settled that "a defendant's right to counsel is personal" to the defendant. *State v. Peterson*, 344 N.C. 172, 179, 472 S.E.2d 730, 733 (1996). Kevin concedes he has no standing to assert Tilmon's constitutional right to counsel. Nevertheless, Kevin argues he was prejudiced by the erroneous admission of the allegedly unconstitutional confession.

Rule 10(b)(1) of the North Carolina Rules of Appellate Procedure requires a party to present a timely request, objection, or motion to the trial court to preserve a question for appellate review. *See* N.C. R. App. P. 10(b)(1). However, Kevin did not make a motion *in limine* to suppress Tilmon's statement on the basis that both the state and federal constitutions require its exclusion. Nor did Kevin object at the time the statement was offered into evidence at trial. Thus, this issue was not properly preserved. Although Kevin's assignment of error includes plain error as an alternative, he does not argue specifically and distinctly, pursuant to N.C. R. App. P. 10(c)(4), that there was plain error. Therefore, this assignment of error is not properly before this Court.

## JURY SELECTION ISSUES

**[10]** By assignments of error, both defendants argue, pursuant to N.C.G.S. § 15A-1214(a), the trial court violated its statutory duty to ensure jury selection was conducted in a random manner. Specifically, defendants contend both the trial court's use of panels

for jury selection and the trial court's placement of certain prospective jurors into particular jury panels violated the randomness requirement of jury selection, the purpose of which is to protect a defendant's state and federal constitutional rights to a fair and impartial jury.

Constitutional questions not raised and passed on by the trial court will not ordinarily be considered on appeal. *See Wallace*, 351 N.C. at 503, 528 S.E.2d at 340-41; *Nobles*, 350 N.C. at 495, 515 S.E.2d at 893. However, statutory violations, regardless of objections at the trial court, are reviewable. "When a trial court acts contrary to a statutory mandate, the right to appeal the court's action is preserved, notwithstanding the failure of the appealing party to object at trial." *State v. Jones*, 336 N.C. 490, 497, 445 S.E.2d 23, 26 (1994).

In the instant case, defendants cite *Gray v. Mississippi*, 481 U.S. 648, 660, 95 L. Ed. 2d 622, 634 (1987) (holding the improper removal of prospective jurors for cause was a type of constitutional error which was not susceptible to harmless error analysis), and contend their constitutional rights to a fair and impartial jury were violated. However, defendants never objected, on constitutional grounds or otherwise, to the use of panels for jury selection or the manner in which the trial court placed prospective jurors into panels. Thus, defendants have waived review of the constitutionality of the trial court's actions. *See Nobles*, 350 N.C. at 495, 515 S.E.2d at 893.

Although defendants failed to object at trial, we review the alleged statutory violation. N.C.G.S. § 15A-1214(a) provides: "The clerk, under the supervision of the presiding judge, must call jurors from the panel by a system of random selection which precludes advance knowledge of the identity of the next juror to be called." N.C.G.S. § 15A-1214(a) (1999). A challenge to a jury panel: (1) "May be made only on the ground that the jurors were not selected or drawn according to law"; (2) "Must be in writing"; (3) "Must specify the facts constituting the ground of challenge"; and (4) "Must be made and decided before any juror is examined." N.C.G.S. § 15A-1211(c) (1999); *see also State v. Workman*, 344 N.C. 482, 498-99, 476 S.E.2d 301, 310 (1996) (where this Court found no merit in the defendant's assignment of error "[i]n light of the fact that defendant failed to follow the procedures clearly set out for jury panel challenges and further failed, in any manner, to alert the trial court to the alleged improprieties"). Defendants in the instant case failed to comply with N.C.G.S. § 15A-1211(c) to challenge the panels; therefore, as

this Court found in *Workman*, defendants have waived review of their assignments of error.

However, assuming, without deciding, that the trial court violated N.C.G.S. § 15A-1214(a), defendants cannot show prejudicial error. The facts surrounding this issue tended to show that the trial court informed both Kevin and Tilmon of its intention to place the prospective jurors into panels for jury selection. The trial court stated:

> I will hear from the state and the defendants as to each of the [hardship] requests, will rule on those. Then from those left, the court—the clerk will draw names and put them into panels. There will be thirty panels. The panels probably will not be of equal number. But the jurors will be randomly drawn and put into the thirty panels.

During jury selection, there were three prospective jurors whose hardship excuses were denied or who did not appear when called and who were placed into specific panels by the trial court. Defendants assigned error to such placement.

First, prospective juror Lance Peedin requested a hardship excuse because he did not have transportation to the courthouse. The trial court suggested placing Peedin in panel number thirty "because if worse came to absolute worse, we could provide him transportation." The trial court asked if anyone had a problem with placing Peedin in panel number thirty; counsel for both defendants responded, "No, sir." Peedin was never called to be questioned for inclusion on the jury.

Second, prospective juror Ronald Harris requested a hardship excuse because he was starting a new job as a deputy sheriff and would have to take unpaid days off to serve. The trial court denied the request and placed Harris into panel number thirty. After some courtroom discussion, Kevin's counsel stated, "We could be out of peremptories by group thirty." Harris was never called to be questioned for inclusion on the jury.

Lastly, prospective juror Jeffrey Beasley, who was selected to be in panel number two, did not appear in court when called. Beasley later informed the court that his work obligations prevented him from coming. The court listed the alternatives of how to respond to Beasley's absence: "move him to a later panel" or "go get him." Tilmon's counsel stated, "I guess on behalf of Tilmon Golphin, we're

satisfied if you move him to a much later group, and if we don't get to him at all, it will be a moot issue." Kevin's counsel stated, "Whatever the Court decides is fine." The court then asked if they would agree to move Beasley to panel number twenty-five. Counsel for both Tilmon and Kevin agreed. Beasley was later called and did appear. Based on his responses to questioning, Tilmon's counsel challenged Beasley for cause, and counsel for Kevin joined the challenge. The trial court excused Beasley for cause.

There were also prospective jurors who had made written requests to be excused, some of which were denied. Those whose requests were denied were placed into a separate panel, number thirty-one. Reflecting the intent of the court, the judge stated:

> Then it is then the intent of the court to draft a letter to be sent to the address of these jurors with the jury reporting instructions informing them that they are on panel thirty-one; that it—that they are to call in each day after five; that if their panel is called in, they are to come at the appointed time at which time they will receive—that they will go through the orientation procedure and then be considered for service in this case. That letter will go out over my signature to these jurors. We will simply mail them the letter since we're not going to need them any time soon. Does anyone object to that procedure?

Both defendants stated there was "[n]o objection." Defendants now assign error to the placement of these prospective jurors into panel number thirty-one.

Defendants were not prejudiced by the use of panels in the jury selection process. Neither Tilmon nor Kevin objected when the trial court indicated its intention to use panels for jury selection or when the trial court stated how the prospective jurors were to be placed into panels. See State v. Lawrence, 352 N.C. 1, 13, 530 S.E.2d 807, 815 (2000) (holding there was a statutory violation, but the defendant could not show he was prejudiced); State v. Hyde, 352 N.C. 37, 49, 530 S.E.2d 281, 290 (2000) (holding the defendant requested and consented to any deviation in the statutory jury selection process).

In addition, defendants cannot show they were prejudiced by the trial court's placement of Beasley, Peedin, and Harris into specific panels. When the trial court was discussing Beasley with all parties, Tilmon's counsel suggested moving Beasley to a later panel, and Kevin's counsel stated he would agree with the court's decision.

Regarding Peedin, both defendants replied "no" when the trial court asked if there was a problem moving Peedin into panel number thirty. Neither defendant objected when the trial court indicated its intention to move Harris into panel number thirty. *See Lawrence,* 352 N.C. at 13, 530 S.E.2d at 815; *Hyde,* 352 N.C. at 49, 530 S.E.2d at 290. Additionally, with regard to Beasley, Peedin, and Harris, defendants argue the trial court's only options were to excuse or defer them. However, Beasley was subsequently excused for cause on a challenge by defendants, and because Peedin and Harris were never called for questioning, it is inconsequential that the trial court did not excuse or defer Peedin and Harris. Thus, defendants were not prejudiced.

Moreover, defendants cannot show they were prejudiced by the trial court's placement of the prospective jurors whose written excuses were denied into panel number thirty-one. Although defendants argue the makeup of the jury might have differed if those prospective jurors had been randomly placed into panels, "defendant[s] [are] not entitled to any particular juror. [The] right to challenge is not a right to select but to reject a juror." *State v. Harris,* 338 N.C. 211, 227, 449 S.E.2d 462, 470 (1994). In *Harris,* this Court noted that the defendant conceded that neither he nor the State exhausted their peremptory challenges, "evidenc[ing] satisfaction with the jury which was empaneled." *Id.* In the instant case, neither defendant exhausted the statutory number of peremptory challenges. *See* N.C.G.S. § 15A-1217(a) (1999). Thus, neither defendant can show he was prejudiced because neither was forced to accept a juror he felt was undesirable. *See Lawrence,* 352 N.C. at 13, 530 S.E.2d at 815 (noting that the defendant did not exhaust his peremptory challenges and was not forced to accept an undesirable juror); *see also Harris,* 338 N.C. at 227, 449 S.E.2d at 470.

Therefore, we conclude defendants failed to preserve any arguments as to a constitutional violation or a statutory violation. Nevertheless, assuming *arguendo* there was error, defendants have failed to show they were prejudiced by the trial court's use of panels in jury selection or the trial court's placement of particular jurors into specific panels.

[11] By assignments of error, both Tilmon and Kevin argue the trial court violated their state and federal constitutional rights to be present at every stage of their capital trial. Defendants contend the trial court's direction to the clerk of court to meet privately with jurors about transportation and other logistical matters violated their

constitutional rights because transportation was a substantive issue which was not "merely administrative" in nature. We disagree.

As we noted above, defendants are guaranteed the right to be present at every stage of their trial by the Confrontation Clause of the Sixth Amendment to the United States Constitution. *See Allen*, 397 U.S. at 338, 25 L. Ed. 2d at 356. Similarly, the Confrontation Clause in Article I, Section 23 of the North Carolina Constitution provides defendants the right to be present at every stage of the trial. *See Call*, 349 N.C. at 397, 508 S.E.2d at 506; *Chapman*, 342 N.C. at 337, 464 S.E.2d at 665; *Payne*, 320 N.C. at 139, 357 S.E.2d at 612. This right cannot be waived when a defendant is being tried capitally, *see Buckner*, 342 N.C. at 227, 464 S.E.2d at 430, and extends to jury selection, *see State v. McCarver*, 329 N.C. 259, 261, 404 S.E.2d 821, 822 (1991); *State v. Smith*, 326 N.C. 792, 794, 392 S.E.2d 362, 363 (1990).

While this Court has held a "trial court's *ex parte* admonitions to the jury amounted to error requiring a new trial," *Payne*, 320 N.C. at 140, 357 S.E.2d at 613, this Court has also held a defendant's right to presence is not violated when a clerk communicates with a jury about administrative matters, *see State v. Bacon*, 337 N.C. 66, 86, 446 S.E.2d 542, 551 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995). In *Bacon*, the defendant argued his right to presence was violated by the trial court's instructions to the bailiff to " 'put the jurors in the jury room on break' " and " 'have them to return back to the jury room' at some specific time," as well as the administrative duties of the clerk of calling jury roll and informing jurors what time they needed to arrive at court. *Id.* This Court concluded "that these challenged communications were of an administrative nature and did not relate to the consideration of defendant's guilt or innocence." *Id.* This Court held the defendant's presence would not have had a reasonably substantial relation to his opportunity to defend. *Id.*

Similarly, in *State v. Lemons*, 348 N.C. 335, 346, 501 S.E.2d 309, 316 (1998), *sentence vacated on other grounds*, 527 U.S. 1018, 144 L. Ed. 2d 768 (1999), the defendant argued the clerk's *ex parte* contact with jurors violated his right to presence because there was no record of the clerk's contact with the jurors, and there was no showing the clerk's contact was limited to the jury questionnaire inquiry. This Court held there was no violation of the defendant's constitutional rights because "[i]n distributing and gathering the questionnaires, the clerk merely sought to carry out the administrative duties which the trial court had requested," and the defend-

ant failed to show " 'how his presence would have been useful to his defense.' " *Id.* at 348, 501 S.E.2d at 317 (quoting *Bacon*, 337 N.C. at 86, 446 S.E.2d at 551-52); *see also State v. Gay*, 334 N.C. 467, 482-83, 434 S.E.2d 840, 848 (1993) (holding the trial court's order to the bailiff to remind jurors to follow the court's instructions is not an instruction as to the law, and such communications do not relate to the defendant's guilt or innocence because the defendant's right to presence would not have been useful to his defense as demonstrated by the fact that defendant's attorney had no objection; thus, while the trial court's order to the bailiff "may run the risk of violating defendant's right to be present," there was no reversible error in the case).

In another case, the defendant argued his right to be present was violated when the bailiff, pursuant to the trial court's instructions, told the jurors to take a fifteen minute break. *See State v. May*, 334 N.C. 609, 614, 434 S.E.2d 180, 183 (1993), *cert. denied*, 510 U.S. 1198, 127 L. Ed. 2d 661 (1994). The defendant contended that because there was no record of the bailiff's conversation with the jury, this Court could not know the nature of the conversation, and it would be impossible to reconstruct. *See id.* at 614-15, 434 S.E.2d at 183. This Court held:

> Without anything in the record to show something else happened, we will assume the bailiff followed the court's instructions. . . . It would impose a heavy burden on our courts if a court reporter were required to accompany a bailiff every time he is with a jury in order to make a record of what was said.

*Id.* at 615, 434 S.E.2d at 183.

In the instant case, after the first three jurors were selected, the trial court instructed the jurors on several matters, including:

> Now, in all candor, I anticipate that that is going to take between another three and four weeks to complete it. And I think from your standpoint, having participated in the jury selection process this week, in projecting it out over the selection of basically an additional thirteen jurors, you can believe that that's probably a fair estimate. Now, I'm not going to ask you to wait, as I promised you in the beginning, in the jury deliberation room while we do this. You will be placed on telephone standby.
>
> When court is recessed, please go to the jury room. The courtroom clerk and the trial court administrator from Cumberland County who are coordinating aspects relating to the

**STATE v. GOLPHIN**

[352 N.C. 364 (2000)]

jury will come into the jury deliberation room to talk with you and to get some information from you. The information that they will want will include telephone numbers where you can be reached during the day or in the evening. We need them. And they may ask questions about the best times to reach you and the best numbers to do that. So they will want some fairly complete information about places that we can reach you.

And it may be that if you know between now and then there will be, you know, a couple days where you may be out of town and be at a different number, that will be fine if we can know where to reach you. So they will be trying—they will be getting more information about how to get up with you than we have been getting from the jury generally because you have been selected as jurors in this case.

They will also be giving you some information about the transportation procedure and about the lunch procedure during the trial, including the menu that you will be able to choose from during the trial and the menu selection sheets. So I would ask that you cooperate with them in furnishing the information that they have requested, and if you have questions about the logistics of reporting, you may ask them and they will probably have the answers.

One thing we do not know at this point is exactly the precise location here at the courthouse where you will report. We will have a place and there will be parking provided at that place, but we cannot tell you right now the precise location. When you are called and told to come in, you will be told specifically when to report. The reporting time will be 8:15. That is on the sheet. That will be basically the reporting time each day unless there is something unusual for that day about the court schedule. So the reporting time here at the courthouse in Johnston County or some location near this will be 8:15 in the morning.

The court schedule again 10:00 to 4:00 with an hour for lunch probably from 12:30 to 1:30. There will be a short break in the middle of the morning, short break in the middle of the afternoon. And then at 4:00 go back to the bus, take you back to the same place—well, the place where your car is here in Johnston County. If somebody is driving you here, that is fine. You should be back at the same place. The bus will leave from the same place and come back to the same place which is near where the cars

will be parked. So if somebody is going to pick you up, they could do so at that location.

The trial court gave similar instructions after each of the remaining nine jurors and four alternate jurors were selected.

Defendants argue the clerk's communication with selected jurors was not merely administrative in nature in that there is a possibility the jurors asked the clerk substantive questions. In support of this argument, defendants point out that, in its instructions to jurors Kirsti Lovette Kearney, Sharon Seals Waugh, and Alice Rayne Stephenson, the trial court added:

> If you have questions about the logistics of when you report, where you report—no one can answer or would answer any questions about any other aspect of the trial—but if you have questions about those kind of logistical matters that [the clerk] may be able to answer those questions for you.

Defendants argue this additional instruction indicates there was a problem limiting jurors' questions to those concerning logistical matters. Defendants also state the trial court did not give this additional instruction to any other group of selected jurors.

The clerk of court's contact with the selected jurors in the instant case is similar to that in *Bacon, Lemons,* and *May.* The clerk was performing an administrative duty in providing logistical information to newly selected jurors. The clerk obtained telephone numbers of the selected jurors, who were placed on telephone standby and were provided information about where to park and the lunch menu during trial. While the trial court did instruct three jurors with the additional statements as defendants indicated, the trial court also made a similar statement when instructing juror Timothy Hugh Renfrow, but to no other jurors. Later, however, when the trial court instructed alternate juror Audrey Pittman, it stated:

> if you will go to the jury deliberation room and wait there for the courtroom clerk, she will come there with the instruction material, with the menu, with the order sheets for the first couple of days, to get your telephone numbers and then *answer any other questions that you have.*

Contrary to defendants' contentions, the trial court's failure to make a statement to the jurors that followed, similar to the one made to jurors Kearney, Waugh, Stephenson, and Renfrow, and the one given

to alternate juror Pittman, shows there was no such concern that the jurors were asking the clerk inappropriate questions. Moreover, as there is nothing in the record to suggest that anything other than logistics was discussed, and the fact that defendants failed to object, we assume the clerk engaged only in the administrative duties assigned. *See May*, 334 N.C. at 615, 434 S.E.2d at 183.

Defendants also argue the trial court indicated the clerk would be discussing transportation procedures, which defendants contend was a substantive issue. Defendants made pretrial motions concerning the route jurors would take to Cumberland County and requested that jurors not be driven by the scene of the crime. These motions were allowed. Defendants contend any discussion of transportation with the clerk could have generated questions about the route and time required to travel from one county to the other.

Defendants speculate that discussion may have arisen about the bus route to Cumberland County. Regarding the subject of transportation, the record indicates the clerk was to inform the jurors where to park their cars in the morning and where the bus would drop them off in the evening. Defendants can focus only on what jurors *may* have asked the clerk about the transportation route and the time necessary to travel from Johnston County to Cumberland County. Based on defendants' failure to object and because the record contains nothing to suggest the clerk spoke with jurors about the bus route or any other substantive issue, we assume the clerk limited any conversation to the logistics of jury service and any other administrative matters. *See id.* at 614-15, 434 S.E.2d at 183. Therefore, we conclude defendants' assignments of error are without merit and are overruled.

**[12]** By assignments of error, both defendants contend the trial court erred by excusing for cause prospective jurors Timothy Ray, Sandra Parker, Jarrell Etheridge, Pamela Sessions, Lester Brown, Michael Hood, Richard Coppedge, Brenda Pone, Paquita Raynor, Edward Blackmon, Robert Batts, and Clifton Cooley because they were qualified to serve and could be fair and impartial. In their briefs, however, defendants argue only that the trial court erred in excusing prospective juror Sandra Parker. As to the remaining prospective jurors defendants included in their assignments of error, any claims are deemed abandoned pursuant to N.C. R. App. P. 28(b)(5).

In his brief, Tilmon argues the trial court erred in excusing prospective juror Parker for cause without allowing an opportunity

to ask further questions. Tilmon contends this error stripped him of his constitutional rights by precluding him from making a full and fair inquiry during the jury selection process. Kevin incorporates Tilmon's argument and contends the trial court erred in excusing Parker for cause in violation of his constitutional rights. Specifically, Kevin argues the trial court's inquiry into Parker's state of mind was cursory, overly general, and not adequate to demonstrate Parker lacked the ability to be fair and impartial.

A defendant's due process rights guarantee the right to a trial by a fair and impartial jury. *See State v. Boykin*, 291 N.C. 264, 269, 229 S.E.2d 914, 917 (1976). Either party may challenge an individual juror for cause if the juror is "unable to render a fair and impartial verdict." N.C.G.S. § 15A-1212(9) (1999). "It has long been held that the 'granting of a challenge for cause rests in the sound discretion of the trial court.' " *State v. Hartman*, 344 N.C. 445, 458, 476 S.E.2d 328, 335 (1996) (quoting *State v. Cunningham*, 333 N.C. 744, 753, 429 S.E.2d 718, 723 (1993)), *cert. denied*, 520 U.S. 1201, 137 L. Ed. 2d 708 (1997); *see also State v. Burrus*, 344 N.C. 79, 88, 472 S.E.2d 867, 874 (1996); *State v. Jaynes*, 342 N.C. 249, 270, 464 S.E.2d 448, 461 (1995), *cert. denied*, 518 U.S. 1024, 135 L. Ed. 2d 1080 (1996). Therefore, absent a showing of abuse of discretion, we will not disturb the trial court's ruling on a challenge for cause. *See Hartman*, 344 N.C. at 458, 476 S.E.2d at 335.

To determine whether a prospective juror is able to render a fair and impartial verdict, the trial court must be able to " 'reasonably conclude from the *voir dire* . . . that a prospective juror can disregard prior knowledge and impressions, follow the trial court's instructions on the law, and render an impartial, independent decision based on the evidence.' " *State v. Sokolowski*, 351 N.C. 137, 148, 522 S.E.2d 65, 72 (1999) (quoting *Jaynes*, 342 N.C. at 270, 464 S.E.2d at 461). In the context of excusing jurors for cause because their views on the death penalty would substantially impair the performance of their duties as a juror, this Court has held:

When challenges for cause are supported by prospective jurors' answers to questions propounded by the prosecutor and by the court, the court does not abuse its discretion, at least in the absence of a showing that further questioning by defendant would likely have produced different answers, by refusing to allow the defendant to question the juror challenged.

*State v. Oliver*, 302 N.C. 28, 40, 274 S.E.2d 183, 191 (1981).

**STATE v. GOLPHIN**

[352 N.C. 364 (2000)]

In the instant case, Parker indicated to the prosecutor she could find defendants guilty, the relatively young ages of defendants would not cause her any problem, she could fairly evaluate the evidence despite having family members in law enforcement, she could consider both possible punishments, she could impose a sentence of life imprisonment without the possibility of parole for someone convicted of first-degree murder, she could recommend the death penalty if she felt it was the appropriate punishment, and she could be fair. The prosecutor accepted Parker.

Tilmon's counsel then questioned Parker. Parker indicated she could render a fair judgment from the facts presented; she could maintain impartiality despite seeing the photographs and other evidence; she could maintain impartiality regardless of defendants' or the victims' race or defendants' religion; and she could weigh the aggravating and mitigating circumstances, follow the trial court's instructions, and fairly consider both life imprisonment without parole and the death penalty. Tilmon's counsel accepted Parker.

When Kevin's counsel questioned Parker, however, she became emotional and began to doubt her impartiality.

[COUNSEL FOR KEVIN]: . . . Do you think your—let's go to that, do you think your nerves might cause you some problems in this trial? Do you think—I mean do you think there might be something about this trial that will cause you to be so emotional or so distraught that you just won't be able to give it your full attention and be a fair and impartial juror?

[PROSPECTIVE JUROR PARKER]: At the beginning of the week, I probably would have said no, but it seems like the closer it gets, the longer it goes, the more it weighs on my mind, what is actually happening here.

[COUNSEL FOR KEVIN]: You understand this is a serious charge obviously and this is serious business that we're here about. Do you mind expanding on that a little? I mean do you think there is something about the trial that may be so emotionally trying for you or so devastating that you wouldn't be able to give it your full attention or that you wouldn't be able to render a fair and impartial verdict or consider the evidence fairly and consider the defendants guilty—innocent until proven guilty, weigh the death penalty and life imprisonment without parole? Do you think some

STATE v. GOLPHIN

[352 N.C. 364 (2000)]

of that might be a problem because of emotions? Tell us now. Now is the time.

[PROSPECTIVE JUROR PARKER]: Like I said, I have a daughter. She's eight years old. And it weighs on my mind that one day she's going to be a teenager and that she may—something may happen where she gets in trouble and I may be sitting behind her in the courtroom and I don't think I can pass a judgment on another person's child. I can't do that. (Juror crying.)

The trial court then intervened and asked questions of Parker.

THE COURT: Ma'am, let me ask you this. Do you feel that the concern that you just raised would interfere substantially with your ability to be fair and impartial to all the parties in this case?

[PROSPECTIVE JUROR PARKER]: (Nodding head.)

THE COURT: Now, let me ask you this. Understanding that it would be hard for you, understanding that you would give it your best efforts, right now, those are not really the questions, whether it would be hard because it may very well be hard to do, you know. And I recognize that you would absolutely give it your best effort. Given that, do you have a question about your ability to be fair to everyone involved in this case?

[PROSPECTIVE JUROR PARKER]: I have doubts.

THE COURT: Well, there's a way that I have asked this to some other jurors that have gone on, so I'm going to ask you, are you confident—are you confident of your ability to be fair and impartial to everyone involved in this case or do you have a serious doubt, a substantial doubt concerning your ability to be fair and impartial?

[PROSPECTIVE JUROR PARKER]: I have a substantial doubt.

The trial court then excused Parker to return to the jury deliberation room. Parker left the courtroom, and the attorneys for all parties discussed her responses.

THE COURT: Anybody got anything?

[COUNSEL FOR KEVIN]: Nothing from us.

[PROSECUTOR]: Yes, sir, Judge. The state would challenge her for cause based on her remarks, if I understand her correctly—

**STATE v. GOLPHIN**

[352 N.C. 364 (2000)]

THE COURT: Okay.

[PROSECUTOR]: —as to what she said.

THE COURT: I will hear from the defendant Kevin Golphin.

[COUNSEL FOR KEVIN]: Well, Your Honor, I guess I would like to ask her a few more questions if I could. I'm not sure she has exactly said she couldn't render a fair and impartial verdict in weighing the evidence and after hearing the evidence.

THE COURT: Mr. Parish?

[COUNSEL FOR TILMON]: I have nothing to add.

The trial court then issued its ruling on the State's motion to excuse Parker for cause and Kevin's request to ask additional questions, saying:

> The question of the ability to be fair and having substantial doubt, concerning the ability to be fair has sort of been my litany in this case throughout and it has been my inclination to allow that to be the standard, and it would be my intent when we come down with the question of any juror to keep that as the standard. Therefore, in the Court's discretion, I'm going to decline the permitting of additional questions and excuse the juror for cause.

Based on our review of the transcript in the instant case, we note that Tilmon did not request from the trial court an opportunity to ask Parker more questions. Although Tilmon states that both he and Kevin requested such an opportunity, the transcript reveals that Kevin's counsel indicated a desire to ask more questions, but Tilmon's counsel stated, "I have nothing to add." The statement by Tilmon's counsel does not express an intent to join the request made by Kevin's counsel. Therefore, Tilmon has not preserved appellate review of this argument pursuant to N.C. R. App. P. 10(b)(1). Moreover, as Tilmon claims the trial court's excusal of Parker violates his constitutional rights, we note that this Court is not required to rule on a constitutional issue unless it was raised and determined by the trial court. *See Nobles*, 350 N.C. at 495, 515 S.E.2d at 893. Tilmon's counsel did not raise a constitutional issue with the trial court concerning the trial court's decision to excuse Parker, and the trial court did not have an opportunity to rule on any constitutional issue. Therefore, we need not address Tilmon's argument as to the

trial court's decision to exclude Parker for cause. As Kevin did request an opportunity to ask Parker further questions, we address his argument.

Parker initially indicated that she could be fair and impartial but then expressed some doubt. The trial court asked Parker more than once whether she doubted her ability to be impartial. In each instance, Parker indicated either that she felt her concerns would interfere with her ability to be fair and impartial or that she doubted her ability to be fair and impartial. Based on the *voir dire* of Parker, the trial court correctly concluded that she could not render a fair and impartial decision. *See Sokolowski*, 351 N.C. at 148, 522 S.E.2d at 72. In addition, there was no showing that further questioning by Kevin's counsel would have produced different answers. *See Oliver*, 302 N.C. at 40, 274 S.E.2d at 191. Kevin has not shown that the trial court abused its discretion in refusing to allow him to further question Parker and in excusing Parker for cause. Kevin's assignment of error is overruled.

**[13]** By assignment of error, Tilmon argues the trial court erred in excusing prospective juror Belinda Smith as not qualified. Tilmon specifically argues that because more than two years had elapsed between the end of Smith's prior jury service and the time she would have been empaneled in the instant case, she was "qualified" to serve as a juror, and the trial court's actions in excusing her violated his state and federal constitutional rights. We disagree.

The transcript reveals that at the time jury selection commenced, Smith had previously served on a federal jury within two years and was not immediately qualified to serve in the instant case. In addition, Tilmon suggested that the trial court excuse her from service. Tilmon cannot now complain that the trial court's excusal of Smith violated his constitutional rights. As we have previously stated, this Court will not ordinarily consider constitutional questions not raised and passed on by the trial court. *See Wallace*, 351 N.C. at 503, 528 S.E.2d at 340-41. Therefore, Tilmon has failed to preserve this question for appellate review.

Assuming *arguendo* that the question was preserved for appellate review, Tilmon's argument must fail.

All persons are qualified to serve as jurors and to be included on the jury list who are citizens of the State and residents of the county, who have *not* served as jurors during the preceding two

years . . . . Persons not qualified under this section are subject to challenge for cause.

N.C.G.S. § 9-3 (1999) (emphasis added). Additionally, "[t]he clerk *shall, at the beginning of court,* swear all jurors who have not been selected as grand jurors." N.C.G.S. § 9-14 (1999) (emphasis added). In the context of swearing in prospective jurors, we have previously defined the phrase "at the beginning of court" as "the beginning of the [session] of court." *State v. McNeill,* 349 N.C. 634, 643, 509 S.E.2d 415, 420 (1998), *cert. denied,* —— U.S. ——, 145 L. Ed. 2d 87 (1999).

In the instant case, Tilmon argues the trial court should have moved Smith to a later panel and then sworn her in at the time she was called, which would have been two years after her prior jury service. However, N.C.G.S. § 9-14 mandates that prospective jurors be sworn in at the beginning of court, which we have held refers to the beginning of the session of court. *See* N.C.G.S. § 9-14; *McNeill,* 349 N.C. at 643, 509 S.E.2d at 420. Therefore, the trial court did not have the authority to swear Smith in at a later time. Because Smith could not be sworn in at the beginning of the session of court as the statute requires, the trial court did not err in excusing her for cause. Tilmon's assignment of error is overruled.

**[14]** By assignments of error, both Kevin and Tilmon argue the trial court erred by allowing the State to exercise peremptory challenges in a racially discriminatory manner in violation of their state and federal constitutional rights. Specifically, defendants contend the State's reasons for excusing prospective jurors Deadra Holder and John Murray were pretextual, and the trial court did not conduct an adequate inquiry. We disagree.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 26 of the Constitution of North Carolina forbid the use of peremptory challenges for a racially discriminatory purpose. *See Batson v. Kentucky,* 476 U.S. 79, 86, 90 L. Ed. 2d 69, 80 (1986); *State v. White,* 349 N.C. 535, 547, 508 S.E.2d 253, 262 (1998), *cert. denied,* 527 U.S. 1026, 144 L. Ed. 2d 779 (1999). "In *Batson* the United States Supreme Court set out a three-pronged test to determine whether a prosecutor impermissibly excluded prospective jurors on the basis of their race." *State v. Bonnett,* 348 N.C. 417, 433, 502 S.E.2d 563, 574 (1998) (citing *Hernandez v. New York,* 500 U.S. 352, 358-59, 114 L. Ed. 2d 395, 405 (1991)), *cert. denied,* 525 U.S. 1124, 142 L. Ed. 2d 907 (1999).

STATE v. GOLPHIN

[352 N.C. 364 (2000)]

In the first prong of the *Batson* test, a criminal defendant must establish a *prima facie* case that a peremptory challenge was exercised on the basis of race. *Hernandez*, 500 U.S. at 358, 114 L. Ed. 2d at 405. All relevant circumstances are considered, including the "defendant's race, the victim's race, the race of key witnesses, questions and statements of the prosecutor which tend to support or refute an inference of discrimination, a pattern of strikes against minorities, or the State's acceptance rate of prospective minority jurors." *White*, 349 N.C. at 548, 508 S.E.2d at 262; *see also State v. Hoffman*, 348 N.C. 548, 550, 500 S.E.2d 718, 720 (1998).

In the second prong, the burden shifts to the State to articulate a race-neutral reason for striking the particular juror. *Hernandez*, 500 U.S. at 358-59, 114 L. Ed. 2d at 405; *Bonnett*, 348 N.C. at 433, 502 S.E.2d at 574. The State's explanation must be clear and reasonably specific, but does not have to rise to the level of justifying a challenge for cause. *See Bonnett*, 348 N.C. at 433, 502 S.E.2d at 574; *State v. Porter*, 326 N.C. 489, 498, 391 S.E.2d 144, 151 (1990). Moreover, " '[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " *Bonnett*, 348 N.C. at 433, 502 S.E.2d at 574-75 (quoting *Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406); *see also Purkett v. Elem*, 514 U.S. 765, 768-69, 131 L. Ed. 2d 834, 839-40 (1995); *State v. Barnes*, 345 N.C. 184, 209-10, 481 S.E.2d 44, 57, *cert. denied*, 522 U.S. 876, 139 L. Ed. 2d 134 (1997), *and cert. denied*, 523 U.S. 1024, 140 L. Ed. 2d 473 (1998). In addition, the second prong provides the defendant an opportunity for surrebuttal to show the State's explanations for the challenge are merely pretextual. *See State v. Gaines*, 345 N.C. 647, 668, 483 S.E.2d 396, 408, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997); *State v. Robinson*, 330 N.C. 1, 16, 409 S.E.2d 288, 296 (1991).

When the trial court explicitly rules that a defendant failed to make out a *prima facie* case, review by this Court is limited to whether the trial court's finding was error. *See State v. Fletcher*, 348 N.C. 292, 320, 500 S.E.2d 668, 684-85 (1998), *cert. denied*, 525 U.S. 1180, 143 L. Ed. 2d 113 (1999). However, when the trial court does not explicitly rule on whether the defendant made a *prima facie* case, and where the State proceeds to the second prong of *Batson* by articulating its explanation for the challenge, the question of whether the defendant established a *prima facie* case becomes moot. *See State v. Williams*, 343 N.C. 345, 359, 471 S.E.2d 379, 386 (1996), *cert. denied*, 519 U.S. 1061, 136 L. Ed. 2d 618 (1997); *State v. Lyons*, 343 N.C. 1,

11-12, 468 S.E.2d 204, 208, *cert. denied,* 519 U.S. 894, 136 L. Ed. 2d 167 (1996).

In the third prong of *Batson,* "the trial court must determine whether the defendant has satisfied his burden of proving purposeful discrimination." *Bonnett,* 348 N.C. at 433, 502 S.E.2d at 575 (citing *Hernandez,* 500 U.S. at 359, 114 L. Ed. 2d at 405). In determining the presence or absence of intentional discrimination, this Court will consider various factors including the "susceptibility of the particular case to racial discrimination, whether the State used all of its peremptory challenges, the race of witnesses in the case, questions and statements by the prosecutor during jury selection which tend to support or refute an inference of discrimination, and whether the State has accepted any African-American jurors." *White,* 349 N.C. at 548-49, 508 S.E.2d at 262. A trial court's rulings regarding race neutrality and purposeful discrimination are largely based on evaluations of credibility and should be given great deference. *See Batson,* 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21; *Bonnett,* 348 N.C. at 433, 502 S.E.2d at 575. We will uphold the trial court's determination unless we are convinced it is clearly erroneous. *See State v. Kandies,* 342 N.C. 419, 434-35, 467 S.E.2d 67, 75, *cert. denied,* 519 U.S. 894, 136 L. Ed. 2d 167 (1996).

In the instant case, the State peremptorily challenged Holder. Tilmon's counsel contended the challenge was not race-neutral, stating it was impermissible pursuant to *Batson* because Holder appeared to be African-American, she gave no inappropriate responses, she had no prior criminal record, she was gainfully employed, and there were no criminals in her family. Kevin's counsel also noted that Holder appeared to be African-American and that *Batson* was controlling unless the State could provide race-neutral reasons for the challenge.

Without ruling, the trial court stated it would hear from the State. The following dialogue took place:

[PROSECUTOR]: Judge, our first contention would be that that doesn't rise to the level of prima facie showing. However, if the state—if the Court would allow me to and thinks it's appropriate at this time, I would be glad if the Court sees fit to state my reasons for excusing that juror.

THE COURT: If you will proceed.

[PROSECUTOR]: Yes, sir. One—I have several reasons for that excuse, Your Honor, and one of [] them is that as I talked to Ms. Holder, I attempted to draw her out and to engage her in more than one-word answers or simply short-phrased answers in a number of ways, not only with the questions that were in the pool of questions I was asking, but also questions that related to her and her family relationship and so on.

She—she did not respond to that. I frankly don't know if that's because she's shy or because she didn't want to tell us or perceived it as her personal business or whatever. But I never was able to draw her out in that manner.

. . . .

. . . And so that was one of the reasons that the state considered excusing Ms. Holder. Another is the age of Ms. Holder. She indicated that she is 22 and that she has a sister who is 18. The relative ages of those individuals and the fact that they still live together in view in particular, Your Honor, of what the state perceives the defendant[s] to be questioning jurors about and the state's perception of what the defendant[s] [are] likely to assert as a defense or as an argument in this case, the defendant[s] [have] consistently asked jurors about their brothers and their sisters and the age differences between them and the relationships, how close they were, how close they were growing up, those sorts of things.

THE COURT: You—you're contending here that this individual has a brother the approximate age range of these defendants?

[PROSECUTOR]: She said she has a sister who is 18 and she is 22. They both still live at home with their parents. They both work in the same place.

THE COURT: That she has a sibling in the age range of the defendants?

[PROSECUTOR]: Yes, sir. And in view of what the state perceives and has gathered from the line of questioning—consistent line of questioning of the defense attorneys of the prospective jurors to this point, the state felt that this juror was one that we wanted to consider and think about in terms of what we perceive the defendant[s'] defense to be.

STATE v. GOLPHIN

[352 N.C. 364 (2000)]

Also I noted in my notes and I remember at the time when I asked her about the death penalty, she paused and she said, well, I guess if someone found—and then she said reasonable doubt, the death penalty might be—is appropriate. Then I see nothing wrong with it. She had a pause there that also we had some concern about. And the—but mainly the concerns that we had regarding what the state perceives the defense to be proceeding on is our concern.

The trial court then gave Tilmon's counsel an opportunity to respond. Tilmon's counsel stated that the State had not asked other prospective jurors whether they had siblings in this age group; that Holder answered the closed-ended questions posed to her with "yes, ma'am," and "no, ma'am," answers; and that Holder did not hesitate when answering the State's questions regarding the death penalty, to which she indicated she could vote for the death penalty if someone was proven guilty beyond a reasonable doubt. Kevin's counsel reiterated Tilmon's counsel's comments and noted that he had not heard the State ask other prospective jurors about their siblings, the State asked nothing but yes or no questions, and Holder answered the death penalty questions appropriately.

The trial court then ruled:

It is the Court's belief that the articulated reason that the juror was relatively young and close to the age range of the defendants and that the juror had a sibling at approximately the age range of the defendants constitutes an articulable race neutral reason for exercising a peremptory challenge, and so the motion is, therefore, denied.

The following day, the State peremptorily challenged Murray. Kevin's counsel challenged the State's peremptory challenge of Murray based on *Batson*. Kevin's counsel indicated there was no articulable basis for the challenge; both Murray and Kevin were black males; and over one-quarter, and almost one-third, of the State's peremptory challenges were against African-Americans. Tilmon's counsel joined the motion and stated the State had passed only one minority juror at that point. The trial court then indicated that because it had required an articulable reason for the previous *Batson* challenge, it was going to require an articulable reason for each *Batson* challenge thereafter.

The State then provided the following reasons for its peremptory challenge:

STATE v. GOLPHIN

[352 N.C. 364 (2000)]

[PROSECUTOR]: . . . Your Honor, we would challenge Mr. Murray on the cumulative effect of three things. One, he has a prior conviction himself for driving while impaired. Two, his father has a prior conviction for robbery for which he served, if I remember correctly, six years in the Department of Corrections. And three, Mr. Murray's statement that he attributed to a male and a female white juror in the courtroom with respect to what he viewed as a challenge to the due process rights of the defendants. The cumulative effect of that we contend makes him challengeable by the state from our point of view peremptorily.

I would also note that during the course of his answers at no time other than answering the questions and facing the person that was asking him the questions, while I certainly don't expect to be afforded any courtesy or recognition of authority because I don't have any authority, so to speak, but I noticed that when he spoke, he did not refer to the Court with any deferential statement other than saying "yes" or "no" in answering your questions when you asked them.

In addition, in my view with respect to his demeanor, I noted that he had a gold earring in his left ear. I also noted and perceived from my point of view a rather militant animus with respect to some of his answers. He elaborated on some things. Other things, he gave very short, what I viewed as sharp answers and also noted that when he spoke to the Court, that he did not defer, at least in his language, to the Court's authority, did not refer to the Court in answering yes, sir or no, sir. Did not address the Court as Your Honor. He just simply gave rather short, cryptic answers.

The trial court then allowed defendants an opportunity to respond. Kevin's counsel stated: the State's argument relying on comments of others was unfair in our system of justice; a prospective juror who was Caucasian had convictions for breaking and entering and trespassing but had not been challenged by the State; Murray stated the situation with his father would not affect him as a juror; and because there were fewer than ten percent minority members of prospective jurors to be chosen in this case, with this challenge, the State had challenged one-third of the prospective minority jurors. Tilmon's counsel noted: the State accepted another prospective Caucasian juror with a driving while impaired conviction; Murray indicated to the State and to the trial court that the conversation he

overheard would not impact his ability to be fair; and the State did not ask questions which would show the impact of Murray's father's conviction, such as whether his father was treated fairly and whether the conviction affected Murray.

The trial court then held: "The Court determines that the state has established a non-racial basis for the peremptory challenge and the objection to that peremptory challenge based on *Batson* is overruled and denied." Following defendants' objections, the trial court stated:

> I would just note for the record that I did not perceive—since this has been raised, I did not perceive any conduct of the juror to be less than deferential to the Court. I think that the juror did demonstrate a consistent reticence to elaborate on questions, but all of his responses were appropriate to the specific questions asked. And probably that—there was a substantial degree of clarity and thoughtfulness in the juror's responses.

> And the Court will note for the record that it is primarily relying upon the defendant's prior record, specifically which it involved an interaction with a traffic law enforcement officer, and the potential empathy that might be engendered from a father who was a criminal defendant as the basis for the exercise of the peremptory challenge.

> I would note further I am not relying upon the impact of the incident in the courtroom as providing a basis for this and frankly is not—I do not consider it to be appropriate for even the exercise for a peremptory challenge.

The State in the instant case gave reasons for peremptorily challenging both Holder and Murray. Therefore, " 'we need not address the question of whether defendant[s] met [their] initial burden of showing discrimination[,] and [they] may proceed as if a *prima facie* case had been established.' " *Bonnett*, 348 N.C. at 434, 502 S.E.2d at 575 (quoting *State v. Harden*, 344 N.C. 542, 557, 476 S.E.2d 658, 665 (1996), *cert. denied*, 520 U.S. 1147, 137 L. Ed. 2d 483 (1997)).

As to the second prong of *Batson*, the State provided race-neutral reasons for the peremptory challenges of both Holder and Murray. With regard to Holder, we perceive no inherent discriminatory intent in the State's explanation that Holder was young, within the age range of defendants, and had a sister who was also within the age range of defendants. *See Bonnett*, 348 N.C. at 433, 502 S.E.2d at 574-75.

Defendants have failed to show the State's reasoning was pretextual. *See Gaines*, 345 N.C. at 668, 483 S.E.2d at 408. The State relied on previous questions by defense counsel to formulate what it believed to be the defense theory in this case and then proceeded to ask questions similar to those asked by defense counsel. There was no evidence of pretext, as the State sought to exclude Holder because she might be able to empathize with defendants because she and her sister were within the same age range as defendants. Therefore, the trial court did not err in concluding that the State's reasoning was race-neutral.

With regard to Murray, we perceive no inherent discriminatory intent in the State's explanation that Murray had been convicted of driving while impaired and that his father had a prior conviction for robbery for which he had served six years in the Department of Correction. *See Bonnett*, 348 N.C. at 433, 502 S.E.2d at 574-75. Defendants did not show the State's explanation to be pretextual. *See Gaines*, 345 N.C. at 668, 483 S.E.2d at 408. While defendants pointed to two other Caucasian prospective jurors who had criminal convictions and were accepted by the State, those other prospective jurors did not also have a parent who was convicted of robbery for which he or she was incarcerated. There is no evidence of pretext, as the State sought to exclude Murray because he might empathize with defendants because of his own experience with traffic law enforcement and his father's incarceration in the Department of Correction. Therefore, the trial court did not err in finding the State's reasoning to be race-neutral.

As the State provided race-neutral reasons for its peremptory challenges of Holder and Murray, we move to the third prong of *Batson*. In light of the factors we consider in evaluating whether there is purposeful discrimination, we note that this case may be one susceptible to racial discrimination because defendants are African-Americans and the victims were Caucasian. *See White*, 349 N.C. at 548-49, 508 S.E.2d at 262. However, the State did not exhaust the statutory number of peremptory challenges allowed for the first twelve jurors, nor did it exhaust its challenges in selecting the four alternate jurors. *See* N.C.G.S. § 15A-1217; *White*, 349 N.C. at 548-49, 508 S.E.2d at 262. In addition, based on the discussion which occurred at the time the State challenged Holder, the State had exercised nine peremptory challenges, only three of which were against African-Americans; the next day, when Murray was challenged, the State had exercised eleven peremptory challenges, only four of which

were against African-Americans, one being Holder. The State had accepted six prospective jurors, one of whom was African-American. This constituted a higher percentage of African-Americans accepted by the State than were in the jury pool. In selecting the twelve jurors and four alternates, the State exercised twenty-seven peremptory challenges, only four of which were against African-Americans. This ratio represents a percentage of African-Americans equivalent to the percentage of African-Americans in the jury pool. Moreover, during jury selection, the State made no comments which would support an inference of discrimination in the instant case.

From our review of the transcript in the instant case, it is apparent the trial court gave great consideration to the arguments by all parties with regard to these two *Batson* challenges before concluding the State did not purposefully discriminate against Holder or Murray. We give great deference to the trial court's rulings. *See Bonnett,* 348 N.C. at 433, 502 S.E.2d at 575. Given the foregoing, we are convinced the State did not discriminate on the basis of race in exercising its peremptory challenges against Holder and Murray. *See Kandies,* 342 N.C. at 434-35, 467 S.E.2d at 75. Defendants' assignments of error are overruled.

## GUILT-INNOCENCE PHASE

[15] By assignment of error, Kevin argues the trial court erred in allowing the State, during its presentation of rebuttal evidence, to demonstrate the effects of pepper spray in an experiment under circumstances dissimilar to those that actually occurred and with the use of law enforcement officers trained in the use of pepper spray. Kevin contends the experiment prejudiced his defense. We disagree.

This Court has recognized a distinction between demonstrations and experiments. An experiment is " 'a test made to demonstrate a known truth, to examine the validity of a hypothesis, or to determine the efficacy of something previously untried.' " *State v. Allen,* 323 N.C. 208, 225, 372 S.E.2d 855, 865 (1988) (quoting *State v. Hunt,* 80 N.C. App. 190, 193, 341 S.E.2d 350, 353 (1986)), *sentence vacated on other grounds,* 494 U.S. 1021, 108 L. Ed. 2d 601 (1990). "Experimental evidence is competent and admissible if the experiment is carried out under substantially similar circumstances to those which surrounded the original occurrence." *State v. Locklear,* 349 N.C. 118, 147, 505 S.E.2d 277, 294 (1998), *cert. denied,* 526 U.S. 1075, 143 L. Ed. 2d 559 (1999); *see also State v. Jones,* 287 N.C. 84, 97, 214 S.E.2d 24, 33

(1975); *State v. Carter*, 282 N.C. 297, 300, 192 S.E.2d 279, 281 (1972). However, exclusion is not required when the conditions are not exactly similar; rather, it goes to the weight of the evidence with the jury. *See Locklear*, 349 N.C. at 147, 505 S.E.2d at 294. Generally, the trial court is given broad discretion to determine if the conditions are sufficiently similar. *See id.*; *State v. Bondurant*, 309 N.C. 674, 686, 309 S.E.2d 170, 178 (1983).

A demonstration on the other hand is " 'an illustration or explanation, as of a theory or product, by exemplification or practical application.' " *Allen*, 323 N.C. at 225, 372 S.E.2d at 865 (quoting *Hunt*, 80 N.C. App. at 193, 341 S.E.2d at 353). The test for admissibility of evidence regarding a demonstration is whether, if relevant, the probative value of the evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury." *Id.*; *see also* N.C.G.S. § 8C-1, Rules 401, 403 (1999). In general, we note that all evidence offered by the State will have a prejudicial effect on a defendant; however, the prejudicial effect will vary in degree. *See State v. Hedgepeth*, 350 N.C. 776, 785, 517 S.E.2d 605, 611 (1999), *cert. denied*, —— U.S. ——, 146 L. Ed. 2d 223, (2000); *State v. Wilson*, 345 N.C. 119, 127, 478 S.E.2d 507, 512-13 (1996); *State v. Weathers*, 339 N.C. 441, 449, 451 S.E.2d 266, 270 (1994). The determination of whether relevant evidence should be excluded pursuant to Rule 403 "is a matter left to the sound discretion of the trial court, and the trial court can be reversed only upon a showing of abuse of discretion." *Wallace*, 351 N.C. at 523, 528 S.E.2d at 352-53; *see also State v. Pierce*, 346 N.C. 471, 490, 488 S.E.2d 576, 587 (1997).

This issue originated when the prosecutor asked First Sergeant George Williamson, a training officer with the North Carolina State Highway Patrol, to spray the prosecutor's arms with pepper spray. Kevin objected to the prosecutor being the subject of the demonstration because he would become a witness. Thereafter, during a lengthy discussion on the issue and after the trial court had indicated a willingness to allow the pepper spray demonstration with witnesses other than the prosecutor, Kevin again voiced an objection based on the use of law enforcement officers who have experience being sprayed with pepper spray because "[t]hat would skew the results, unless the demonstration—or the sample is sufficiently large that you would find some of these variable reactions in there." The trial court overruled that objection. Kevin modified his objection and moved "that whoever the state uses to spray be a person who does not have

prior experience with being sprayed." The trial court overruled the objection and stated it would not limit either side as to who is sprayed because the opposing side could point out the prior experience to the jury during cross-examination. The trial court further limited the testimony to the subject's reaction to being sprayed.

When the State presented six possible witnesses to be sprayed, Kevin objected to all six as they were all trained law enforcement officers and objected to the "demonstration in total as being inappropriate, improper and not a valid sampling of the general population as to the effects of pepper spray." The trial court sustained the objection as to two Cumberland County sheriff's deputies who had provided security to the jury, but overruled the objection as to four members of the State Highway Patrol.

Thereafter, Sgt. Williamson sprayed Troopers Raymond Battle and Curtis Toler with foam pepper spray. The State asked Sgt. Williamson to spray Trooper Battle in a manner so that some of the spray got on his face and in his ear but not in his eye. The State then asked Sgt. Williamson to spray Trooper Toler in a manner so that some spray got on his face, in his ear, and in his eye. Trooper Battle then testified that he felt no burning sensation on his face or in his ear. He further testified that in 1993, he was sprayed with stream pepper spray, rather than foam pepper spray, directly in his eyes. Trooper Battle indicated the prior spraying had been incapacitating and that it had taken approximately twenty-five minutes before he could see well enough to function.

Trooper Toler then testified to his reaction. He indicated that he felt an intense burning sensation when the spray hit his left eye, and he closed his eye. He stated he could still use his right eye and felt no burning sensation in the right eye. In 1993, Trooper Toler was sprayed in both eyes, and it had taken approximately twenty to twenty-five minutes for him to recover. Trooper Toler then stated that if he had been sprayed in both eyes, as he was in 1993, he would not have been able to walk to his chair unassisted as he was able to do following the instant demonstration. Trooper Toler also indicated that in 1993, a lot of pepper spray had gotten into his nose causing "material" to come out of his nose; however, during the instant demonstration, only a little spray got into his nose which caused him to have only a minor "sniffle." Following the State's demonstration, both defendants were given an opportunity to present additional witnesses to be sprayed with pepper spray and then to testify about their reaction. Neither

defendant chose to present evidence in response to the State's demonstration.

We hold the evidence at issue here was a demonstration. In arguing for the pepper spray demonstration, the State contended that "at this point all we're trying to do is, first of all, explain to this jury what this stuff is. It's not some fancy compound. It's just, uh, cayenne peppers," and that the jury "needs to have some reality to this issue." The presentation by the State was to illustrate or explain to the jury the effects of pepper spray by practical application. *See Allen*, 323 N.C. at 225, 372 S.E.2d at 865.

The evidence of the pepper spray demonstration was relevant as Kevin had made the effects of pepper spray an issue in the instant case. *See* N.C.G.S. § 8C-1, Rule 401. During the State's presentation of evidence, Kevin repeatedly asked witnesses on cross-examination questions pertaining to pepper spray. On cross-examination of Sergeant Jimmie Turbeville of the State Highway Patrol, Kevin asked what the effects of being sprayed in the face with pepper spray would be, and Sgt. Turbeville responded that it was very painful and irritating to the eyes. On cross-examination of Sergeant Danny Williams of the Harnett County Sheriff's Department, Kevin asked about the use of pepper spray and the varying reactions people with different sensitivities can have to being sprayed. Sgt. Williams also indicated that if someone was not sprayed in the eyes, the person might experience mild burning depending on the sensitivity of the individual's skin. On cross-examination of Trooper Vincent Terry of the State Highway Patrol, Kevin asked whether Trooper Terry himself had been sprayed and whether he had ever used pepper spray on anyone else. Trooper Terry stated that when he was sprayed, he experienced a burning sensation in his eyes; and when he sprayed someone during a traffic stop, the person began crying and screaming, and he assumed she was feeling pain from being sprayed.

In addition, Kevin's entire presentation of evidence related to the use of pepper spray. The sole focus of Kevin's opening statement was pepper spray. Kevin's counsel read the warning label from the container of pepper spray as well as instructions for use of the product. Thereafter, Kevin offered a pepper spray demonstration by a private investigator and then called Sergeant William Ellis of the Cumberland County Sheriff's Department to testify about pepper spray. Kevin asked Sgt. Ellis several questions about the proper use of pepper spray and then asked him to read portions of the instructions for the use of pepper spray, which included: "Number six, extreme cau-

**STATE v. GOLPHIN**

[352 N.C. 364 (2000)]

tion should be exercised when using an aerosol irritant projector against persons who have reduced sensitivity to pain. If such persons are not disabled with an aerosol irritant projector, they may react with violence."

As Kevin continually asked questions on cross-examination of State witnesses about the effects of pepper spray, and on direct examination offered only evidence concerning the use of pepper spray, the effects of pepper spray, and the warnings for pepper spray, the State's rebuttal demonstration showing the effects of pepper spray was relevant pursuant to N.C.G.S. § 8C-1, Rule 401.

Having determined the evidence of the demonstration was relevant, we must now determine whether the evidence should have been excluded because the probative value was substantially outweighed by the danger of unfair prejudice. *See* N.C.G.S. § 8C-1, Rule 403. Although Kevin argues the circumstances surrounding the demonstration were dissimilar to those surrounding the incident, that is not the focus of our review in the instant case. Kevin has not shown that the prejudicial effect of the demonstration substantially outweighed its probative value. Based on our review of the transcript, we cannot conclude the trial court abused its discretion in allowing the demonstration of the effects of pepper spray. Therefore, the trial court did not err in allowing the demonstration.

With regard to Kevin's argument about the use of law enforcement officers for the demonstration, he cannot show prejudice. When the trial court decided to allow the State to present the demonstration, it informed Kevin he would also be given an opportunity to present witnesses to be sprayed and then to testify. Kevin even indicated to the court that he would call his own witnesses to be sprayed and to testify. However, at the conclusion of the State's presentation, Kevin decided not to introduce alternative participants. In addition, the trial court stated, "Both sides may cross[-]examine each person as to their bias, and that they are, therefore, uh, not completely credible as to their description of their subjective experience." With Kevin's opportunity to offer alternative people to participate in the demonstration and his ability to cross-examine the law enforcement officers regarding their potential bias, he cannot show he was prejudiced by the use of law enforcement officers during this demonstration. This assignment of error is overruled.

By assignments of error, Kevin argues the trial court erred by admitting evidence offered, first, by the State and, second, by Tilmon

STATE v. GOLPHIN

[352 N.C. 364 (2000)]

regarding seizure of his luggage by the Fayetteville police a week prior to the murders. Kevin contends the evidence offered by the State concerning the alleged misconduct was hearsay, did not corroborate the witness' testimony, was irrelevant as it showed only bad character, and violated his Confrontation Clause rights. He further contends the evidence offered by Tilmon concerning the alleged misconduct was irrelevant as it had no bearing on Tilmon's guilt. Both Tilmon and the State relied on this evidence to show Kevin's motive for stealing the Toyota Camry and to show why the brothers were unable to take the bus back to Richmond. We disagree with Kevin's contentions.

In a pretrial motion *in limine*, Kevin requested a hearing on the admissibility of any information regarding seizure of drugs from Kevin on 17 September 1997. In the motion, Kevin indicated that on 17 September 1997, the Fayetteville Police Department stopped him at the Fayetteville Greyhound bus station and requested to search his luggage. Kevin refused. The Fayetteville police retained Kevin's luggage, and Kevin proceeded to South Carolina without being arrested or charged. Thereafter, the police obtained a search warrant and searched Kevin's luggage. The police allegedly discovered eighty grams of marijuana in Kevin's bag. In the motion, Kevin asked the trial court to prevent the State from mentioning the seizure of marijuana because there never was a conviction, the seizure was not connected to the instant case, and the introduction of the evidence would be unfairly prejudicial. The trial court deferred ruling on the motion until it became an issue in the case.

[16] We begin our discussion with Kevin's argument that the trial court erred by allowing the State to introduce evidence concerning the seizure of Kevin's luggage. When the State was questioning Lt. Kirby about the investigation of the 23 September 1997 armed robbery in Kingstree, South Carolina, the prosecutor sought to introduce the armed robbery report. Kevin asked to view the report and stated that if it referenced only the armed robbery, then he had no objection. After viewing the exhibit, Kevin objected to it "in part." The trial court overruled the objection and received the report into evidence.

Generally, the report includes information similar to Lt. Kirby's testimony. In his testimony, Lt. Kirby stated that he investigated the armed robbery by canvassing the businesses near Financial Lenders, including the bus station. In the bus station, an employee gave him

information on the robbery suspects. Based on this information, Lt. Kirby drove to Greeleyville, South Carolina, to the home of Kevin and Tilmon's grandparents.

The robbery report, however, further provides what people told Lt. Kirby, which Kevin argues to this Court is inadmissible hearsay and violates the Rules of Evidence, as well as his rights under the Confrontation Clause. The report indicates, in pertinent part:

> During the course of investigating the above case number, this r/o went to Marcus Department Store, after hearing that Mr. Marcus did talk with the two b/m's before the robbery took place. While in the store Mr. Marcus was not there, so this r/o asked Mr. Jimmy if he knew anything about the two b/m's. Mr. Jimmy stated that the suspects came up to file a report that their luggage got lost on the Bus. Mr. Jimmy stated that he asked the two b/m's what happened to their luggage. Mr. Jimmy stated that the two males stated that the police in Fayetteville, N.C. took their luggage. Mr. Jimmy stated that he asked them did they have any drugs in their luggage. Mr. Jimmy stated they said nothing. Mr. Jimmy stated he told them if they had drugs in the bags that they would not get their luggage back. Mr. Jimmy gave me a copy of a paper with a name of a Thomas Jr. and an address of Rte. 2 Box 66-B Greeleyville, S.C. 29056.

Regarding the alleged violation of Kevin's Confrontation Clause rights, we initially note that in the motion *in limine* requesting a hearing on the admissibility of evidence, Kevin did not raise any constitutional issues. In addition, the objection Kevin made to the introduction of the police report was a general objection—he did not raise any constitutional issues and did not provide the trial court with an opportunity to rule on any constitutional issues. As " '[t]his Court is not required to pass upon a constitutional issue unless it affirmatively appears that the issue was raised and determined in the trial court,' " *Nobles*, 350 N.C. at 495, 515 S.E.2d at 893 (quoting *Creason*, 313 N.C. at 127, 326 S.E.2d at 27), we need not address Kevin's argument that admission of the robbery report violated his Confrontation Clause rights.

[17] Next, we turn to whether admission of the robbery report violated the Rules of Evidence. Kevin objected to the introduction of the robbery report without specifying the grounds for the objection; therefore, we rely on the rules governing general objections. We have previously stated that a general objection is "ineffective unless there

is no proper purpose for which the evidence is admissible. The burden is on the defendant to show that there was no proper purpose for which the evidence could be admitted." *State v. Young*, 317 N.C. 396, 412, 346 S.E.2d 626, 635 (1986) (citation omitted); *see also State v. Moseley*, 338 N.C. 1, 32, 449 S.E.2d 412, 431 (1994), *cert. denied*, 514 U.S. 1091, 131 L. Ed. 2d 738 (1995).

"Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401; *see also State v. Perry*, 298 N.C. 502, 510, 259 S.E.2d 496, 501 (1979) (holding, "[g]enerally, evidence is relevant if it has *any* logical tendency, however slight, to prove a fact in issue in the case"). Evidence which has no tendency to prove a fact in issue is, however, inadmissible. *See* N.C.G.S. § 8C-1, Rule 402 (1999); *Perry*, 298 N.C. at 510, 259 S.E.2d at 501. Pursuant to Rule 403, "the determination of whether relevant evidence should be excluded is a matter left to the sound discretion of the trial court, and the trial court can be reversed only upon a showing of abuse of discretion." *Wallace*, 351 N.C. at 523, 528 S.E.2d at 352-53; *see also Pierce*, 346 N.C. at 490, 488 S.E.2d at 587.

Furthermore, evidentiary rules define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (1999). Out-of-court statements offered for purposes other than to prove the truth of the matter asserted are not considered hearsay. *State v. Thomas*, 350 N.C. 315, 339, 514 S.E.2d 486, 501, *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 388 (1999). We have held "statements of one person to another to explain subsequent actions taken by the person to whom the statement was made are admissible as nonhearsay evidence." *Id.*; *see also State v. Morston*, 336 N.C. 381, 399, 445 S.E.2d 1, 11 (1994); *State v. Coffey*, 326 N.C. 268, 282, 389 S.E.2d 48, 56 (1990).

The robbery report in the instant case is relevant evidence. The statements made to Lt. Kirby were vital to the identification of Kevin and Tilmon as the suspects in the armed robbery. The declarant provided the background information in order to show his knowledge of the suspects. Moreover, the report does not indicate the Fayetteville police actually discovered drugs in Kevin's luggage. The declarant merely informed Kevin and Tilmon that if the police discovered drugs in the luggage, then the luggage would not be returned to them. In

addition, the report was admissible for nonhearsay purposes. The report was not offered to prove the truth of the statements made by the declarant to police, but to help explain the subsequent actions taken by Lt. Kirby in traveling to the home of Kevin and Tilmon's grandparents, which in turn furthered the investigation of this case. As we have found that the robbery report was admissible, Kevin has not met his burden of showing "there was no proper purpose for which the evidence could be admitted." *Young*, 317 N.C. at 412, 346 S.E.2d at 635. Therefore, we conclude Kevin's general objection was ineffective, and the trial court did not err in admitting the robbery report into evidence.

**[18]** We now turn to Kevin's argument that the trial court erred in admitting Tilmon's evidence concerning the seizure of Kevin's luggage by the Fayetteville police. Tilmon sought to call Sam Willie McCray, Kevin and Tilmon's grandfather, as a witness. Tilmon initially reminded the trial court of Kevin's motion *in limine* concerning the admissibility of evidence that Fayetteville police seized drugs from Kevin's luggage. In indicating an intent to call McCray as a witness, Tilmon stated that in a prior interview, "McCray indicated that Kevin told him that he'd been stopped in Fayetteville on the bus; that the cops had taken his luggage but didn't say why the law enforcement officers had taken his luggage." Tilmon further stated he believed "McCray would testify, if asked, that Kevin told him that he was stopped at the bus station, talked to some of the officers and that they left his luggage there—they seized his luggage after a dog alerted to it." Kevin's counsel then responded: "We haven't put anything on from Kevin that they could use that to impeach. I think under a 404 or 403 balancing test, it still fails the test to come in. And it now becomes, at least for practical purposes here, double hearsay." Kevin's counsel further argued: "It may be a prior bad act statement of the defendant. It's not something Mr. McCray independently knows about." The trial court allowed Tilmon's counsel an opportunity to rebut, and Tilmon's counsel stated: "It is our contention that it bears on the need to take the car; that it was not our client's need; that— again, that the inability to take the bus back up through Fayetteville was based on Kevin Golphin's problems when he encountered the law enforcement officers in Fayetteville." Tilmon's counsel further indicated that while McCray was not told whether there were drugs in Kevin's luggage, McCray did have a conversation with Kevin about what happened to Kevin's luggage. The trial court then denied Kevin's objection.

Tilmon then called McCray, and the following exchange took place, in pertinent part:

Q Did you ask Kevin about how he got down [to Greeleyville, S.C.]?

A Yeah—yes, I did.

Q What did he tell you?

A He tell me he came on the bus.

Q All right. From Richmond?

A Yes.

Q Did he indicate any stops along the way?

A Well, he told me—he said the bus stop in Fayetteville.

Q Fayetteville, North Carolina?

A Yes, sir.

Q All right. When you saw Kevin, did he have any luggage with him at all?

A No, sir.

Q Kevin tell you anything about why he didn't have any luggage?

A Well, he said the police had took his luggage in Fayetteville.

Q Did he tell you why?

A Uh, no. He just say they take his luggage.

Q All right. Did they give it back to him?

A No, sir.

Q Did he indicate to you why they took the luggage?

[KEVIN'S COUNSEL]: Objection, asked and answered.

A No, he didn't—he didn't stated [sic] why they take—

THE COURT: Overruled.

A —his luggage.

THE COURT: Overruled.

Although Kevin does not specifically argue the admission of this testimony violates his constitutional rights, he makes a general argument to that effect. However, as previously noted, this Court will not address any constitutional issue with regard to the admission of McCray's testimony concerning the seizure of Kevin's luggage because Kevin did not give the trial court an opportunity to pass on any such constitutional issue. *See Nobles*, 350 N.C. at 495, 515 S.E.2d at 893.

We now turn our focus to answering the questions of whether McCray's testimony was inadmissible as it pertained to unrelated misconduct and whether it was irrelevant as it had no bearing on the question of Tilmon's guilt. As to the argument that McCray's testimony was inadmissible because it related to prior misconduct,

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as *proof of motive*, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (1999) (emphasis added). Rule 404(b), as we have previously held, is

> a clear general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged.

*Coffey*, 326 N.C. at 278-79, 389 S.E.2d at 54.

On the issue of the relevance of McCray's testimony, we have previously stated:

> "[I]n a criminal case every circumstance calculated to throw any light upon the supposed crime is admissible and permissible. It is not required that evidence bear directly on the question in issue, and evidence is competent and relevant if it is one of the circumstances surrounding the parties, and necessary to be known, to properly understand their conduct or motives, or if it reasonably allows the jury to draw an inference as to a disputed fact."

*State v. Jones*, 336 N.C. 229, 243, 443 S.E.2d 48, 54 (quoting *State v. Arnold*, 284 N.C. 41, 47-48, 199 S.E.2d 423, 427 (1973)) (citations

omitted in original), *cert. denied,* 513 U.S. 1003, 130 L. Ed. 2d 423 (1994); *see also State v. Brown,* 350 N.C. 193, 202, 513 S.E.2d 57, 63 (1999).

In the instant case, McCray's testimony concerning Kevin's luggage is both admissible pursuant to Rule 404(b) and relevant. Pursuant to Rule 404(b), the testimony was admissible to prove Kevin's motive for not wanting to return to Richmond by bus. *See* N.C.G.S. § 8C-1, Rule 404(b); *Coffey,* 326 N.C. at 278-79, 389 S.E.2d at 54. The testimony was also relevant as it involved a circumstance surrounding Kevin's trip from Richmond to Greeleyville which then revealed information concerning the motive for his future actions. *See Jones,* 336 N.C. at 243, 443 S.E.2d at 54. From this evidence, the jury could infer that Kevin did not wish to take the bus back to Richmond because it would stop in Fayetteville where his luggage had been seized by police. *See id.*

As we previously concluded that the State's evidence of the robbery report was admissible for a proper purpose and we now conclude that Tilmon's evidence of McCray's testimony was admissible and relevant, we hold the trial court did not err. These assignments of error are overruled.

[19] By assignment of error, Kevin argues the trial court violated his state and federal constitutional rights by admitting into evidence a statement made by Tilmon which implicated Kevin. Specifically, Kevin argues admission of the statement violated *Bruton,* 391 U.S. 123, 20 L. Ed. 2d 476, which held the defendant's Confrontation Clause rights were violated by the admission of a nontestifying codefendant's confession. We disagree.

This issue arose when the State called Howard Kinlaw as a witness and began to question him about being in an isolation cell beside Tilmon in the Cumberland County jail. Kevin's counsel objected and indicated there were potential *Bruton* problems because of a statement made by Tilmon to Kinlaw. On *voir dire,* Kinlaw stated that Tilmon said, in pertinent part:

> that they had, uh—were on their way to Virginia to rob a Food Lion so that they could get some money to go to Jamaica. And, uh, they got pulled and, uh, his brother was, uh, being roughed up and sprayed with Mace by this cop. And a deputy sheriff came up and jumped out and went running over there and started to pull his Mace out. And when he seen that, he took a AK-47 and jumped

out of the car and shot him, and then his brother got up and took a pistol and shot the cop and they left.

In addition to an objection based on hearsay, Kevin's counsel stated:

We object to the part that says they stole—not to the part about stealing the car—to rob a Food—where it starts "to rob a Food Lion." "He stated that they had already planned to rob—they had already planned to rob the Food Lion in Richmond, Virginia. He stated that they were going to rob the Food Lion in order to get money to go to Jamaica." We object to that under *Bruton* grounds. The next part we object to is his brother—his description of "his brother then got up off the ground, took the officer's pistols and shot him—pistol and shot him." That's all we object to in the statement.

After discussing the issue with all the parties, the trial court issued its ruling.

[THE COURT:] In dealing with the specifics of *Bruton* as to this witness, there are, um—there are two things in particular. The discussion of the Richmond armed robbery. Now—(pause)—now, I will suggest a redaction of that so that he stated that there was a plan to rob the Food Lion in Richmond in order to get money to go to Jamaica. He stated that they stole a car on the way to Richmond. I don't require a redaction of that.

[KEVIN'S COUNSEL]: We're not objecting to that.

THE COURT: There's not a serious issue to—all right. Stated that they stole a car on the way to Richmond. There was a plan to rob the Food Lion in Richmond, Virginia, in order to get money to go to Jamaica.

And then the other *Bruton* objection is—

[KEVIN'S COUNSEL]: His brother then got off—

THE COURT: Yeah, that his brother got off the ground and took the officer's pistol and shot him. And I am going to sustain that objection and require that redaction.

Subsequently, the trial court explained the ruling to Kinlaw.

THE COURT: All right. Let me—just be patient for a moment. Now, the first issue concerns the testimony related to the Food

Lion in Richmond, Virginia. And as it relates to that, you can testify that they stole a car on the way to Richmond; that there was a plan to rob the Food Lion in Richmond in order to get money to go to Jamaica. Not that "they planned" but that "there was a plan."

WITNESS: Um-hum. I understand that.

THE COURT: Now, you understand the difference between that—

WITNESS: I understand.

THE COURT: Now, you are not to relate the part of your testimony in which you assert that the statement was made that the defendant said his brother then got off the ground, took the officer's pistol and shot him.

Thereafter, with the jury present, Kinlaw testified regarding Tilmon's statement to him as follows:

[H]e had stolen a car and, uh, *there was a plan* to go to Richmond to rob a Food Lion so that he could get money to go to Jamaica. And that, uh, he had gotten pulled over.

. . . .

By a state trooper.

. . . .

And that his brother was getting Maced, and that a deputy sheriff had pulled up and got out. And as he [the deputy sheriff] was running over to where the trooper, uh, and his brother were, he was—

. . . .

. . . He was pulling out his Mace. And when he seen that, he got out of the car with a AK-47 and shot the two officers.

(Emphasis added.)

On appeal, Kevin contends the trial court's redactions were not sufficient to preserve Kevin's rights under *Bruton* because the reference to "a plan" implicated him. Pursuant to Rule 10(b)(1) of the North Carolina Rules of Appellate Procedure, however, "a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired

the court to make" in order to preserve a question for appellate review. N.C. R. App. P. 10(b)(1). Kevin's only objection came prior to the *voir dire* of Kinlaw. Kevin did not object to the trial court's suggested redaction, nor did he object when Kinlaw actually testified as instructed by the trial court. As there was no further objection to the trial court's response to the original objection, Kevin violated Rule 10(b)(1). Because of the constitutional nature of Kevin's argument, in our discretion pursuant to N.C. R. App. P. 2, we will address the merits of Kevin's argument.

As we have previously stated, the Supreme Court in *Bruton*, 391 U.S. 123, 20 L. Ed. 2d 476, held the defendant's Confrontation Clause rights were violated by the admission of a nontestifying codefendant's confession that implicated the defendant in the crime. *See Barnes*, 345 N.C. at 214, 481 S.E.2d at 60. The Supreme Court noted that the confession was "powerfully incriminating" and then explained that because there was a substantial risk the jury would look to the extrajudicial statements in determining the defendant's guilt, despite instructions to the contrary, admission of the codefendant's confession violated the defendant's right of cross-examination guaranteed by the Confrontation Clause of the Sixth Amendment. *See id.* at 214-15, 481 S.E.2d at 60.

Kevin contends the instant case is more like *Gray v. Maryland*, 523 U.S. 185, 140 L. Ed. 2d 294 (1998). In *Gray*, the Supreme Court held *Bruton*'s protective rule applied to the codefendant's confession, which merely substituted blanks and the word "delete" for the defendant's actual name. *See id.* at 188, 140 L. Ed. 2d at 298. The State, on the other hand, argues the case is more similar to *Richardson v. Marsh*, 481 U.S. 200, 95 L. Ed. 2d 176 (1987). In *Richardson*, the Supreme Court held the Confrontation Clause was not violated where a nontestifying codefendant's confession was redacted so as to eliminate the defendant's name as well as any reference to the defendant's existence. *See id.* at 211, 95 L. Ed. 2d at 188.

We find the instant case more similar to *Barnes*, 345 N.C. at 217, 481 S.E.2d at 62, wherein this Court found *Bruton* distinguishable. A codefendant in *Barnes* stated, "I shouldn't have gone with them," and the defendant argued that the statement was prejudicial in that it was "particularly significant" and that it violated his due process and confrontation rights. *Id.* This Court recognized that while the Supreme Court in *Bruton* held the introduction of a codefendant's hearsay

statement "posed a substantial threat to [the defendant's] right to confront the witnesses against him" and therefore constituted reversible error, *Bruton*, 391 U.S. at 137, 20 L. Ed. 2d at 486, the Supreme Court also stated that " '[n]ot every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions . . . . It is not unreasonable to conclude.that in many such cases the jury can and will follow the trial judge's instructions to disregard such information.' " *Barnes*, 345 N.C. at 218, 481 S.E.2d at 62 (quoting *Bruton*, 391 U.S. at 135, 20 L. Ed. 2d at 484-85). We stated that the statement the defendant complained of was not "powerfully incriminating" when viewed in the context of the evidence against him, that the reference to "them" in the statement was not made in the context of any specific statements about the killings, and that the trial court cautioned the jury with respect to the statement. *Id.* at 217-18, 481 S.E.2d at 62. We concluded that the statement did not clearly identify the defendant or create a substantial risk that the jury would ignore the trial court's instructions in its determination of the defendant's guilt. *Id.* at 218, 481 S.E.2d at 62.

Similarly, in the instant case, considering the evidence against Kevin, Tilmon's statement to Kinlaw was not "powerfully incriminating" toward Kevin. Kinlaw testified that Tilmon told him that *Tilmon* stole the car, that there was a plan to rob a Food Lion in Virginia so *Tilmon* could get money to go to Jamaica, and that *Tilmon* got out of the car with an "AK-47" and shot the two officers when he saw them attempting to spray Kevin with "Mace." Although the statement did not eliminate all reference to Kevin and his existence, as was the situation in *Richardson*, 481 U.S. at 211, 95 L. Ed. 2d at 188, the reference to "they" in the statement was not in connection with the "plan" to rob the Food Lion to get money to go to Jamaica, as Kevin argued, *see Barnes*, 345 N.C. at 217-18, 481 S.E.2d at 62. In addition, the trial court repeatedly cautioned the jury to consider the evidence against each defendant separately. As in *Barnes*, we conclude Tilmon's statement to Kinlaw did not clearly make reference to Kevin in relation to the plan or create a substantial risk that the jury would ignore the trial court's instructions in its determination of Kevin's guilt. *See id.* Therefore, Kevin's assignment of error is overruled.

[20] By assignment of error, Kevin argues the trial court erred in admitting into evidence a portion of his statement to police in violation of his state and federal constitutional rights. Specifically, Kevin contends he had invoked his right to silence with respect to a partic-

ular topic, and the investigator continued to ask him questions regarding that topic. We disagree.

Prior to trial, Kevin made a motion to suppress his statement to law enforcement officers on the basis that he did not waive his right to have a parent, guardian, or custodian present during questioning. Following a hearing, the trial court denied the motion, concluding that Kevin freely, voluntarily, and understandingly waived his rights including the right to have a parent, guardian, or custodian present.

Thereafter, during trial, Agent Tilley testified concerning the interview he conducted with Kevin on 23 September 1997. Agent Tilley stated that prior to asking any case-specific questions, he informed Kevin of his juvenile rights, which include the rights to remain silent; to have a parent, guardian, or custodian present during questioning; and to have an attorney. Agent Tilley then read Kevin the waiver of rights form, which Kevin subsequently signed.

Agent Tilley testified that Kevin then told him of the events of 23 September 1997. After Kevin completed his recitation of the events, Agent Tilley informed him he was aware of an incident involving a Jeep. Agent Tilley testified that Kevin said "he didn't want to say anything about the jeep. He did not know who it was or he would have told us." Agent Tilley then asked about the Jeep incident, and Kevin stated that Tilmon shot at the Jeep while Kevin drove past it.

On appeal, Kevin argues his rights were violated because questioning resumed after he had invoked his right to silence regarding the Jeep incident. Kevin did not object to Agent Tilley's testimony on the basis of waiver or on the basis of resumption of questioning. As we stated previously, a motion *in limine* is not sufficient to preserve for appeal the question of admissibility of evidence if the defendant does not object to that evidence at the time it is offered at trial. *See Hayes*, 350 N.C. at 80, 511 S.E.2d at 303. Therefore, Kevin has not properly preserved this issue for appellate review. *See* N.C. R. App. P. 10(b)(1).

Nonetheless, as Kevin argues the trial court committed plain error with regard to this assignment of error, he is entitled to relief if he can demonstrate plain error. *See* N.C. R. App. P. 10(c)(4). " 'Under the plain error rule, defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result.' " *State v. Roseboro*, 351 N.C. 536, 553,

528 S.E.2d 1, 12 (2000) (quoting *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993)).

The United States Supreme Court, in *Miranda*, 384 U.S. 436, 16 L. Ed. 2d 694, held "a suspect must be informed of his rights upon being arrested: that is, to remain silent, to an attorney and that any statement made may be used as evidence against him." *State v. Miller*, 344 N.C. 658, 666, 477 S.E.2d 915, 920 (1996). Additionally, juveniles have the right to have a parent, guardian, or custodian present during questioning. *See* N.C.G.S. § 7B-2101(a)(3) (1999); *Miller*, 344 N.C. at 666, 477 S.E.2d at 920. Pursuant to *Miranda*, 384 U.S. 436, 16 L. Ed. 2d 694, and *Edwards*, 451 U.S. 477, 68 L. Ed. 2d 378, the Fifth and Fourteenth Amendments to the United States Constitution "require that during custodial interrogation, if the individual 'indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.' " *Fletcher*, 348 N.C. at 305-06, 500 S.E.2d at 676 (quoting *Miranda*, 384 U.S. at 473-74, 16 L. Ed. 2d at 723); *see also Edwards*, 451 U.S. at 482, 68 L. Ed. 2d at 384.

Recently, however, based on the United States Supreme Court's case involving ambiguous invocations of a suspect's right to a lawyer, *Davis v. United States*, 512 U.S. 452, 129 L. Ed. 2d 362 (1994), the Fourth Circuit Court of Appeals addressed the issue of ambiguous invocations of a defendant's right to remain silent in *Burket v. Angelone*, 208 F.3d 172 (4th Cir.), *cert. denied*, —— U.S. ——, 147 L. Ed. 2d 1022 (2000). In *Burket*, the Fourth Circuit held it was not clear the defendant wished to remain silent and, considering the circumstances as a whole, the investigator had every reason to believe the defendant wished to talk and, thus, concluded that the police did not violate *Miranda* because the defendant never invoked his right to remain silent. *Id.* at 200. The Fourth Circuit stated:

> The Supreme Court's most recent exposition on ambiguous invocations was in the context of whether a suspect invoked his Sixth Amendment right to counsel. In *Davis*, the Court held that the determination of whether a suspect invoked his right to counsel is an objective one. The question is whether the suspect "articulate[d] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." [*Davis*, 512 U.S. at 459, 129 L. Ed. 2d at 371.] Other circuits have

held that this "objective inquiry" into ambiguity is applicable to invocations of the right to remain silent.

*Burket*, 208 F.3d at 200. The Fourth Circuit then noted that the Second, Fifth, Seventh, Eighth, and Eleventh Circuit Courts of Appeal have relied on the Supreme Court's analysis in *Davis* to determine whether a suspect's invocation of the right to remain silent was ambiguous. *Id.* The Fourth Circuit then noted that it had not yet decided whether *Davis* applied to invocations of the right to remain silent, but held that it was not necessary to do so in *Burket* because that case specifically focused on federal law. *Id.* However, the Fourth Circuit then held, "[i]n light of the language and logic of the Supreme Court's decision in *Davis*," the Virginia Supreme Court's decision to admit the defendant's statement was not "contrary . . . to clearly established federal law as determined by the Supreme Court." *Id.* In so holding, the Fourth Circuit stated:

> *Davis* held that when faced with an ambiguous invocation of a right, an interrogator was not required to ask clarifying questions. In this case, however, [the defendant] said to the officers "I just don't think that I should say anything" and "I need somebody that I can talk to." These statements do not constitute an unequivocal request to remain silent. In fact, [the defendant's] statements are quite similar to the defendant's statement in *Davis* ("Maybe I should talk to a lawyer"), which the Supreme Court found ambiguous.

*Id.* (citation omitted).

Similarly, in the instant case, Kevin's statement did not constitute an unequivocal request to remain silent. When Agent Tilley asked Kevin about an incident involving a Jeep, which Kevin had not mentioned previously during his statement, Agent Tilley stated that Kevin said "he didn't want to say anything about the jeep. He did not know who it was or he would have told us." This statement is not an unambiguous invocation of Kevin's right to silence, as he indicated that had he known who the incident involved, he would have made a statement concerning that incident. *See id.* Under the circumstances, it was not unreasonable for Agent Tilley to believe Kevin wanted to talk and to then inquire as to what happened involving the Jeep. Kevin's rights were not violated, as the police did not act contrary to clearly established federal law.

Because Kevin did not unambiguously invoke his right to remain silent, the trial court did not err in admitting the portion of his

statement concerning the Jeep. Thus, Kevin has failed to satisfy the first part of plain error review, that there be error. *See Roseboro*, 351 N.C. at 553, 528 S.E.2d at 12. Therefore, this assignment of error is overruled.

By assignments of error, both Kevin and Tilmon argue the State's improper closing argument violated their state and federal constitutional rights. Specifically, they argue the State's closing argument was so grossly improper that the trial court should have intervened *ex mero motu*. In addition, Tilmon argues the State further violated his rights by categorizing the portions of his statement, which the State had introduced into evidence, as lies. We disagree.

[21] We first address Kevin's and Tilmon's argument that the trial court should have intervened *ex mero motu*. During the State's closing argument, the prosecutor was recounting the testimony of the various witnesses to the crimes. One witness observed Tilmon resisting Deputy Hathcock and trying to get back toward the stolen vehicle. In explaining why Tilmon might want to get back to the vehicle, the prosecutor held up the SKS rifle Tilmon allegedly used in the killings. Then, in explaining what one might do with a rifle, the prosecutor displayed the rifle in the direction of one of the district attorneys and then in the direction of a juror, and then put the rifle down. Later, the prosecutor described that another witness observed Deputy Hathcock backing away from Tilmon. In explaining why the deputy might have been backing away, the prosecutor again displayed the rifle in the direction of the same juror.

Defendants argue the trial court's failure to intervene when the prosecutor displayed the rifle in the direction of a juror was prejudicial and entitles them to new trials. Defendants, however, failed to object to the allegedly improper closing argument. Therefore, "the standard of review is whether the argument was so grossly improper that the trial court erred in failing to intervene *ex mero motu*." *Roseboro*, 351 N.C. at 546, 528 S.E.2d at 8; *see also State v. Trull*, 349 N.C. 428, 451, 509 S.E.2d 178, 193 (1998), *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 80 (1999). A " 'trial court is not required to intervene *ex mero motu* unless the argument strays so far from the bounds of propriety as to impede defendant's right to a fair trial.' " *State v. Smith*, 351 N.C. 251, 269, 524 S.E.2d 28, 41 (2000) (quoting *State v. Atkins*, 349 N.C. 62, 84, 505 S.E.2d 97, 111 (1998), *cert. denied*, 526 U.S. 1147, 143 L. Ed. 2d 1036 (1999)). Prosecutors, in capital cases, have wide latitude during jury arguments and must vigorously present arguments for the sentence of death using every legitimate method. *See*

*Roseboro,* 351 N.C. at 546, 528 S.E.2d at 8; *Warren,* 348 N.C. at 124, 499 S.E.2d at 456; *Daniels,* 337 N.C. at 277, 446 S.E.2d at 319. Whether a prosecutor " 'abuses this privilege is a matter ordinarily left to the sound discretion of the trial judge, and we will not review the exercise of this discretion unless there be such gross impropriety in the argument' as would be likely to influence the verdict of the jury.' " *Smith,* 351 N.C. at 270, 524 S.E.2d at 41 (quoting *State v. Covington,* 290 N.C. 313, 328, 226 S.E.2d 629, 640 (1976)).

In *State v. Oliver,* 302 N.C. 28, 274 S.E.2d 183, the prosecutor waved a gun which had been offered into evidence during closing argument. *Id.* at 42, 274 S.E.2d at 193. Later, the prosecutor made reference to the gun while displaying it to the jury. *Id.* The defendants objected, but the trial court overruled their objections. *Id.* This Court held the record revealed no improper use of the weapon in the prosecutor's closing argument because the gun was in evidence and because it "was not improper for the prosecutor to utilize it in his summation so long as he did not attempt to draw inferences from the weapon which were not supported by the evidence or to frighten or intimidate the jury with it." *Id.* This Court then emphasized that prosecutors may argue " 'the facts in evidence and all reasonable inferences to be drawn therefrom.' " *Id.* (quoting *Covington,* 290 N.C. at 327-28, 226 S.E.2d at 640).

In the instant case, the trial court did not err by failing to intervene *ex mero motu.* We note that we are unable to determine from the transcript exactly how the prosecutor used the rifle during closing arguments. While the court reporter made references during transcription, it is mere speculation as to the exact nature of the use of the rifle. The court reporter did not provide details and did not note any reaction from the juror or any courtroom personnel. Four seasoned defense attorneys and an able trial judge were present, and no objection was made to the prosecutor's actions. That being said, the record does not reveal that the prosecutor used the rifle to attempt to draw inferences from the weapon which were not supported by the evidence. *See id.* In addition, the record does not reveal that the juror was frightened or intimidated by the prosecutor's actions. *See id.* Based on the testimony of numerous witnesses, the prosecutor was simply explaining Tilmon's actions according to what witnesses observed.

While we do not condone pointing weapons at jurors, if that in fact occurred, the prosecutor's actions were not "so grossly improper

that the trial court erred in failing to intervene *ex mero motu*." *Roseboro*, 351 N.C. at 546, 528 S.E.2d at 8. Defendants have failed to show the trial court abused its discretion. In light of the overwhelming evidence in this case, defendants were not prejudiced, and the prosecutor's actions during closing arguments did not prevent defendants from receiving a fair trial. This assignment of error is overruled.

[22] We next address Tilmon's argument that the trial court erred in overruling his objection to the portion of the State's closing argument in which the prosecutor referred to parts of his statement as lies. During the State's closing argument, the prosecutor was describing Tilmon's different versions of the events of 23 September 1997. The prosecutor then referred to "[l]ie number one," to which Tilmon's counsel objected, with the qualification, "unless he's contending it's a lie." The prosecutor stated that he was contending it was a lie. The trial court then overruled the objection. Thereafter, the prosecutor described eighteen items from Tilmon's statement about which the State contended Tilmon had lied, including that Tilmon originally did not mention anything about pepper spray; that Tilmon originally stated he had not shot a gun that day, and then that he *probably* had shot a gun that day; and that Tilmon omitted shooting at Waters or at Waters' vehicle.

Tilmon acknowledges the State can "contend" that a defendant lied, *see State v. Davis*, 291 N.C. 1, 12, 229 S.E.2d 285, 293 (1976), but argues the State offered his statement into evidence, and it should not be able to argue the statement contains lies because *he* did not put his own credibility at issue.

This Court addressed a similar issue in *State v. Williams*, 314 N.C. 337, 333 S.E.2d 708 (1985). In *Williams*, the defendant offered no evidence on his own behalf, but the State introduced his confession. *See id.* In holding the trial court did not err, this Court stated:

> The introduction of an exculpatory statement by the State does not preclude it from showing facts concerning the crime to be different. The State is entitled to comment during closing argument on any contradictory evidence as the basis for the jury's disbelief of the defendant's story. The record here plainly exhibits plenary evidence introduced by the State to contradict defendant's written statement. During her closing argument, the District

Attorney indeed commented on the untruthfulness of that statement. This the law allowed her to do.

*Id.* at 357, 333 S.E.2d at 721-22 (citations omitted).

In the instant case, as in *Williams*, the State introduced Tilmon's statement into evidence, and Tilmon did not testify. The State repeated to the jury some instances where Tilmon made exculpatory statements during questioning and later gave different versions of the events. The law permits the State to show the jury how those exculpatory statements differed from the version of events depicted by other evidence that was presented. *See id.*

Tilmon relies on *State v. Locklear*, 294 N.C. 210, 241 S.E.2d 65 (1978), where we said: "It is improper for a lawyer to assert his opinion that a witness is lying. 'He can argue to the jury that they should not believe a witness, but he should not call him a liar.'" *Id.* at 217, 241 S.E.2d at 70 (quoting *State v. Miller*, 271 N.C. 646, 659, 157 S.E.2d 335, 345 (1967)). In addition, Tilmon cites *State v. Bolin*, 281 N.C. 415, 189 S.E.2d 235 (1972), where we said: "'When the State introduces in evidence exculpatory statements of the defendant which are not contradicted or shown to be false by any other facts or circumstances in evidence, the State is bound by these statements.'" *Id.* at 424, 189 S.E.2d at 241 (quoting *State v. Carter*, 254 N.C. 475, 479, 119 S.E.2d 461, 464 (1961)).

*Locklear* is distinguishable. Tilmon was not a witness in the case, and the prosecutor was merely showing the jury instances where Tilmon had not been truthful while giving his statement to law enforcement officers. *See Locklear*, 294 N.C. at 217, 241 S.E.2d at 70. As for Tilmon's reliance on *Bolin*, it is misplaced. Tilmon incorrectly stated that we referred to nonexculpatory statements in *Bolin*, when in fact we referred to instances when the State introduced exculpatory statements. *See Bolin*, 281 N.C. at 424, 189 S.E.2d at 241. Nevertheless, in addition to the statement Tilmon attributes to *Bolin*, we also stated: "The introduction in evidence by the State of a statement made by defendant which may tend to exculpate him, does not prevent the State from showing that the facts concerning the homicide were different from what the defendant said about them." *Id.* at 425, 189 S.E.2d at 241-42. In the instant case, the prosecutor merely pointed out exculpatory statements or omissions to show how the facts differed from Tilmon's statement.

Tilmon was not prejudiced by the prosecutor's contention that portions of Tilmon's statement were lies. Therefore, this assignment of error is overruled.

**[23]** By numerous assignments of error, both Kevin and Tilmon argue the trial court erred by giving an acting in concert instruction for the first-degree murder and robbery with a dangerous weapon charges. Defendants contend the instruction permitted the jury to find them guilty of first-degree murder and robbery with a dangerous weapon without finding the required intent to commit the crimes, in violation of their constitutional rights. In addition, Kevin argues the evidence was not sufficient to convict him of the first-degree murder or the robbery with a dangerous weapon of Deputy Hathcock. We disagree.

This Court, in *Barnes*, 345 N.C. at 233, 481 S.E.2d at 71, restated the doctrine of acting in concert as enumerated in *State v. Erlewine*, 328 N.C. 626, 403 S.E.2d 280 (1991), and *State v. Westbrook*, 279 N.C. 18, 181 S.E.2d 572 (1971), *death sentence vacated*, 408 U.S. 939, 33 L. Ed. 2d 761 (1972):

> "[I]f 'two persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal if the other commits that particular crime, but he is also guilty of any other crime committed by the other in pursuance of the common purpose . . . or as a natural or probable consequence thereof.' "

*Erlewine*, 328 N.C. at 637, 403 S.E.2d at 286 (quoting *Westbrook*, 279 N.C. at 41-42, 181 S.E.2d at 586) (alteration in original); *see also Gaines*, 345 N.C. at 677 n.1, 483 S.E.2d at 414 n.1 ("In *State v. Barnes*, 345 N.C. 184, 233, 481 S.E.2d 44, 71 (1997), a majority of this Court held that a finding that the accomplice individually possessed the *mens rea* to commit the crime is not necessary to convict a defendant of premeditated and deliberate murder under a theory of acting in concert.").

Thus, "if two or more persons act together in pursuit of a common plan or purpose, each of them, if actually or constructively present, is guilty of any crime committed by any of the others in pursuit of the common plan." *State v. Laws*, 325 N.C. 81, 97, 381 S.E.2d 609, 618 (1989), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *quoted in State v. McCullers*, 341 N.C. 19, 29-30, 460 S.E.2d 163, 169 (1995). While a person may be either actually or constructively present at the scene, *see State v. Oliver*, 309

N.C. 326, 362, 307 S.E.2d 304, 327 (1983), "[a] person is constructively present during the commission of a crime if he is close enough to provide assistance if needed and to encourage the actual execution of the crime." *Gaines*, 345 N.C. at 675-76, 483 S.E.2d at 413; *see also State v. Willis*, 332 N.C. 151, 175, 420 S.E.2d 158, 169 (1992).

In the instant case, in instructing the jury on the first-degree murder charges, the trial court included an acting in concert instruction consistent with the pattern instruction, and stated:

> For a person to be guilty of a crime, it is not necessary that he himself do all the acts necessary to constitute the crime. If two or more persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty of that crime of, in this case, possession of a stolen vehicle, if the other commits the crime, but he is also guilty of any other crime committed by the other in pursuance of the common purpose to commit the crime of possession of a stolen vehicle.

*See* N.C.P.I.—Crim. 202.10 (1998). A similar instruction was included in the jury instruction for robbery with a dangerous weapon, pursuant to N.C.P.I.—Crim. 202.10.

In its mandate on each charge of first-degree murder, the trial court instructed as follows:

> I charge that if you find from the evidence beyond a reasonable doubt that on or about the twenty-third day of September, 1997, the defendant [defendant's name], acting either by himself or acting together with [other defendant's name], intentionally killed the victim [victim's name] with a deadly weapon, thereby proximately causing the victim [victim's name] death, and that the defendant [defendant's name] acted with malice, with premeditation and with deliberation, it would be your duty to return a verdict of guilty of first degree murder.

Similarly, in its mandates on robbery with a dangerous weapon, the trial court gave instructions substantially similar to the following:

> as to the charge of robbery with a firearm in which [defendant's name] is the defendant and in which [victim's name] is the alleged victim, I charge that if you find from the evidence beyond a reasonable doubt that on or about the twenty-third day of September, 1997, the defendant [defendant's name] had in his possession a firearm and took and carried away property from

the person or presence of [victim's name], without [victim's name]'s voluntary consent, by endangering or threatening [victim's name]'s life with the use or threatened use of a firearm, the defendant [defendant's name] knowing that he was not entitled to take the property and intending to deprive [victim's name] of its use permanently, it would be your duty to return a verdict of guilty of robbery with a firearm in the case in which [victim's name] is the alleged victim.

We note the trial court's acting in concert instructions comported in all respects with our previous case law. Therefore, defendants' arguments in this regard are without merit.

[24] We next address whether there was sufficient evidence to submit the charges of first-degree murder and robbery with a dangerous weapon of Deputy Hathcock against Kevin. Kevin made a motion to dismiss to preserve this issue for appellate review. The trial court denied that motion. "In ruling on a motion to dismiss, the trial court must consider the evidence in the light most favorable to the State and give the State every reasonable inference to be drawn therefrom." *Nobles*, 350 N.C. at 504, 515 S.E.2d at 898; *see also Call*, 349 N.C. at 417, 508 S.E.2d at 518; *State v. Lee*, 348 N.C. 474, 488, 501 S.E.2d 334, 343 (1998). To withstand a defendant's motion to dismiss, "the trial court need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator." *Call*, 349 N.C. at 417, 508 S.E.2d at 518. "[T]he trial court should consider all evidence actually admitted, whether competent or not, that is favorable to the State." *State v. Jones*, 342 N.C. 523, 540, 467 S.E.2d 12, 23 (1996).

Circumstantial evidence may be utilized to overcome a motion to dismiss " 'even when the evidence does not rule out every hypothesis of innocence.' " *Thomas*, 350 N.C. at 343, 514 S.E.2d at 503 (quoting *State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988)). If the trial court finds substantial evidence, whether direct or circumstantial, or a combination, "to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied." *State v. Locklear*, 322 N.C. 349, 358, 368 S.E.2d 377, 383 (1988). If, however, the evidence "is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator, the motion to dismiss must be allowed." *State v. Malloy*, 309 N.C. 176, 179, 305 S.E.2d 718, 720 (1983).

Regarding the sufficiency of the evidence of the charges of first-degree murder and robbery with a dangerous weapon of Deputy Hathcock against Kevin, the trial court instructed the jury with an acting in concert instruction based on the possession of a stolen vehicle. As we previously held, this instruction was proper. Therefore, our inquiry is limited to whether there was sufficient evidence of first-degree murder by Kevin, Tilmon, or both, and robbery with a dangerous weapon by Kevin, Tilmon, or both, based on the common purpose of possessing the stolen vehicle.

We find there was sufficient evidence that Kevin and Tilmon acted with a common purpose in possessing the stolen vehicle. The evidence showed Kevin and Tilmon were riding together from Kingstree to Richmond when they were stopped by Trooper Lowry near Fayetteville. Although Kevin was driving the stolen vehicle, in his statement to Agent Tilley, he admitted giving Tilmon's driver's license to Trooper Lowry. After shooting both Trooper Lowry and Deputy Hathcock, Kevin and Tilmon retrieved the officers' weapons and left the scene in the stolen vehicle. There is also evidence they exited the highway to remove the license plate from the stolen vehicle to avoid detection.

Moreover, without utilizing the acting in concert theory, there was sufficient evidence Kevin committed first-degree murder. Contrary to Kevin's argument that Tilmon shot Deputy Hathcock with Trooper Lowry's weapon prior to retrieving the rifle, Kevin, in his statement to Agent Tilley, stated he took Trooper Lowry's gun from the trooper's holster. Kevin also stated Tilmon did not fire the trooper's gun, and he did not think Tilmon ever had the trooper's gun in his possession. After initially denying that he had shot a gun on the day in question, Kevin eventually admitted shooting the trooper's gun. A gunshot residue test on Kevin's hands revealed that he had shot a weapon recently. Additionally, a .40-caliber bullet from Trooper Lowry's gun was recovered from Deputy Hathcock's body during the autopsy, and that .40-caliber wound was a fatal wound.

In addition, a rational trier of fact could find Kevin and Tilmon committed robbery with a dangerous weapon of Deputy Hathcock. The evidence shows Tilmon shot Deputy Hathcock with an assault rifle. Thereafter, Tilmon retrieved Deputy Hathcock's weapon. There is also evidence that Kevin inflicted a fatal wound to Deputy Hathcock. Subsequently, when Kevin and Tilmon fled the scene, Tilmon was carrying Deputy Hathcock's weapon.

Kevin points to other possible scenarios based on the evidence presented. However, we do not require the evidence to rule out every possible hypothesis of innocence. *See Thomas*, 350 N.C. at 343, 514 S.E.2d at 503. Considering the evidence in the light most favorable to the State, *see Nobles*, 350 N.C. at 504, 515 S.E.2d at 898, there is substantial evidence from which the jury could find that the first-degree murder and robbery with a dangerous weapon of Deputy Hathcock were committed pursuant to Kevin's common purpose with Tilmon of possessing a stolen vehicle.

## CAPITAL SENTENCING PROCEEDING

[25] By assignment of error, Tilmon argues the trial court erred by denying his motion to sever his and Kevin's sentencing proceedings. Tilmon contends the trial court's actions constituted prejudicial error. By a similar assignment of error, Kevin argues the trial court committed reversible constitutional error by joining his and Tilmon's cases for sentencing. We disagree.

Initially, we note Kevin concedes he did not object to joinder for sentencing or renew a previous motion to sever; therefore, he did not preserve appellate review of this issue pursuant to N.C. R. App. P. 10(b)(1). Kevin argues, however, the trial court's error amounts to plain error pursuant to N.C. R. App. P. 10(c)(4). However, plain error review is limited to errors in a trial court's jury instructions or a trial court's rulings on admissibility of evidence. *See State v. Cummings*, 346 N.C. 291, 313-14, 488 S.E.2d 550, 563 (1997), *cert. denied*, 522 U.S. 1092, 139 L. Ed. 2d 873 (1998). This Court has previously declined to extend plain error review to other issues, and we decline to do so now. *See State v. Fleming*, 350 N.C. 109, 133, 512 S.E.2d 720, 737 (declined to extend plain error review to the situation where the trial court allowed and instructed the prosecutor to prompt his witness after the witness had taken the stand), *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 274 (1999); *Atkins*, 349 N.C. at 81, 505 S.E.2d at 109-10 (declined to extend plain error review to situations in which the trial court failed to give an instruction during jury *voir dire* which was not requested). Therefore, we will not review Kevin's assignment of error.

Tilmon, on the other hand, relied on a letter from his mother, Sylvia Williams, to show why the cases should be severed for sentencing. The letter stated that Williams would not testify for Tilmon because of possible damage to Kevin's case. However, Tilmon never actually renewed his prior motion to sever, nor did he object to joinder of the cases for sentencing. Therefore, the trial court never ruled

on this issue. Tilmon's purported efforts, during the sentencing phase, to revive his previous motion to sever were insufficient to satisfy N.C. R. App. P. 10 to preserve appellate review of this issue. Pursuant to N.C. R. App. P. 2, however, we waive the appellate rules and review Tilmon's assignment of error. Any error found by this Court will also apply to Kevin, as his case was joined with Tilmon's. *See Oliver*, 309 N.C. at 361, 307 S.E.2d at 327.

Joint defendants convicted of capital crimes at a joint trial can be joined for sentencing if each defendant receives individualized sentencing consideration. *See id.* at 366, 307 S.E.2d at 328-29. In *Oliver*, this Court stated that the United States Supreme Court impliedly approved joint sentencing proceedings as long as there is "individualized consideration given to each defendant's culpability." *Id.* at 366, 307 S.E.2d at 330 (citing *Enmund v. Florida*, 458 U.S. 782, 73 L. Ed. 2d 1140 (1982)). In considering joinder for sentencing, this Court has relied on the general rules governing joinder for trial. *See Barnes*, 345 N.C. at 224, 481 S.E.2d at 66 (where this Court relied on *Pickens*, 335 N.C. 717, 440 S.E.2d 552, which addresses joinder for trial, and held two of the three defendants were not denied a fair capital sentencing proceeding because testimony of a third defendant did not result in antagonistic defenses, as each defendant could show why he should not receive the death penalty).

"[T]he propriety of joinder depends upon the circumstances of each case and is within the sound discretion of the trial judge." *Pickens*, 335 N.C. at 724, 440 S.E.2d at 556. When a decision is within the trial court's discretion, the court's determination will not be disturbed absent an abuse of discretion. *See id.* As we previously stated, the North Carolina General Statutes provide for joinder of defendants in situations where each defendant is charged with accountability for each offense. *See* N.C.G.S. § 15A-926(b). Joinder of defendants is also appropriate if the several offenses charged were part of a common plan or scheme; were part of the same act or transaction; or were so closely connected in time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others. *See id.*

Tilmon argues severance was appropriate because Williams would not testify for him otherwise. Tilmon's argument, however, makes the unsubstantiated assumption that Williams would have testified favorably on his behalf and unfavorably on behalf of Kevin. Such an assertion can be substantiated only by an offer of proof.

STATE v. GOLPHIN

[352 N.C. 364 (2000)]

"It is well established that an exception to the exclusion of evidence cannot. be sustained where the record fails to show what the witness' testimony would have been had he been permitted to testify." *State v. Simpson*, 314 N.C. 359, 370, 334 S.E.2d 53, 60 (1985) (citing *State v. Cheek*, 307 N.C. 552, 299 S.E.2d 633 (1983)). "[I]n order for a party to preserve for appellate review the exclusion of evidence, the significance of the excluded evidence must be made to appear in the record and a specific offer of proof is required unless the significance of the evidence is obvious from the record." *Id.* at 370, 334 S.E.2d at 60 (citing *Currence v. Hardin*, 296 N.C. 95, 249 S.E.2d 387 (1978)).

*State v. Johnson*, 340 N.C. 32, 49, 455 S.E.2d 644, 653 (1995). However, Tilmon made no offer of proof in the instant case as to the actual substance of Williams' testimony, and the significance of the testimony is not apparent from the record. Thus, we are unable to rely on this reasoning in support of Tilmon's argument. Furthermore, we note that Tilmon could have subpoenaed Williams to testify. *See Coffey*, 326 N.C. at 292, 389 S.E.2d at 62. There was no indication that she would not testify truthfully if she had been subpoenaed.

In addition, Tilmon contends that information Williams would have provided regarding his difficult childhood could have supported mitigating circumstances that would have led the jury to impose life imprisonment rather than death. This information, however, had already been provided by other witnesses, and Tilmon has offered no proof that Williams' testimony would have expanded on what had already been made known to the jury.

Further, Tilmon cannot show he was denied individualized consideration during the joint sentencing proceeding. The trial court's instructions to the jury at the conclusion of the sentencing proceeding included the following: "[Y]ou must consider the evidence *separately* as to each defendant and as to each victim. You must evaluate and make a *separate* recommendation based upon a *separate* and distinct evaluation as to each defendant and as to each victim." (Emphasis added.) On more than one occasion, the trial court instructed the jury to consider each defendant separately. We presume juries follow the instructions of the trial court. *See Trull*, 349 N.C. at 455, 509 S.E.2d at 196. As such, the transcript reveals Tilmon received individualized consideration during the sentencing proceeding. It is also apparent from the "Issues and Recommendation as to Punishment" forms that Kevin and Tilmon were given separate consideration by the jury. The jury found as a mitigating circumstance

that Kevin lacked parental involvement. In contrast, in Tilmon's case, the jury did not find any of the mitigating circumstances related to parental involvement. Therefore, Kevin and Tilmon were given individualized sentencing consideration. *See Oliver*, 309 N.C. at 366, 307 S.E.2d at 330. Tilmon has not shown that the trial court abused its discretion. Therefore, Tilmon's assignment of error is overruled.

[26] By assignment of error, Tilmon contends the trial court committed reversible error by denying his motion to suppress two letters seized by prison officials allegedly in violation of his constitutional rights to freedom of speech and freedom from unreasonable searches and seizures. Tilmon's pretrial motion to suppress the content of the letters was denied by the trial court after conducting a hearing. The State did not use the letters during the guilt/innocence phase of the trial, but introduced them during the sentencing proceeding. When the State introduced the letters and read them to the jury, Tilmon failed to object. To preserve an issue for appeal, the defendant must make an objection at the point during the trial when the State attempts to introduce the evidence. *See Hayes*, 350 N.C. at 80, 511 S.E.2d at 303. A defendant cannot rely on his pretrial motion to suppress to preserve an issue for appeal. *See id.* His objection must be renewed at trial. *See id.* Tilmon's failure to object at trial waived his right to have this issue reviewed on appeal. This assignment of error is overruled.

[27] By two assignments of error, Kevin contends the trial court erred by admitting into evidence during the sentencing proceeding a note he wrote. This note contained Rastafarian language, and Kevin argues the note was seized in violation of his federal and state constitutional rights, has no relevance to the issues presented in his case, and was unfairly prejudicial. We disagree.

During the jury selection phase of the trial, Kevin drafted a note while sitting in the courtroom. Correctional Sergeant Scott Brown, who led the security detail during transport of defendants, instructed Kevin not to bring anything into or take anything out of the courtroom. Another officer informed Sgt. Brown that Kevin was leaving the courtroom with a piece of paper in his hand. Sgt. Brown took no immediate action, but waited to see if Kevin would pass the note to his attorneys on the way out of the courtroom. He did not. Thereafter, when Kevin was in the prisoner holding area, Sgt. Brown confiscated the note. Sgt. Brown testified that he confiscated the note because of concerns about possible escape plans.

At the outset, we note that Kevin failed to raise an objection regarding his argument that the note was seized in violation of his federal and state constitutional rights. Prior to sentencing, Kevin raised relevancy as the only basis for his objection to the introduction of the letter. " 'This Court is not required to pass upon a constitutional issue unless it affirmatively appears that the issue was raised and determined in the trial court.' " *Nobles*, 350 N.C. at 495, 515 S.E.2d at 893 (quoting *Creason*, 313 N.C. at 127, 326 S.E.2d at 27). Therefore, we need not address Kevin's allegation that the note was seized in violation of his federal and state constitutional rights.

We now turn to Kevin's claims that the note was irrelevant and highly prejudicial. It is well settled that "[t]he North Carolina Rules of Evidence do not apply to sentencing hearings." *State v. Bond*, 345 N.C. 1, 31, 478 S.E.2d 163, 179 (1996), *cert. denied*, 521 U.S. 1124, 138 L. Ed. 2d 1022 (1997). "Evidence may be presented as to any matter that the court deems relevant to sentence, and may include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (e) and (f)." N.C.G.S. § 15A-2000(a)(3) (1999); *see also State v. Daughtry*, 340 N.C. 488, 517, 459 S.E.2d 747, 762 (1995), *cert. denied*, 516 U.S. 1079, 133 L. Ed. 2d 739 (1996). Because the State can present any evidence that is competent and relevant to the submitted aggravating circumstances, "trial courts are not required to perform the Rule 403 balancing test during a sentencing proceeding." *State v. Flippen*, 349 N.C. 264, 273, 506 S.E.2d 702, 708 (1998), *cert. denied*, 526 U.S. 1135, 143 L. Ed. 2d 1015 (1999).

In the instant case, the State offered five statutory aggravating circumstances in Kevin's sentencing proceeding for the murder of Trooper Lowry, including N.C.G.S. § 15A-2000(e)(9)—that the murder of Trooper Lowry was especially heinous, atrocious, or cruel. This Court has previously held " '[i]t is not merely the specific and narrow method in which a victim is killed which makes a murder heinous, atrocious, and cruel; rather, it is the entire set of circumstances surrounding the killing.' " *State v. Stanley*, 310 N.C. 332, 338-39, 312 S.E.2d 393, 397 (1984) (quoting *Magill v. State*, 428 So. 2d 649, 651 (Fla.), *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983)); *see also State v. Gibbs*, 335 N.C. 1, 63, 436 S.E.2d 321, 357 (1993), *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 881 (1994). Evidence that a murder was racially motivated can be used to show the "depravity of defendant's character." *State v. Moose*, 310 N.C. 482, 500, 313 S.E.2d 507, 519 (1984). The evidence of racial motivation then becomes a key factor

because the (e)(9) aggravating circumstance is appropriate "when the killing demonstrates an unusual depravity of mind on the part of the defendant." *Kandies*, 342 N.C. at 450, 467 S.E.2d at 84.

Kevin's note contained references to "the beast" and "Babylon," which were interpreted at trial to mean "the police" and "Caucasian-run America," respectively. The references in Kevin's note are evidence that the murders were racially motivated; therefore, the jury could properly consider the note when determining if the murder was especially heinous, atrocious or cruel. *See* N.C.G.S. § 15A-2000(e)(9). This assignment of error is overruled.

[28] In two assignments of error, Tilmon contends the trial court erred by allowing the State to cross-examine Dr. John Warren, an expert in the field of forensic psychology, regarding Dr. Warren's potential bias. Tilmon argues certain questions asked by the prosecutor were improper and resulted in a denial of his federal and state constitutional rights to a fair sentencing hearing. Tilmon claims the questions concerning the fees charged by Dr. Warren for testimony in indigent cases, his ownership of a plane, places where he would not testify, and a highly publicized case in which he was involved were improper. However, Tilmon failed to object to any questions asked or answers given during the portion of the cross-examination when these topics were discussed.

To preserve an issue for appeal, a party must make a timely objection. *See* N.C. R. App. P. 10(b)(1). As Tilmon did not object, he has failed to preserve these assignments of error for appellate review. In addition, this Court will not review Tilmon's constitutional arguments because he did not provide the trial court with an opportunity to rule on any constitutional issue related to this cross-examination. *See Nobles*, 350 N.C. at 495, 515 S.E.2d at 893. Moreover, although Tilmon assigns plain error in the alternative, he did not "specifically and distinctly" argue plain error. *See* N.C. R. App. P. 10(c)(4). Therefore, these assignments of error are overruled.

In two assignments of error, Kevin argues the trial court erred by allowing the State to cross-examine one of Tilmon's expert witnesses with a report prepared by another expert witness and by allowing the report into evidence. Specifically, Kevin contends his constitutional right to confront the witnesses against him was violated by the introduction of this report, and the report contains incriminating hearsay statements that are highly prejudicial to his case. We disagree.

Dr. James Johnson, an expert on African-American males and the sociological impact of societal forces, testified on behalf of Tilmon and was cross-examined by the State. Kevin was given an opportunity to cross-examine Dr. Johnson but chose not to do so. Later, following Dr. Johnson's testimony, the trial court ruled that a preliminary draft of a report completed by Dr. Johnson was discoverable by the State. Kevin received a copy of the report after the trial court's ruling. Subsequently, the State then cross-examined Dr. Warren about the report and introduced it into evidence following Dr. Warren's testimony.

[29] Kevin first argues the report itself was hearsay and was improperly introduced after Dr. Warren's testimony. Therefore, it should not have been allowed into evidence. The Rules of Evidence do not apply in sentencing hearings. *See Daughtry*, 340 N.C. at 517, 459 S.E.2d at 762. "Any evidence the court 'deems relevant to sentence' may be introduced at [the sentencing proceeding]." *Id.* (quoting N.C.G.S. § 15A-2000(a)(3)). Hearsay evidence can be admitted if the trial court concludes it is relevant to the defendant's sentencing, and it does not violate a defendant's constitutional right to confront witnesses against him. *See State v. McLaughlin*, 341 N.C. 426, 458-59, 462 S.E.2d 1, 19 (1995), *cert. denied*, 516 U.S. 1133, 133 L. Ed. 2d 879 (1996).

[30] Kevin contends he was denied his right to confront Dr. Johnson because he was not given an opportunity to cross-examine Dr. Johnson regarding the substance of the report. While it is true that Kevin did not obtain a copy of the report until *after* Dr. Johnson had been excused as a witness, Kevin was aware of the report's existence *prior* to the conclusion of Dr. Johnson's testimony. The State cross-examined Dr. Johnson regarding the existence of the report. Only one question was asked regarding its substance, but a plain and unambiguous reference was made which clearly revealed its existence. After cross-examination by the State and redirect examination by Tilmon's counsel, the court gave Kevin a second opportunity to question Dr. Johnson, *following* the line of questioning by the State which revealed the report's existence. Kevin responded to the court that he had no questions for Dr. Johnson. Kevin cannot now claim his decision not to cross-examine Dr. Johnson was influenced by a lack of time for adequate preparation because he could have requested a continuance. *See State v. Branch*, 306 N.C. 101, 104-05, 291 S.E.2d 653, 656 (1982) (holding a motion to continue which raises constitutional issues, including the right to confront witnesses, has no fixed

time limits, and there is a case-by-case determination as to what constitutes a reasonable time to prepare a defense). Thus, introduction of the report did not violate Kevin's right to confront the witnesses against him. The trial court did not err in admitting Dr. Johnson's report into evidence.

Kevin also argues the report itself contained inadmissible hearsay statements which also violated his right to confront the witnesses against him. Rule 703 provides guidance on the admissibility of expert opinions based on out-of-court communications when presented during the sentencing proceeding:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

N.C.G.S. § 8C-1, Rule 703 (1999).

Allowing disclosure of the bases of an expert's opinion "is essential to the factfinder's assessment of the credibility and weight to be given to it." *State v. Jones*, 322 N.C. 406, 412, 368 S.E.2d 844, 847 (1988).

Testimony as to matters offered to show the basis for a physician's opinion and not for the truth of the matters testified to is not hearsay. "We emphasize again that such testimony is not substantive evidence." *State v. Wade*, 296 N.C. 454, 464, 251 S.E.2d 407, 412 (1979). Its admissibility does not depend on an exception to the hearsay rule, but on the limited purpose for which it is offered.

*State v. Wood*, 306 N.C. 510, 516-17, 294 S.E.2d 310, 313 (1982); *see also Jones*, 322 N.C. at 412, 368 S.E.2d at 847; *State v. Allen*, 322 N.C. 176, 184, 367 S.E.2d 626, 630 (1988).

Dr. Johnson's report included comments from unidentified informants on various aspects of Tilmon's character and upbringing, including the relationship Tilmon had with his parents, Tilmon's prior experience with police, Tilmon's demeanor, and the influence Kevin had over Tilmon. Experts in Dr. Johnson's field often rely upon statements such as these to form an opinion. These statements were introduced, not for the truth of the matter asserted, but as non-

hearsay evidence to support Dr. Johnson's conclusions. Therefore, the report was admissible.

[31] Kevin further argues the State improperly cross-examined Dr. Warren about Dr. Johnson's report. Pursuant to N.C.G.S. § 8C-1, Rule 705, an expert witness may be cross-examined with regard to " 'the underlying facts and data used by [the] expert in reaching his expert opinion,' " including other experts' reports. *State v. White,* 343 N.C. 378, 393, 471 S.E.2d 593, 602 (quoting *State v. Simpson,* 341 N.C. 316, 355, 462 S.E.2d 191, 213 (1995), *cert. denied,* 516 U.S. 1161, 134 L. Ed. 2d 194 (1996)), *cert. denied,* 519 U.S. 936, 136 L. Ed. 2d 229 (1996).

Assuming *arguendo* that the report was improperly admitted, any error that may have resulted was harmless beyond a reasonable doubt. Kevin argues that certain statements in the report were "incriminating." However, references to Kevin in the report as "the sly manipulator" and the "bad" brother were not nearly as incriminating as the evidence that Kevin resisted arrest; shot Trooper Lowry several times after he had been rendered helpless; shot Deputy Hathcock after he had been rendered helpless; and according to Kevin's own statement, drove the stolen car past Waters' Jeep so Tilmon could shoot at him. Furthermore, Dr. Johnson's report supported Kevin's mitigating circumstances that he grew up in an unstable environment and that he had previous negative experiences with the police. Kevin was not prejudiced by the State's cross-examination of Dr. Warren.

Accordingly, the trial court did not err in admitting Dr. Johnson's report into evidence, and the cross-examination of Dr. Warren about Dr. Johnson's report did not prejudice Kevin. Therefore, these assignments of error are overruled.

[32] In assignments of error, Tilmon and Kevin argue the trial court erred by failing to instruct the jury that unless the aggravating circumstances outweighed the mitigating circumstances, a life sentence should be imposed. Defendants claim the trial court's use of the pattern jury instructions resulted in confusion and may have led to imposition of a death sentence on less than complete jury unanimity. Defendants also argue the trial court's instructions called for imposition of the death penalty if the jury found the mitigating circumstances and aggravating circumstances to be in "equipoise," which means a state of equilibrium.

The trial court instructed the jury, pursuant to the pattern instruction, as follows: "Do you unanimously find beyond a reasonable doubt that the mitigating circumstance or circumstances found is, or are, insufficient to outweigh the aggravating circumstance or circumstances found by you?" This instruction is entirely consistent with N.C.G.S. § 15A-2000(c)(3), which provides that the jury may recommend a death sentence if it finds "[t]hat the mitigating circumstance or circumstances are insufficient to outweigh the aggravating circumstance or circumstances found." This Court has previously denied the same argument. *See State v. Keel*, 337 N.C. 469, 493-94, 447 S.E.2d 748, 761-62 (1994), *cert. denied*, 513 U.S. 1198, 131 L. Ed. 2d 147 (1995); *State v. Hunt*, 323 N.C. 407, 433, 373 S.E.2d 400, 416-17 (1988), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 602 (1990); *State v. McDougall*, 308 N.C. 1, 26, 301 S.E.2d 308, 326, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983). Defendants request that we reconsider these holdings. We decline to do so and reaffirm our prior decisions with respect to this issue. These assignments of error are overruled.

By assignments of error, Tilmon and Kevin contend the trial court erred by failing to intervene *ex mero motu* during the State's sentencing proceeding arguments. Neither defendant objected to the State's argument. Specifically, both defendants claim the State improperly argued general deterrence. In addition, Tilmon contends the State improperly argued community sentiment, and Kevin claims Tilmon's Rastafarian beliefs were wrongly attributed to him. Defendants insist these arguments were improper and warranted the trial court's intervention *ex mero motu*. We disagree.

Prosecutors are given wide latitude during jury arguments and may argue "the facts in evidence and all reasonable inferences that may be drawn therefrom." *State v. Anderson*, 322 N.C. 22, 37, 366 S.E.2d 459, 468, *cert. denied*, 488 U.S. 975, 102 L. Ed. 2d 548 (1988). When a defendant does not object to an allegedly improper argument, the trial court should intervene *ex mero motu* if the argument rises to the level of gross impropriety. *See Trull*, 349 N.C. at 451, 509 S.E.2d at 193. "It is well established that '[c]ontrol of closing arguments is in the discretion of the trial court.'" *State v. Barrett*, 343 N.C. 164, 181, 469 S.E.2d 888, 898 (quoting *State v. Green*, 336 N.C. 142, 186, 443 S.E.2d 14, 40, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994)), *cert. denied*, 519 U.S. 953, 136 L. Ed. 2d 259 (1996). As previously stated, " 'we will not review the exercise of this discretion unless there be such gross impropriety in the argument as would be likely to

influence the verdict of the jury.' " *Smith,* 351 N.C. at 270, 524 S.E.2d at 41 (quoting *Covington,* 290 N.C. at 328, 226 S.E.2d at 640).

[33] We first address defendants' arguments that the State made impermissible statements regarding the general deterrent effect of the death penalty. Although Tilmon objected to one reference regarding sending a message to anyone contemplating lawlessness and the trial court sustained the objection, both defendants argue the trial court should have intervened with regard to other such references.

In spite of the wide latitude granted to the State, *Anderson,* 322 N.C. at 37, 366 S.E.2d at 468, the State is prohibited from arguing general deterrence "because it is not relevant to defendant, his character, his record, or the circumstances of the charged offense." *State v. Bishop,* 343 N.C. 518, 555, 472 S.E.2d 842, 862 (1996), *cert. denied,* 519 U.S. 1097, 136 L. Ed. 2d 723 (1997). The State, however, in its arguments, can "urg[e] the jury to sentence a particular defendant to death to specifically deter that defendant from engaging in future murders." *McNeil,* 350 N.C. at 687, 518 S.E.2d at 504.

In the instant case, the State's argument included such statements as the following:

These two defendants deserve the death penalty for what they did, for their motives, for their actions. Someone has got to tell people like these two defendants, "We absolutely will not tolerate this any longer." If you don't tell that to these two defendants, nobody else will. We can't rely on the next bad case. We can't rely on the next jury to send that message to people who have no regard for your way of life, for your state, for your law enforcement officers.

After reviewing the argument in context, we conclude the State's arguments did not constitute a general deterrence argument. *See State v. Guevara,* 349 N.C. 243, 258, 506 S.E.2d 711, 721 (1998) (holding the State's argument "merely focused the jury's attention on the seriousness of the crime and the importance of the jury's duty" and did not constitute a general deterrence argument), *cert. denied,* 526 U.S. 1133, 143 L. Ed. 2d 1013 (1999); *Barrett,* 343 N.C. at 181, 469 S.E.2d at 898 (holding the State can argue the seriousness of the crime). Nevertheless, assuming the State's arguments were improper, they were not so grossly improper as to warrant intervention by the trial court. *See, e.g., McNeil,* 350 N.C. at 687, 518 S.E.2d at 504 (holding the State's argument that the death penalty is proper in our soci-

ety and "we're going to enforce the laws and if you kill three people, that's enough" was not so "grossly improper" as to warrant intervention by the trial court *ex mero motu*); *State v. Hill*, 311 N.C. 465, 475, 319 S.E.2d 163, 170 (1984) (holding the State's argument referring to the "deterrent effect" of the death penalty did not warrant *ex mero motu* intervention by the trial court). Therefore, intervention by the trial court was not warranted.

**[34]** We next address Tilmon's argument that the State's reference to the community's sentiment regarding the death penalty was improper. A prosecutor is prohibited from "intimat[ing] to the jury community preferences regarding capital punishment." *State v. Artis*, 325 N.C. 278, 329, 384 S.E.2d 470, 499 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). The State cannot encourage the jury to lend an ear to the community. *See State v. Jones*, 339 N.C. 114, 161, 451 S.E.2d 826, 852 (1994), *cert. denied*, 515 U.S. 1169, 132 L. Ed. 2d 873 (1995). However, "it is not improper to remind the jury . . . that its voice is the conscience of the community," nor is it "objectionable to tell the jury that its verdict will 'send a message to the community' about what may befall a person convicted of murder in a court of justice." *Artis*, 325 N.C. at 329-30, 384 S.E.2d at 499-500.

The State's arguments in the instant case included the following:

Someone has got to stand up and tell defendants like this, "We are not gonna tolerate this. We cannot tolerate this." What does a life sentence to these two defendants *send* as a message to the citizens of this state? . . .

I submit that it would *send* a message to them that we do not hold our law enforcement officers in very high esteem . . . .

(Emphasis added.)

A review of the prosecutor's statements reveals that he never told the jury what was expected of them by the community, but instead reiterated what the jury's message should be to the community. *See State v. Quesinberry*, 325 N.C. 125, 141, 381 S.E.2d 681, 691 (1989) (holding the trial court properly did not intervene *ex mero motu* to the State's argument that the jury should send a message to the community), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990). Thus, we conclude the State did not improperly argue community sentiment to the jury.

[35] We finally address Kevin's argument that the trial court should have intervened *ex mero motu* because the State's attribution of hatred based on Rastafarian beliefs on him was not supported by the evidence and was grossly improper. He contends that any discussion of Rastafarianism, and its related beliefs, should have been limited to Tilmon's sentencing but was improperly submitted to the jury as a factor in considering his own sentence.

A review of the record and transcript, however, shows there was evidence that Kevin was involved with Rastafarianism. The note written by Kevin during jury selection revealed that he, too, was immersed in the Rastafarian culture, as the note contained references to "the beast" and "Babylon." There was evidence which showed that these two words were used in Rastafarian jargon to mean "the police" and "Caucasian-run America." In addition, there was evidence from Kevin's expert witness, Dr. Thomas Harbin, who referred to Kevin's religious belief in terms of the Rastafarian religion. Dr. Harbin stated that Kevin got his beliefs from his brother. The State's argument was comprised of reasonable inferences from the facts in evidence. *See Anderson*, 322 N.C. at 37, 366 S.E.2d at 468. Thus, Kevin cannot show a consideration of Rastafarian beliefs by the jury regarding his sentencing was grossly improper. Therefore, the State's closing argument during sentencing did not require *ex mero motu* intervention by the trial court. These assignments of error are overruled.

[36] In another assignment of error, Kevin contends the trial court committed plain error by not instructing the jury consistently with *Enmund v. Florida*, 458 U.S. 782, 73 L. Ed. 2d 1140, and *Tison v. Arizona*, 481 U.S. 137, 95 L. Ed. 2d 127 (1987), in the Hathcock murder case, when there was evidence that defendant himself did not participate in that killing. Kevin concedes that he did not request such an instruction at trial and therefore relies on the plain error rule for this assignment of error.

Because Kevin did not request the *Enmund/Tison* instruction, he is limited to plain error review. N.C. R. App. P. 10(c)(4). As we have stated, under plain error review, the defendant must be able to show that there was error and that the jury probably would have reached a different result absent the error. *See Roseboro*, 351 N.C. at 553, 528 S.E.2d at 12.

In *State v. McCollum*, 334 N.C. 208, 433 S.E.2d 144 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994), this Court explained the holdings in *Enmund* and *Tison*:

STATE v. GOLPHIN

[352 N.C. 364 (2000)]

In *Enmund,* the [United States Supreme] Court held that the Eighth Amendment forbids the imposition of the death penalty on a defendant who aids and abets in the commission of a felony in the course of which a murder is committed by others, when the defendant does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed. *Enmund,* 458 U.S. at 801, 73 L. Ed. 2d at 1154. In a later case, however, the Court further construed its holding in *Enmund* and held that major participation in the felony committed, combined with reckless indifference to human life, is sufficient grounds for the imposition of the death penalty. *Tison v. Arizona,* 481 U.S. 137, 158, 95 L. Ed. 2d 127, 145 (1987).

*McCollum,* 334 N.C. at 223, 433 S.E.2d at 151-52.

Pursuant to our pattern jury instructions, if there is evidence which suggests that a defendant was not personally involved in the killing, then an instruction must be given which requires the jury to first determine the defendant's culpability before considering the death penalty. *See* N.C.P.I.—Crim. 150.10 (1998); *Lemons,* 348 N.C. at 364-65, 501 S.E.2d at 327.

This issue, however, "only arises when the State proceeds on a felony murder theory." *State v. Robinson,* 342 N.C. 74, 87, 463 S.E.2d 218, 226 (1995), *cert. denied,* 517 U.S. 1197, 134 L. Ed. 2d 793 (1996). In *State v. Gaines,* this Court held:

The *Enmund* rule does not apply to a defendant who has been found guilty of first-degree murder based on premeditation and deliberation. Because defendant was convicted of first-degree murder based on premeditation and deliberation, and not based on the felony-murder rule, Issue One-A [of the pattern jury instructions] is inapplicable.

345 N.C. at 682, 483 S.E.2d at 417 (where the jury found the defendant guilty of premeditated and deliberate murder either under the theory of acting in concert or by aiding and abetting); *see also Lemons,* 348 N.C. at 365, 501 S.E.2d at 327.

In the instant case, the jury found Kevin guilty of first-degree murder on the basis of premeditation and deliberation under the theory that Kevin committed all the elements or that he acted in concert with Tilmon. As we stated in *Gaines,* the *Enmund/Tison* instruction is not required in such a case. *Gaines,* 345 N.C. at 682, 483 S.E.2d at

417. Therefore, the trial court did not err by failing to give the requested instruction, and Kevin has failed to establish the existence of error for the purpose of plain error review. Moreover, even if the *Enmund/Tison* instruction did apply to premeditated and deliberate murder, there was more than sufficient evidence that Kevin's actions alone possessed the requisite intent to overcome the need for the *Enmund/Tison* instruction. Accordingly, this assignment of error is overruled.

**[37]** By assignment of error, Kevin contends the trial court committed constitutional error by failing to give a peremptory instruction for the (f)(7) mitigating circumstance, which relates to "[t]he age of the defendant at the time of the crime." N.C.G.S. § 15A-2000(f)(7) (1999). We disagree.

"Upon request, a trial court should give a peremptory instruction for any mitigating circumstance, whether statutory or nonstatutory, if it is supported by uncontroverted evidence." *Wallace*, 351 N.C. at 525-26, 528 S.E.2d at 354; *see also White*, 349 N.C. at 568, 508 S.E.2d at 274. Conversely, the trial court is not required to give a peremptory instruction when the evidence supporting a mitigating circumstance is controverted. *See State v. Womble*, 343 N.C. 667, 683, 473 S.E.2d 291, 300 (1996), *cert. denied*, 519 U.S. 1095, 136 L. Ed. 2d 719 (1997). The existence of the (f)(7) mitigating circumstance is not wholly determined by the defendant's chronological age. *See State v. Skipper*, 337 N.C. 1, 47, 446 S.E.2d 252, 277 (1994), *cert. denied*, 513 U.S. 1134, 130 L. Ed. 2d 895 (1995). Other varying circumstances and conditions must also be considered. *See State v. Gregory*, 340 N.C. 365, 422, 459 S.E.2d 638, 671 (1995), *cert. denied*, 517 U.S. 1108, 134 L. Ed. 2d 478 (1996).

In the instant case, Kevin clearly requested a peremptory instruction on the (f)(7) mitigating circumstance. The State did not object to Kevin's request. The trial court then decided to give a partial peremptory instruction that all the evidence showed that Kevin was seventeen years old at the time of the crimes. Kevin did not object. Thereafter, the trial court instructed the jury on the (f)(7) circumstance, stating:

> The evidence tends to show that the defendant Kevin Golphin was seventeen years of age at the time of each of these murders. The mitigating effect of the age of the defendant is for you to determine from all the facts and circumstances which you find from the evidence. "Age" is a flexible and relative concept.

The chronological age of the defendant is not always the deter-minative factor.

Following the court's instructions, Kevin did not object to the instruc-tion, nor did Kevin request any clarification for the jury. Therefore, Kevin waived appellate review of this assignment of error. *See* N.C. R. App. P. 10(b)(2); *see also State v. Gregory*, 348 N.C. 203, 211-12, 499 S.E.2d 753, 759 (holding the defendant waived appellate review where he requested a peremptory instruction, the trial court gave the peremptory instruction, and the defendant did not object to the instruction or request clarification), *cert. denied*, 525 U.S. 952, 142 L. Ed. 2d 315 (1998). Moreover, Kevin cannot show prejudice because one or more jurors found the (f)(7) circumstance. While Kevin assigns plain error as an alternative, he does not specifically and dis-tinctly argue plain error. *See* N.C. R. App. P. 10(c)(4). This assignment of error is overruled.

By assignment of error, Tilmon contends the trial court erred by refusing to give a peremptory instruction on several mitigating cir-cumstances which he contends are supported by uncontroverted, credible evidence. Specifically, Tilmon contends his request for peremptory instructions on the mitigating circumstances regarding his age, N.C.G.S. § 15A-2000(f)(7), and inability to appreciate the criminality of his actions, N.C.G.S. § 15A-2000(f)(6), and nonstatutory mitigating circumstances regarding Tilmon's being forced to lie about parental abuse, being subjected to parental neglect, and his not receiving necessary counseling were improperly denied. We disagree.

As we previously stated, the trial court should give a peremptory instruction for mitigating circumstances when the evidence is *uncon-troverted. See Wallace*, 351 N.C. at 525-26, 528 S.E.2d at 354. However, peremptory instructions are not required when the evidence support-ing a mitigating circumstance is controverted. *See Womble*, 343 N.C. at 683, 473 S.E.2d at 300.

[38] We first address the failure of the trial court to give a peremp-tory instruction for the statutory mitigating circumstance of Tilmon's age at the time of the crimes. *See* N.C.G.S. § 15A-2000(f)(7).

Our review of the transcript reveals that Tilmon did not request a peremptory instruction on the (f)(7) statutory mitigating circum-stance. In addition, following the trial court's instructions, when the parties were given an opportunity to request corrections and clarifi-cations, Tilmon did not object to the trial court's failure to give any

peremptory instruction on Tilmon's age at the time of the crime. Therefore, pursuant to N.C. R. App. P. 10(b)(2), Tilmon cannot now assign as error this alleged omission from the instruction. Accordingly, this argument is without merit.

[39] Tilmon also contends he should have received a peremptory instruction stating that the evidence tended to show "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired." N.C.G.S. § 15A-2000(f)(6).

While there was evidence which supported Tilmon's contention that he could not "appreciate the criminality of his conduct," there was also evidence that Tilmon attempted to eliminate Waters as a witness and that he initially denied shooting Trooper Lowry or Deputy Hathcock. In addition, there was evidence from family members that Tilmon cared for his grandmother. *See State v. Lynch*, 340 N.C. 435, 477, 459 S.E.2d 679, 701 (1995) (holding evidence by friends and family that a defendant volunteered to help and took care of others could conflict with evidence that a defendant's capacity to appreciate the criminality of his conduct was impaired), *cert. denied*, 517 U.S. 1143, 134 L. Ed. 2d 558 (1996). Therefore, as there was contradictory evidence, the trial court did not err in refusing to give a peremptory instruction on the (f)(6) statutory mitigating circumstance.

[40] Tilmon further contends the trial court should have given peremptory instructions which he requested for several nonstatutory mitigating circumstances: (1) he was subjected to parental neglect, (2) his mother forced him to lie about being abused, (3) he did not receive appropriate counseling, and (4) he was abandoned by his father. Our review of the transcript reveals Tilmon was given a peremptory instruction on the nonstatutory mitigating circumstance that he was abandoned by his father. Therefore, we address only Tilmon's argument as to the other three circumstances.

Tilmon's claim that he was subjected to parental neglect was supported by evidence at trial. However, the State presented contradictory evidence. Neighbors of the Golphin family testified they never witnessed neglect by Tilmon's parents. In addition, there was evidence Tilmon lived in two nice neighborhoods while growing up. Therefore, as there was contradictory evidence, the trial court did not err in refusing to give a peremptory instruction on the nonstatutory mitigator that Tilmon was neglected by his parents.

STATE v. GOLPHIN

[352 N.C. 364 (2000)]

Tilmon also argues the trial court should have granted his request for a peremptory instruction about his mother previously forcing him to lie about parental abuse to protective services. The trial court originally indicated it would peremptorily instruct the jury with regard to this circumstance, but then decided the word "forced" in the circumstance was "sufficiently subjective" and not appropriate for a peremptory instruction. While there may have been evidence that Tilmon lied to protective services about abuse, it is not clear from the evidence that he was "forced" to lie. Therefore, the trial court properly refused to give a peremptory instruction for this nonstatutory mitigating circumstance.

Finally, Tilmon argues the trial court should have given a peremptory instruction on the nonstatutory mitigating circumstance that he did not receive *any* counseling for his problems. Again, the trial court initially agreed to give the instruction, but then decided it was "just too universal to be subject to a peremptory instruction." While Dr. Johnson testified there was "nothing in the record that says Tilmon got any counseling," this is not definitive evidence that he did not have *any* counseling. Therefore, the trial court did not err in refusing to give the peremptory instruction. Accordingly, this assignment of error is overruled.

[41] In another assignment of error, Kevin contends the trial court committed reversible constitutional error by giving disjunctive instructions on the statutory aggravating circumstance of murder committed in the course of a felony. *See* N.C.G.S. § 15A-2000(e)(5). Kevin argues the instruction given by the trial court allowed the jury to find the (e)(5) aggravating circumstance to exist if the jury found him guilty of either armed robbery of Ava Rogers' car in South Carolina, *or* guilty of robbery of Trooper Lowry's weapon. Kevin contends this violated the jury unanimity requirement. We disagree.

In *State v. DeCastro*, 342 N.C. 667, 467 S.E.2d 653, this Court approved the use of a disjunctive instruction on the (e)(3) aggravating circumstance—that defendant had been previously convicted of a crime involving the use or threat of violence to another person. *Id.* at 696, 467 S.E.2d at 668-69. We noted that the defendant's reliance on cases requiring a unanimous verdict to convict a defendant of a charged offense was misplaced. *Id.* We then stated, "So long as the crimes for which defendant had been previously convicted were felonies and involved the use or threatened use of violence against another person, the specific crime which supports this aggravating circumstance is immaterial." *Id.* at 696-97, 467 S.E.2d at 669.

In the instant case, the State requested two (e)(5) aggravating circumstances, one for each felony, to insure unanimity. Kevin objected to using two (e)(5) circumstances, and requested one (e)(5) circumstance based on one felony because the jury may perceive the number of aggravating circumstances as significant, and the legislature did not intend subdivision of the eleven aggravating circumstances. The trial court recognized Kevin's concerns and refused to allow the separate (e)(5) circumstances to be submitted based on each felony. Instead, the trial court submitted two theories of (e)(5) to the jury as subissues of one (e)(5) aggravating circumstance. On this issue, it instructed as follows:

> As to the defendant Kevin Golphin as to the case in which the victim is Lloyd Lowry, the potential aggravating circumstance is stated as follows: "Was the capital felony committed by the defendant while the defendant was engaged in a flight after committing armed robbery or while in the commission of an armed robbery?"
>
> . . . .
>
> As to the defendant Kevin Golphin in the case in which Lloyd Lowry is the victim, if you find from the evidence beyond a reasonable doubt that when Kevin Golphin killed Lloyd Lowry, the defendant was engaged in a flight after taking and carrying away a motor vehicle from the person and presence of Ava Rogers without her voluntary consent by endangering or threatening her life with a firearm, the defendant Kevin Golphin knowing that he was not entitled to take the property and intending at that time to deprive Ava Rogers of its use permanently or if you find from the evidence beyond a reasonable doubt that when Kevin Golphin killed Lloyd Lowry, the defendant was in the commission of taking and carrying away a pistol from the person and presence of Lloyd Lowry, without his voluntary consent by endangering or threatening his life with a firearm, the defendant Kevin Golphin knowing he was not entitled to take the pistol and intending at that time to deprive him of its use permanently, then you would find this aggravating circumstance and would so indicate by having your foreperson write, "Yes," in the space provided.

The instant case is analogous to *DeCastro*. There was evidence to support both theories of the (e)(5) circumstance, and both of the theories involved felonies. Therefore, both theories satisfy the requirements of the (e)(5) circumstance. *See id.* at 696, 467 S.E.2d at

STATE v. GOLPHIN

[352 N.C. 364 (2000)]

668-69. As such, it is immaterial which crime the jurors use to support the circumstance. *See id.* at 697, 467 S.E.2d at 669. Moreover, the case relied on by Kevin to support the unanimity requirement, *Richardson v. United States*, 526 U.S. 813, 143 L. Ed. 2d 985 (1999), actually requires unanimity for elements of an offense, rather than for aggravating circumstances. Therefore, we conclude the trial court did not err by using a disjunctive instruction for the two theories under one (e)(5) aggravating circumstance. This assignment of error is overruled.

**[42]** In an assignment of error, Kevin argues the trial court committed reversible constitutional error by submitting the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance, that the murder was especially heinous, atrocious, or cruel in the Trooper Lowry case. The jury found this circumstance to exist, and Kevin contends resentencing is required. Kevin bases his argument on three separate grounds: (1) the (e)(9) circumstance is unconstitutionally vague, (2) submission of the (e)(9) circumstance was not supported by the evidence, and (3) it was arbitrary and capricious to submit the (e)(9) circumstance as to him and not as to his brother. We disagree.

We first address Kevin's argument that the (e)(9) aggravating circumstance is unconstitutionally vague. Although defendant requested that the trial court not submit the (e)(9) circumstance because it was not justified in the instant case, he never made any constitutional claims at trial and never objected after the trial court's instruction. He will "not be heard on any constitutional grounds now." *State v. Anderson*, 350 N.C. 152, 186, 513 S.E.2d 296, 317, *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 326 (1999). Moreover, this Court has consistently rejected this argument. *See id.* at 187, 513 S.E.2d at 317; *Simpson*, 341 N.C. at 357, 462 S.E.2d at 214.

Kevin further contends the evidence does not support submission of the (e)(9) aggravating circumstance. "In determining whether evidence is sufficient to support the trial court's submission of the especially heinous, atrocious, or cruel aggravator, we must consider the evidence 'in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom.' " *Flippen*, 349 N.C. at 270, 506 S.E.2d at 706 (quoting *State v. Lloyd*, 321 N.C. 301, 319, 364 S.E.2d 316, 328, *sentence vacated on other grounds*, 488 U.S. 807, 102 L. Ed. 2d 18 (1988)). Determination of whether submission of the (e)(9) circumstance is appropriate depends on the facts of the case. *See Anderson*, 350 N.C. at 185, 513 S.E.2d at 316.

This Court has previously held the following types of murders to warrant submission of the (e)(9) aggravating circumstance:

> One type includes killings physically agonizing or otherwise dehumanizing to the victim. *State v. Lloyd*, 321 N.C. 301, 319, 364 S.E.2d 316, 328 (1988). A second type includes killings less violent but "conscienceless, pitiless, or unnecessarily torturous to the victim," *State v. Brown*, 315 N.C. 40, 65, 337 S.E.2d 808, 826-27 (1985) [, *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988)], including those which leave the victim in her "last moments aware of but helpless to prevent impending death," *State v. Hamlet*, 312 N.C. 162, 175, 321 S.E.2d 837, 846 (1984). A third type exists where the "killing demonstrates an unusual depravity of mind on the part of the defendant beyond that normally present in first-degree murder." *Brown*, 315 N.C. at 65, 337 S.E.2d at 827.

*Gibbs*, 335 N.C. at 61-62, 436 S.E.2d at 356. In addition, this Court held the submission of the (e)(9) aggravating circumstance is warranted when there is evidence that the killing was committed in a fashion beyond what was necessary to effectuate the victim's death. *See State v. Reese*, 319 N.C. 110, 146, 353 S.E.2d 352, 373 (1987), *overruled on other grounds by Barnes*, 345 N.C. 184, 481 S.E.2d 44.

In two previous cases with fact patterns similar to the instant case, this Court found no error in the submission of the (e)(9) aggravating circumstance. In *State v. Pinch*, the defendant shot the victim once, and then walked over to where the victim lay moaning and shot him again at close range. *State v. Pinch*, 306 N.C. 1, 35, 292 S.E.2d 203, 228, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *overruled on other grounds by State v. Rouse*, 339 N.C. 59, 451 S.E.2d 543 (1994), *cert. denied*, 516 U.S. 832, 133 L. Ed. 2d 60 (1995), *by State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995), *and by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988). In *State v. Bonney*, this Court held the (e)(9) aggravating circumstance was properly submitted to the jury when the victim died within two or three minutes after being shot, but was nevertheless aware of his impending death. *See State v. Bonney*, 329 N.C. 61, 80, 405 S.E.2d 145, 156 (1991). In the instant case, Tilmon shot Trooper Lowry, causing him to become incapacitated. Kevin was therefore able to shake himself free of Trooper Lowry's grasp and retrieve the trooper's pistol. He then shot the trooper multiple times

as he lay on the ground moaning. Because Trooper Lowry had the presence of mind to attempt to grab Kevin after he had been shot, this, taken in the light most favorable to the State, was evidence he was aware of his fate and unable to prevent impending death. *See Hamlet*, 312 N.C. at 175, 321 S.E.2d at 846. These facts are sufficiently similar to the facts of *Pinch* and *Bonney* to warrant the same holding. Therefore, sufficient evidence did exist to support the submission of the (e)(9) aggravating circumstance to the jury.

In his third argument, Kevin contends the (e)(9) aggravating circumstance should not have been submitted against him because it was arbitrary and capricious to submit the circumstance against only him, and not against Tilmon. However, he failed to object at trial and has cited no authority to support his contentions. We have previously recognized that the (e)(9) aggravating circumstance can be utilized when the evidence shows the murder "was committed in such a way as to amount to a conscienceless or pitiless crime which is *unnecessarily* torturous to the victim." *State v. Martin*, 303 N.C. 246, 255, 278 S.E.2d 214, 220, *cert. denied*, 454 U.S. 933, 70 L. Ed. 2d 240 (1981) (emphasis added). The State has borne this burden with respect to Kevin. Kevin has not shown the (e)(9) circumstance was improperly submitted. The trial court did not err in submitting the (e)(9) aggravating circumstance against Kevin. This assignment of error is accordingly overruled.

[43] By assignments of error, Tilmon and Kevin contend the trial court erred by allowing the jury to consider and find aggravating circumstances pursuant to both N.C.G.S. § 15A-2000(e)(4), that the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody, and (e)(8), that the capital felony was committed against a law enforcement officer while engaged in the performance of his official duties. We disagree.

Kevin concedes this argument has been decided adversely to his position in *Hutchins*, 303 N.C. 321, 279 S.E.2d 788. Tilmon, however, argues the circumstances were based on the same evidence and inherently duplicitous. "Aggravating circumstances are not considered redundant absent a complete overlap in the evidence supporting them." *Moseley*, 338 N.C. at 54, 449 S.E.2d at 444. The same evidence cannot be used to support submission of more than one aggravating circumstance. *See Hutchins*, 303 N.C. at 354, 279 S.E.2d at 808.

In *Hutchins*, this Court addressed the submission of both the (e)(4) and (e)(8) aggravating circumstances:

Of the two aggravating circumstances challenged by defendant here as purportedly being based upon the same evidence, one of the aggravating circumstances looks to the underlying factual basis of defendant's crime, the other to defendant's subjective motivation for his act. The aggravating circumstance that the murder was committed against an officer engaged in the performance of his lawful duties involved the consideration of the factual circumstances of defendant's crime. The aggravating circumstance that the murder was for the purpose of avoiding or preventing a lawful arrest forced the jury to weigh in the balance defendant's motivation in pursuing his course of conduct. There was no error in submitting both of these aggravating circumstances to the jury.

*Id.* at 355, 279 S.E.2d at 809.

As in *Hutchins*, in the instant case, the trial court submitted both the (e)(4) and (e)(8) aggravating circumstances to the jury. The (e)(4) aggravating circumstance required the jury to determine the subjective motivation for the murders. There is evidence that defendants were motivated by the desire to avoid arrest for stealing Rogers' vehicle. In support of the (e)(8) aggravating circumstance, the jury must consider the factual circumstances of the crime. There was evidence Trooper Lowry was performing an official duty when he stopped Kevin on I-95 for not wearing a seat belt and then learned of defendants' theft. There is also evidence that Deputy Hathcock was performing an official duty when he arrived on the scene to provide assistance to a fellow officer. Therefore, although the same underlying sequence of events was the subject of the (e)(4) and (e)(8) aggravating circumstances, the two circumstances were directed at distinct aspects of the crimes charged. The trial court did not err by submitting both the (e)(4) and (e)(8) aggravating circumstances. These assignments of error are overruled.

**[44]** By assignments of error, Kevin and Tilmon contend the trial court erred by submitting the (e)(5) aggravating circumstance, that the capital felony was committed while defendant was engaged in or in flight after committing a robbery, and the (e)(11) aggravating circumstance, that the murder committed was part of a course of conduct involving other violent crimes, without instructing the jury not to consider the same evidence for each. We disagree.

It is axiomatic that a sentencing jury may not consider the same evidence in support of more than one aggravating circumstance. *See*

*Hutchins*, 303 N.C. at 354, 279 S.E.2d at 808. In the instant case, both defendants concede there was sufficient evidence to provide adequate and separate bases for the two statutory aggravating circumstances in that both an armed robbery and a double murder took place. However, both argue that there was a likelihood that without a proper instruction, the jury might have utilized the same evidence in support of more than one aggravating circumstance. Neither defendant objected to the submission of the (e)(5) and (e)(11) circumstances on this basis, nor did they request a limiting instruction to that effect. Therefore, our review is limited to a search for plain error, "which requires [a] defendant to show that the error was so fundamental that another result would probably have obtained absent the error." *Rouse*, 339 N.C. at 99, 451 S.E.2d at 565. After a careful review of the record, we agree with defendants' concessions that there exists more than sufficient evidence to provide independent bases for the two aggravating circumstances. Because such a quantum of evidence exists, defendants cannot show that a different result was probable had a limiting instruction been given. *See Kandies*, 342 N.C. at 452, 467 S.E.2d at 85. Accordingly, we decline to find plain error, and these assignments of error are overruled.

**[45]** By several assignments of error, Kevin and Tilmon contend the trial court's instructions involving the jury's consideration of mitigating circumstances were erroneous. Specifically, they argue the instruction that allows the jury to reject a mitigating circumstance if it finds the circumstance to be without mitigating value is unconstitutional. We disagree.

Kevin and Tilmon both concede that this Court has previously upheld the instructions they challenge and ruled contrary to their positions on this issue in *State v. Hill*, 331 N.C. 387, 417 S.E.2d 765 (1992), *cert. denied*, 507 U.S. 924, 122 L. Ed. 2d 684 (1993). However, Tilmon makes an additional argument, without reference to any prior holding of this Court, relating to the jury's rejection of several nonstatutory mitigating circumstances. Tilmon claims that uncontroverted evidence supported, *inter alia*, the following nonstatutory mitigating circumstances: that he had an unstable home environment, that he was physically abused as a child, that he was reared by an abusive father, that he was remorseful, that he cared for his ailing grandmother, that he loved his grandparents, and that he suffered from parental neglect and low intellectual functioning. Tilmon claims that because these circumstances possess inherent mitigating value, the jury was not free to reject them and was required to

give them mitigating value pursuant to *Lockett v. Ohio,* 438 U.S. 586, 57 L. Ed. 2d 973 (1978), and *Eddings v. Oklahoma,* 455 U.S. 104, 71 L. Ed. 2d 1 (1982).

Although Tilmon attempts to frame this argument anew, citing "inherent mitigating content," we have previously rejected these claims. *See Hill,* 331 N.C. at 418, 417 S.E.2d at 780; *State v. Huff,* 325 N.C. 1, 58-61, 381 S.E.2d 635, 668-70 (1989), *sentence vacated on other grounds,* 497 U.S. 1021, 111 L. Ed. 2d 777 (1990); *State v. Fullwood,* 323 N.C. 371, 395-97, 373 S.E.2d 518, 533-34 (1988), *sentence vacated on other grounds,* 494 U.S. 1022, 108 L. Ed. 2d 602 (1990). Defendant has not cited, nor do we perceive, any reason to revisit our prior decisions. These assignments of error are overruled.

**[46]** By another assignment of error, Kevin contends his sentences of death were imposed in an arbitrary and capricious manner because no juror found that the (f)(2) mitigating circumstance existed even though a peremptory instruction was given and substantial and uncontradicted evidence was presented in support of it. Kevin argues the jury was required to find that the (f)(2) circumstance existed because at least one juror found the existence of the nonstatutory mitigating circumstance that "Kevin Golphin lacked parental involvement or support in treatment for psychological problems." He contends the same evidence was sufficient to support the (f)(2) statutory mitigating circumstance that "the capital felony was committed while the defendant was under the influence of mental or emotional disturbance." N.C.G.S. § 15A-2000(f)(2). We disagree.

Although a peremptory instruction for a mitigating circumstance may be given because the evidence in support of it is uncontroverted, a jury remains free to reject the circumstance in the event it does not find the evidence in support of the circumstance credible or convincing. *See, e.g., Rouse,* 339 N.C. at 107, 451 S.E.2d at 571; *Gay,* 334 N.C. at 492, 434 S.E.2d at 854; *Huff,* 325 N.C. at 59, 381 S.E.2d at 669. The evidence presented by Kevin's mental health expert was not so manifestly credible that we are able to conclude that the jury was required to find it convincing. Furthermore, the fact that a juror accepted the expert's testimony to support the nonstatutory mitigating circumstance that "Kevin Golphin lacked parental involvement or support in treatment for psychological problems," is not determinative of the sufficiency of the evidence in support of the (f)(2) statutory mitigating circumstance. The two mitigating circumstances emphasize different times and different events. The nonstatutory cir-

cumstance relates to *parental support* at the time Kevin sought psychological treatment, before these crimes were committed. The statutory circumstance involves Kevin's mental or emotional state at the time the crimes were committed. Thus, it cannot be said that the same evidence necessarily supports both mitigating circumstances. Accordingly, this assignment of error is overruled.

## PRESERVATION ISSUES

Defendants have raised seven additional issues which they concede have been decided previously by this Court contrary to their respective positions: (1) the trial court's instruction regarding the burden of proof applicable to mitigating circumstances was unconstitutionally vague and imposed too high a burden of proof by utilizing the term "satisfy"; (2) the jury instructions for Issues Three and Four on the sentencing recommendations forms which provided that jurors "may" rather than "must" consider mitigating circumstances were erroneous; (3) the jury instructions for Issues Three and Four which provided that each juror could consider only mitigating circumstances that juror had found in Issue Two were erroneous; (4) the jury instructions for Issues One, Three, and Four were unconstitutionally vague and ambiguous, resulting in an arbitrary verdict and requiring the jury to unanimously reject a death sentence to impose a life sentence; (5) the jury instruction defining mitigation was unconstitutionally narrow; (6) the trial court erred by "death qualifying" the jury, which resulted in an unconstitutionally biased jury in favor of the death penalty, and by failing to require separate juries for determinations of guilt and sentence; and (7) the North Carolina death penalty statute and the death sentences imposed are unconstitutional.

Defendants make these arguments for the purposes of permitting this Court to reexamine its prior holdings and to preserve these arguments for any possible further judicial review in these cases. We have thoroughly considered defendants' arguments on these issues and find no compelling reason to depart from our prior holdings. Accordingly, these assignments of error are overruled.

## PROPORTIONALITY REVIEW

Having concluded that defendants' trial and capital sentencing proceeding were free from prejudicial error, it is our duty, pursuant to N.C.G.S. § 15A-2000(d)(2), to make the following determinations with regard to each sentence of death: (1) whether the evidence sup-

ports the jury's findings of the aggravating circumstances upon which the sentence of death was based; (2) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *See* N.C.G.S. § 15A-2000(d)(2).

In relation to Kevin's conviction for the murder of Trooper Lowry, the jury found the following five aggravating circumstances to exist: (1) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest, N.C.G.S. § 15A-2000(e)(4); (2) the capital felony was committed while the defendant was engaged in flight after committing robbery or while the defendant was engaged in the commission of armed robbery (Lowry's gun), N.C.G.S. § 15A-2000(e)(5); (3) the capital felony was committed against a law enforcement officer while engaged in the performance of his official duties, N.C.G.S. § 15A-2000(e)(8); (4) the murder for which defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11); and (5) the capital felony was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9). In relation to Kevin's conviction for the murder of Deputy Hathcock as well as Tilmon's convictions for the murders of both officers, the jury found the following four aggravating circumstances to exist in each instance: (1) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest, N.C.G.S. § 15A-2000(e)(4); (2) the capital felony was committed while the defendant was engaged in flight after committing robbery, N.C.G.S. § 15A-2000(e)(5); (3) the capital felony was committed against a law enforcement officer while engaged in the performance of his official duties, N.C.G.S. § 15A-2000(e)(8); and (4) the murder for which defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11).

The trial court submitted four statutory mitigating circumstances as to each murder on Kevin's behalf. The jury found that one, defendant's age at the time of the crimes, N.C.G.S. § 15A-2000(f)(7), existed. The jury also found that one of the fifteen nonstatutory mitigating circumstances, that Kevin "lacked parental involvement or support in treatment for psychological problems," submitted by the trial court on Kevin's behalf existed. The trial court submitted five statutory mit-

STATE v. GOLPHIN

[352 N.C. 364 (2000)]

igating circumstances as to each murder on Tilmon's behalf. Again, the jury found that one, defendant's age at the time of the crimes, N.C.G.S. § 15A-2000(f)(7), existed. Of the thirty-six nonstatutory mitigating circumstances submitted on Tilmon's behalf, the jury found none to exist.

After a thorough review of the record, including the transcripts, briefs, and oral arguments, we conclude the evidence fully supports all of the aggravating circumstances found by the jury. Further, we find no indication the sentences of death were imposed under the influence of passion, prejudice, or any other arbitrary factor. We therefore turn to our final statutory duty of proportionality review.

The purpose of proportionality review is to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *Holden*, 321 N.C. at 164-65, 362 S.E.2d at 537. Proportionality review also acts "[a]s a check against the capricious or random imposition of the death penalty." *Barfield*, 298 N.C. at 354, 259 S.E.2d at 544. In conducting proportionality review, we compare the instant cases with other cases in which this Court has concluded the death penalty was disproportionate. *See McCollum*, 334 N.C. at 240, 433 S.E.2d at 162. This Court has determined the death penalty to be disproportionate on seven occasions: *Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by Gaines*, 345 N.C. 647, 483 S.E.2d 396, *and by Vandiver*, 321 N.C. 570, 364 S.E.2d 373; *Young*, 312 N.C. 669, 325 S.E.2d 181; *Hill*, 311 N.C. 465, 319 S.E.2d 163; *Bondurant*, 309 N.C. 674, 309 S.E.2d 170; *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

[47] Several factors lead us to the conclusion that the instant cases are not similar to the cases in which we have found a death sentence to be disproportionate. First and foremost, the evidence in this case reveals that defendants deliberately murdered two law enforcement officers for the purpose of evading lawful arrest. This Court has noted that the N.C.G.S. § 15A-2000(e)(4) and (e)(8) aggravating circumstances reflect the General Assembly's recognition that "the collective conscience requires the most severe penalty for those who flout our system of law enforcement." *State v. Brown*, 320 N.C. 179, 230, 358 S.E.2d 1, 33, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987).

The murder of a law enforcement officer *engaged in the performance of his official duties* differs in kind and not merely in

degree from other murders. When in the performance of his duties, a law enforcement officer is the representative of the public and a symbol of the rule of law. The murder of a law enforcement officer engaged in the performance of his duties in the truest sense strikes a blow at the entire public—the body politic—and is a direct attack upon the rule of law which must prevail if our society as we know it is to survive.

*Hill,* 311 N.C. at 488, 319 S.E.2d at 177 (Mitchell, J. (later C.J.) concurring in part and dissenting in part), *quoted with approval in McKoy,* 323 N.C. at 46-47, 372 S.E.2d at 37. Second, defendants were each convicted of two counts of first-degree murder. This Court has never found a sentence of death disproportionate in a case where the jury has found a defendant guilty of murdering more than one victim. *See State v. Goode,* 341 N.C. 513, 552, 461 S.E.2d 631, 654 (1995). Third, defendants' convictions for the murders were based on the theory of premeditation and deliberation. This Court has stated, "The finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *Artis,* 325 N.C. at 341, 384 S.E.2d at 506. Fourth and finally, as to each murder conviction, the jury found these two aggravating circumstances: (1) "[t]he capital felony was committed while the defendant was engaged, or was an aider or abettor, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any homicide, robbery, rape or a sex offense, arson, burglary, kidnapping, or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb," N.C.G.S. § 15A-2000(e)(5); and (2) "[t]he murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons," N.C.G.S. § 15A-2000(e)(11). In addition, in relation to Kevin's conviction for Trooper Lowry's murder, the jury also found that "[t]he capital felony was especially heinous, atrocious, or cruel," N.C.G.S. § 15A-2000(e)(9). There are four statutory aggravating circumstances which, standing alone, this Court has held sufficient to support a sentence of death. *See Bacon,* 337 N.C. at 110 n.8, 446 S.E.2d at 566 n.8. The N.C.G.S. § 15A-2000(e)(5), (e)(9), and (e)(11) statutory aggravating circumstances are among those four. *See id.* For these stated reasons, we conclude this case is not substantially similar to any case in which this Court has found the death penalty disproportionate.

We also compare the instant cases with the cases in which this Court has found the death penalty to be proportionate. While we

review all of the cases in the pool of "similar cases" when engaging in our statutorily mandated duty of proportionality review, we reemphasize that we will not undertake to discuss or cite all of those cases each time we carry out that duty. *See State v. Williams*, 308 N.C. 47, 81, 301 S.E.2d 335, 356, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983). Considering the brutal circumstances of these murders along with the fact that the victims were law enforcement officers engaged in the performance of their official duties, it suffices to say the instant cases are more similar to cases in which we have found the sentence of death proportionate than to those in which we have found it disproportionate.

Accordingly, we conclude that defendants received a fair trial and capital sentencing proceeding, free from prejudicial error, and that the sentences of death are not disproportionate. Therefore, the judgments of the trial court must be and are left undisturbed.

NO ERROR.